Heidi BROWN, and Heidi Brown as Parent and Next Friend of Trevor Rhiner, Individually and On Behalf of All Others Similarly Situated, Plaintiffs,

v.

Dr. Paul KERKHOFF; Kerkhoff Chiropractic; The Masters Circle; Dr. Larry Markson; Dr. Bob Hoffman; Dr. Dennis Perman; and John Does, Defendants.

No. 4:06–cv–00342–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 23, 2007.

Kimberley K. Baer, Steven P. Wandro, Wandro & Associates PC, Des Moines, IA, for Plaintiffs.

James H. Gilliam, Sean P. Moore, Brown Winick Graves Gross Baskerville Schoenebaum, Des Moines, IA, Jonathan R. Poole, Mary M. Brockington, Strickland Brockington Lewis LLP, John E. Floyd, Bondurant Mixon & Elmore LLP, Atlanta, GA, for Defendants.

## ORDER

GRITZNER, District Judge.

This matter comes before the Court on a Motion to Dismiss for Failure to State a Claim (Clerk's No. 21) filed by Defendants Kerkhoff Chiropractic, The Masters Circle, Inc., Larry Markson, Bob Hoffman, Dennis Perman, and Paul Kerkhoff; a Motion to Dismiss for Lack of Personal Jurisdiction (Clerk's No. 22) filed by Defendants The Masters Circle, Inc., Larry Markson, Bob Hoffman, and Dennis Perman; and a Motion for Leave to File Third Amended Complaint and Dissolve or Modify the State Court's June 15, 2006, Order Pursuant to 28 U.S.C. § 1450 filed by Plaintiffs (Clerk's No. 33). Plaintiffs are represented by Kimberley Baer, Steven Wandro, and Kasey Kincaid. Defendants are represented by Mary Brockington, Jonathan Poole, James Gilliam, and Sean Moore. Following an April 27, 2007, hearing, these matters are fully submitted and are ready for disposition.[1]

### TABLE OF CONTENTS

FACTUAL AND PROCEDURAL HISTORY ................................... 474

I. Factual Allegations ............................................. 474
 A. The Defendants .............................................. 474
 B. Defendants' Alleged Wrongful Practices ...................... 476
 C. The Proposed Class Representatives .......................... 477
 1. Heidi Brown and Trevor Rhiner ........................... 477
 2. Cynthia Christian ....................................... 478
 D. Nonresident Defendants' Contacts with Iowa ................. 478
 1. The Masters Circle ...................................... 478
 a. Physical Presence ................................... 478
 b. Virtual Presence .................................... 481
 2. Individual Nonresident Defendants ....................... 481
 a. Markson ............................................. 481
 b. Hoffman ............................................. 482
 c. Perman ............................................. 482

II. Procedural History ............................................ 483

DISCUSSION ........................................................ 483

---

1. The Court recognizes the burden placed on the parties by the length of this order, but the length and detail have been required in order to fully address the various motions, internal arguments, pivotal facts, and the Court's analysis of complex legal issues. The Court elects not to separate the personal jurisdiction, Rule 12(b)(6), and amendment issues into separate orders.

472

I. Issues Related to Standing .................................................483
 A. Relevance of the State Court's June 2006 Order ...........................483
 B. Standing of Brown and Rhiner to Sue The Masters Circle, Hoffman,
 Markson, and Perman ...............................................484
 1. Applicable Legal Standards ........................................484
 2. Discussion .....................................................485
 3. The Third Amended Complaint .....................................486
 C. Conclusion .......................................................487

II. Motion to Dismiss for Lack of Personal Jurisdiction ...........................487
 A. Applicable Legal Standards .........................................487
 1. Burden of Proof ................................................487
 2. Constitutional and Statutory Considerations .........................488
 a. Service of Process ..........................................488
 b. Constitutional Parameters ....................................489
 B. Personal Jurisdiction Under RICO ....................................489
 1. Statutory Authorization ..........................................489
 a. Statutory Provisions .........................................489
 b. Analysis ...................................................490
 i. The Argument for Subsection (d) ..........................491
 ii. The Argument for Subsection (b) ..........................491
 iii. Application of Subsection (b) ............................493
 (a) The Ninth Circuit Approach ...........................494
 (b) The Tenth Circuit Approach ...........................494
 (c) Application of the Tests .............................495
 2. Constitutional Considerations .....................................497
 3. Conclusion .....................................................497
 C. Personal Jurisdiction Under the Calder "Effects" Test .....................497
 1. Applicable Legal Standards ........................................497
 2. Discussion .....................................................498
 D. Personal Jurisdiction Under the Iowa Long–Arm Statute ..................499
 1. Applicable Legal Principles ........................................499
 2. Summary of Defendants' Contacts ..................................501
 a. The Masters Circle ..........................................501
 b. Individual Defendants .......................................503
 3. Nature, Quality, and Quantity of the Nonresident Defendants'
 Contacts, and the Relation of Such Contacts to Plaintiffs' Causes of
 Action ........................................................503
 a. The Masters Circle ..........................................503
 i. Internet Contacts ......................................503
 (a) Legal Standards .....................................504
 (b) Analysis ...........................................506
 ii. Non–Internet Contacts ..................................508
 iii. Individual Defendants ...................................512
 iv. Conclusion ............................................512
 4. Interest of the Forum State and Convenience of the Parties .............512
 5. Conclusion .....................................................513
 E. Personal Jurisdiction Under A "Conspiracy Jurisdiction" Theory .............513
 F. Conclusion .......................................................518

III. Motion to Dismiss for Failure to State a Claim ...............................518
 A. Applicable Legal Standards .........................................518
 1. Rule 8(a) Claims (Non–Fraud Based Claims) ...........................518
 2. Rule 9(b) Claims (Fraud Based Claims) .............................523
 B. Civil Conspiracy ..................................................525
 1. Elements of the Claim ............................................525
 2. Allegations of an Agreement or Understanding to Effect a Wrong ........526
 a. Allegations of the Second Amended Petition .......................526
 b. Analysis ...................................................527

 3. Allegations of Injury or Damage........................................528
 4. Conclusion...........................................................528
 C. Ongoing Criminal Conduct ...............................................529
 1. Overview of the Statute ...........................................529
 2. Purported Pleading Deficiencies ....................................530
 3. "Specified Unlawful Activity" Allegations ...........................530
 a. Theft by Deception Under Iowa Law ...........................530
 i. Legal Standards........................................530
 ii. Arguments of the Parties ....................................531
 iii. Allegations of the Second Amended Petition ...................531
 iv. Analysis...............................................532
 v. Conclusion.............................................534
 b. Insurance Fraud Under Iowa and New York Law...................534
 i. Legal Standards........................................534
 ii. Arguments of the Parties ....................................535
 c. Allegations of the Second Amended Petition......................535
 d. Analysis .....................................................536
 e. Conclusion ...................................................537
 4. Scheme to Defraud ...............................................537
 a. Legal Standards .............................................537
 b. Allegations of the Second Amended Petition......................538
 c. Arguments of the Parties .....................................538
 d. Analysis .....................................................538
 e. Conclusion ...................................................539
 5. Money Laundering ...............................................539
 a. Legal Standards .............................................539
 b. Allegations of the Second Amended Petition......................540
 c. Arguments of the Parties .....................................540
 d. Analysis .....................................................541
 e. Conclusion ...................................................542
 6. Conspiracy ......................................................542
 a. Legal Standards .............................................542
 b. Allegations of the Second Amended Petition......................542
 c. Arguments of the Parties .....................................542
 d. Discussion ...................................................543
 e. Conclusion ...................................................543
 7. Conclusion.......................................................543
 D. Unjust Enrichment.....................................................543
 1. Elements.........................................................543
 2. Allegations of the Second Amended Petition .........................544
 3. Discussion.......................................................544
 4. Conclusion.......................................................545
 E. Conclusion ............................................................545

IV. Plaintiffs' Motion to Amend the Second Amended Petition ......................545
 A. Legal Standards .......................................................545
 1. Federal Rule of Civil Procedure 15(a) ...............................545
 2. 28 U.S.C. § 1450 .................................................546
 B. Discussion ............................................................546
 1. Failure to Cure Previous Amendments ..............................546
 2. Futility .........................................................546
 a. Legal Standards .............................................546
 b. Discussion ...................................................547
 i. Federal RICO Claims.......................................547
 (a) Applicable Legal Standards ............................548
 (b) Analysis ............................................548
 (c) Conclusion .........................................551
 ii. Tortious Interference Claims................................551
 (a) Elements of the Claims ................................551

 (b) Allegations of the Third Amended Complaint . . . . . . . . . . . . . . 552
 (c) Arguments of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 552
 (d) Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 553
 (e) Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 553
 iii. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 553
 c. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 553

V. Motion Seeking Leave to Amend to Cure Deficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . 553

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 554

## FACTUAL AND PROCEDURAL HISTORY

### I. Factual Allegations.[2]

This is an uncertified national class action brought on behalf of all patients residing in the United States who have received at least twelve chiropractic treatments from a chiropractor who is currently or who was at the time of treatment a member of organizations known as The Masters Circle, Inc., or The Masters LLC.[3] Second Am. Pet. ¶¶ 1, 20. *But see id.* ¶ 3 (seeking "redress on behalf of all past, current and *future* patients who have been treated by chiropractors who *are* members of [T]he Masters Circle" (emphases added)). According to Plaintiffs, "The Masters Circle is a worldwide organization which trains chiropractors on methods of 'targeting, leveraging and closing' the sale of chiropractic services to new patients," and "teaches 'scripts,' various leveraging and high pressure sales tactics to its chiropractors to be used to convince patients to agree for chiropractic care." *Id.* ¶ 1. Plaintiffs contend chiropractors pay The Masters Circle a monthly fee in exchange for education on scripts and tactics they could use to rapidly expand their patient base, resulting in "the practice of their dreams." *Id.* ¶ 2. Plaintiffs contend patients visited chiropractors who were members of The Masters Circle expecting they would administer care with the patient's best interests in mind but were instead unwittingly drawn into "a nationwide conspiracy by which chiropractors used unethical and misleading practices to induce patients into agreeing to pay for chiropractic care," thereby depriving their patients "of their right to make informed medical decisions based upon unbiased medical advice." *Id.* ¶ 3.

### A. The Defendants.

Defendant Dr. Paul Kerkhoff is an Iowa resident who either operates or is employed by Kerkhoff Chiropractic, an Iowa corporation with its principal place of business in Waukee, Iowa.[4] Kerkhoff is a doctor of chiropractic and is licensed to practice in the State of Iowa.

The Masters Circle is a New York corporation with its primary place of business in New York. It was incorporated on August 29, 2000, and began conducting

---

**2.** With the exception of factual allegations addressing personal jurisdiction, which are mined from papers other than the pleadings, the following allegations are derived from the Second Amended Petition and National Class Action ("Second Amended Petition") and, where applicable, the proposed Third Amended Complaint and are cast in a light favorable to Plaintiffs.

**3.** The Third Amended Complaint seeks to add The Masters LLC as a Defendant.

**4.** Unless specifically denoted, Kerkhoff and his clinic are referred to herein as "Kerkhoff."

business on January 1, 2001.[5] The stated purpose of the organization "is to be an example of and help others achieve happiness, success, and fulfillment through personal growth and professional excellence." Markson Aff. ¶ 20.

To become a member of The Masters Circle, chiropractors submit an application, sign a contract, and pay a monthly fee. In June 2005, the monthly fee was $650 per month, but members could receive a discount by signing up for a longer term of affiliation. Contracts establish a term of affiliation of either fifteen or twenty-seven months for new members and twelve or twenty-four months for renewing members, with termination fees applicable if a member terminates early. Choice of law and forum selection clauses indicate disputes with respect to contracts between the company and its members are to be brought in New York and be governed by New York law.

In exchange for their membership fees, members received a variety of services.[6] Members received an Enrollment Package that included a 340–page document entitled "Masters Guide for the 21st Century Chiropractor" (the "Manual"). Topics included in the Manual include patient education, patient compliance, developing leverage over patients, and acquiring new patients. The Manual contains written "scripts" each chiropractor was to memorize and use to persuade patients to start or continue care.

Members were also provided access to the "Members Only" portion of the compa-

---

**5.** The Masters Circle was preceded by two companies—not necessarily predecessor entities—with which some Defendants were affiliated. Markson founded and was employed by Markson Management Service, Inc., from 1980 through 1996, when that company ceased operations. Markson Aff. ¶ 18; Markson Supp. Aff. ¶ 13. He was then a partner in The Masters LLC from 1997 through 2000, when that company ceased operations. Markson Aff. ¶ 17; Markson Supp. Aff. ¶ 14. Perman and others were also partners n the company. Perman Aff. ¶ 12(a); Markson Supp. Aff. ¶ 14. Markson claims Markson Management Services, Inc., The Masters LLC, and The Masters Circle are all separate companies with separate owners, different officers, different directors, and different corporate forms. Markson Aff. ¶ 19.

**6.** The list of benefits contained in a flyer published by The Masters Circle is worth summarizing because it illustrates the continuous communications The Masters Circle warranted would exist between the company and its members. Each member would receive an orientation cassette tape in an enrollment package, a half-hour consultation "to learn about the needs and wants of the individual member," receipt of "[p]ersonalized [c]oaching [s]essions with . . . [c]hiropractic [c]onsultants," a monthly computerized analysis of his or her practice, access to "[r]egularly scheduled Teleclasses" on various topics, eligibility to participate in "Mastermind Teleclass Pods" as needed, access to a hot-line to call for "quick question answers," access to a "private Egroup Bulletin Board" where members would communicate with each other and with The Masters Circle between seminars and coaching calls, immediate e-mail and fax accessibility to consultants for issues requiring immediate attention, a monthly "Master-Memo" prepared by Markson which advertised The Masters Circle's events and was sent through the mail, a monthly newsletter also prepared by Markson entitled "Secrets to Creating the Practice of Your Dreams," a monthly audio magazine entitled MasterTalk designed to distribute "the latest cutting-edge wisdom of [Markson], [Perman], and [Hoffman] and other experts," access to a "collection of popular press camera-ready articles that will validate the chiropractic lifestyle" and increase members' practice skills, a digital medical dictionary, and a weekly inspirational "e-column" prepared by Perman. Resist. to Defs.' Mot. to Dismiss for Lack of Personal Juris. ex. 13, at 1; *see also* Resist. to Defs.' Mot. to Dismiss for Lack of Personal Juris. ex. 15, at 1–2 (reproduction of a page of The Masters Circle's web page listing similar benefits). The Masters Circle later distributed the MasterMemo electronically but apparently continued to mail the MasterTalk CDs. Markson Dep. 9:10–17; 10:11–22.

ny's website, written and audiovisual materials, educational products, monthly practical open discussions,[7] telephone and e-mail access to coaches, and access to a digital bulletin board. The company's coaching services have been described as "life-changing" and are available "at any time" a chiropractor needs a consult. Kerkhoff Aff. ¶ 13. As a result of the nature of the coaching services, coaches often become "very close friends and mentors" of the company's chiropractor members. *Id.* The Masters Circle also provides members and their staffs admittance at four seminars each year, including an annual "Super Conference". Seminars are held in New Jersey, Illinois, Nevada, and California, and none have ever been held in Iowa.

Upon becoming a member of The Masters Circle, chiropractors were required to agree to study and follow the Manual, comply with The Masters Circle's practices and policies, and follow the advice and instructions of their coaches. These practices had the alleged goal of encouraging patients to pay for long-term chiropractic services that may or may not have been needed. Plaintiffs contend chiropractors' use of these services and practices were not disclosed to the patients they treated.

Defendant Dr. Larry Markson is The Masters Circle's CEO Emertius.[8] He acts as the Chairman of the Board, oversees partners' meetings, designs seminars, and authors publications. Defendant Dr. Robert Hoffman is the company's president. Hoffman is responsible for day-today operations and hiring, firing, budgetary, and policy decisions. Defendant Dr. Dennis Perman is the company's vice-president. Hoffman, Markson, and Perman are each New York residents[9] and are all alleged to be owners or employees of The Masters Circle who disseminated techniques of the organization to dues-paying members.

**B. Defendants' Alleged Wrongful Practices.**

According to Plaintiffs, The Masters Circle trumpets itself as a "highly specialized and unique leadership training and practice building organization" that uses an "Identity Based" approached to transform chiropractors into the types of people who will "do whatever it takes" to "build the practice of their dreams and the lifestyle they can imagine." Plaintiffs allege some of the practices the organization taught and its members used are unethical and unlawful.

As a result of the joint agreement to use services taught by The Masters Circle, Plaintiffs assert Defendants engaged in a nationwide conspiracy designed to induce patients to pay for unneeded or excessive chiropractic care to make The Masters Circle and its members more prosperous. The Masters Circle's techniques allegedly increased the chiropractors' businesses and spurned additional purchases of The Masters Circle's products and services. The Masters Circle used its increased revenue to attract new chiropractors to its fold.

---

**7.** Practical open discussions, or "PODS," are interactive classes conducted over the phone. Perman Dep. 31:5–22.

**8.** Markson was the CEO of The Masters Circle from January 1, 2001, until January 1, 2005. Markson Aff. ¶ 14.

**9.** Markson was a New York resident at the time he prepared his affidavit, but indicated he would be "moving to Florida shortly." Markson Aff. ¶ 2. The record does not contain positive evidence that he actually moved to Florida, but the uncertainty of his relocation is largely irrelevant for personal jurisdiction purposes.

### C. The Proposed Class Representatives.

There are three named plaintiffs in this action.[10]

### 1. Heidi Brown and Trevor Rhiner.

Heidi Brown and her son, Trevor Rhiner, are Iowa residents. Rhiner, accompanied by Brown, sought treatment from Kerkhoff in late 2001 when Rhiner was fourteen years of age. Kerkhoff recalled Rhiner was suffering from leg pain, low back pain, and headaches. According to Kerkhoff, Rhiner had difficulty walking because of the pain.

Kerkhoff administered x-rays and diagnosed a reverse curvature of the cervical spine and scoliosis. Kerkhoff recommended a course of treatment that included adjustments and traction. Plaintiffs allege Kerkhoff indicated that without intense and immediate chiropractic treatment, Rhiner could not continue playing sports, would develop arthritis, and was at risk of serious injury. According to Plaintiffs, Kerkhoff attempted to "presell" a year of chiropractic treatment but mentioned discounts were available if they paid in cash immediately.

After Kerkhoff treated Rhiner for several weeks, he became symptom-free. Although Rhiner's initial symptoms disappeared, Kerkhoff recommended further treatment to resolve "underlying conditions which had caused his symptoms." According to Kerkhoff, he advised Rhiner to refrain from playing sports until his underlying condition improved, which would reduce the risk of a serious and permanent injury.

During the course of treatment, Kerkhoff allegedly submitted claims to Rhiner's insurance carrier seeking payment for the diagnosis and treatment. According to Plaintiffs, Kerkhoff received payment for some treatments from Rhiner's insurance carrier.

Brown and Rhiner became concerned with the continued treatment regimen, so they visited an orthopedic surgeon for a second opinion. The orthopedic surgeon allegedly disagreed with Kerkhoff's assessment of the severity of Rhiner's scoliosis, as well as Kerkhoff's recommendation that Rhiner continue treatment. Plaintiffs relay the orthopedic surgeon indicated the traction treatments recommended by Kerkhoff were unnecessary and could be harmful. Kerkhoff recalls the orthopedic surgeon phoned him after examining Rhiner, reporting he found a slight reverse curvature of Rhiner's cervical spine but did not think chiropractic treatment could

---

**10.** While this action was originally filed as a class action pursuant to Iowa Rule of Civil Procedure 1.261 and is now styled as a class action, it has not been certified under either Iowa Rule of Civil Procedure 1.262 or Federal Rule of Civil Procedure 23. As a result, only the named parties are relevant for purposes of the pending motions. *See Baxter v. Palmigiano,* 425 U.S. 308, 310 n. 1, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("Without ... certification and identification of the class, the action is not properly a class action." (citing *Indianapolis Sch. Comm'rs v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975))); *Cruz v. Farquharson,* 252 F.3d 530, 534 (1st Cir.2001) ("Only when a class is certified does the class acquire a legal status independent of the interest asserted by the named plaintiffs. ....."); *McKenzie v. City of Chicago,* 118 F.3d 552, 555 (7th Cir.1997) ("Because a class has not been certified, the only interests at stake are those of the named plaintiffs." (citing *Baxter,* 425 U.S. at 310 n. 1, 96 S.Ct. 1551)); *cf. Jones v. Caddo Parish Sch. Bd.,* 735 F.2d 923, 936 n. 16 (5th Cir.1984) (decree binding only on those parties before the Court in the absence of class certification). This is a sensible rule in the context of a motion to dismiss for failure to state a claim, for if Plaintiffs cannot state claim upon which relief could be granted, and Plaintiffs' claims are typical of the class, Fed.R.Civ.P. 23(a)(3), the class would lack sufficient allegations as well.

alleviate the symptoms. Instead, the surgeon recommended physical therapy and anti-inflammatory drugs.

Brown discontinued Rhiner's chiropractic treatment and sued Kerkhoff for malpractice in the Iowa District Court for Dallas County (the "state court"). During discovery in the malpractice case, Brown learned Kerkhoff was a member of The Masters Circle. According to Plaintiffs, they learned Kerkhoff used purportedly unethical and fraudulent practices endorsed and taught by this organization as part of Rhiner's treatment program.

Defendants argue that because The Masters Circle was not in existence when Rhiner received treatment from Kerkhoff, Kerkhoff could not have been a member at the time he treated Rhiner.[11] At their depositions in the malpractice action, Rhiner and Brown admitted that Rhiner's headaches, leg pain, and back pain dissipated as a result of Kerkhoff's treatment and that he had not been injured by Kerkhoff's techniques.

### 2. Cynthia Christian.

Plaintiff Cynthia Christian is also a resident of Iowa. Christian visited Kerkhoff in 2004 after experiencing neck pain. Kerkhoff allegedly told Christian she had "noncurvature" in her neck and that immediate and intense chiropractic treatments were needed to correct her condition. He also told Christian that without long-term chiropractic care, she would not be able to hold her head up when she reached her sixties.

According to Plaintiffs, Kerkhoff encouraged Christian to purchase nine months of chiropractic care up front. When Chris-

tian told Kerkhoff she could not afford it, Kerkhoff purportedly told her to obtain a bank loan to obtain money to pay for the necessary treatments.

After a few treatments, Christian's neck improved. However, Plaintiffs argue Kerkhoff continued to use unethical practices to pressure Christian to continue to pay for treatment. After Christian had received nine months of treatment, Kerkhoff allegedly attempted to sell Christian another long-term package.

### D. Nonresident Defendants' Contacts with Iowa.

Because one of Defendants' motions seeks dismissal of Plaintiffs' claims against The Masters Circle, Hoffman, Markson, and Perman because of a purported lack of personal jurisdiction, a relevant issue is the type of contacts these Defendants have had with Iowa.

#### 1. The Masters Circle.

##### a. Physical Presence.

The Masters Circle is a New York corporation and maintains its primary place of business there. All of the company's materials and products—including its website—are prepared, produced, and maintained in New York. The company maintains no offices in Iowa and does not have a registered agent in Iowa. The company owns and leases no real or personal property in this state, and it maintains no mailing address, bank accounts, records, or telephone numbers in Iowa. The company does not send mail from or receive mail in Iowa. The company is neither licensed to do business in nor has it ever been registered to do business in Iowa. The compa-

---

11. Kerkhoff was, however, a member of the two entities preceding The Masters Circle. He was a member of Markson Management Services, Inc., for a short time in 1996, Markson Aff. ¶ 48; Kerkhoff Aff. ¶ 7, and was a member of The Masters LLC from January 1997 through October 1997 and from January 1998 through December 1999, Markson Aff. ¶ 49; Kerkhoff Aff. ¶ 8.

ny pays no taxes to the State of Iowa.[12] None of its shareholders are Iowa residents.

The record also shows The Masters Circle does not make telephone calls into Iowa to solicit members, recruit members, or sell products. The company contends it has never recruited employees in Iowa, does not advertise in Iowa, and claims to direct no print, television, or radio advertising toward the state, and does not tailor its business products to Iowa residents.

Only one employee of The Masters Circle, Dr. Janice Hughes, has ever lived in Iowa during the time of her employment with the company. The record shows The Masters Circle recruited Hughes while she lived in Canada. For approximately a year and a half, she visited Davenport every three or four months to teach a weeklong course at the Palmer College of Chiropractic. She became a full-time Palmer employee and a Davenport resident from July 2003 through August 2004. Concurrent with a portion of her time at Palmer, she performed part-time contract work as a coach for The Masters Circle. None of the individuals she coached resided in Iowa.

Plaintiffs point to an Annual Report prepared by The Masters Circle for the 2003 fiscal year detailing Hughes's involvement with a "vital" speakers program at Palmer that featured The Masters Circle's executives.[13] Hughes was also responsible for coordinating a fair that drew "outstanding members of The Masters Circle to speak at the college on an average of every 6–8 weeks" and structuring "workshops [that] present specific concepts and topics unique to The Masters Circle systems and philosophy."

In addition, Hughes oversaw the establishment of a Masters Circle Club at the college. The Masters Circle Club is designed "to help ease the transition from student to Doctor of Chiropractic" by "empower[ing] students with the tools and resources to create success in practice and in life." The Masters Circle publishes bylaws and guidelines for these clubs, but the organizations are formed by and operated by students.

After leaving Palmer, Hughes moved to Colorado and has lived there since. The record contains evidence suggesting Hughes was to return to Iowa in May 2005 to deliver a speech about The Masters Circle's practices and techniques at a meeting at Palmer, but the record does not indicate whether Hughes actually attended.

As of June 2005, seventeen Iowa residents were dues-paying members of the organization. The organization's Iowa members were required to sign contracts and pay monthly membership fees. Four Iowa residents joined at a seminar in Illinois, four joined at a seminar in Nevada, six joined by telephoning The Masters Circle and asking to join, and three joined at

**12.** In a footnote, Plaintiffs argue The Masters Circle's allegation that it pays no taxes to the State of Iowa is at odds with Iowa law, which, Plaintiffs argue, requires vendors selling products in Iowa at shows and who sell goods to Iowa residents over the internet to remit sales taxes to the State of Iowa. *See* Resist. to Defs.' Mot. to Dismiss for Lack of Personal Juris 6 n. 2. The Court expresses no opinion regarding whether The Masters Circle's business practices comply with Iowa law and accepts as true the position that The

Masters Circle pays no taxes in this state because there is

**13.** Plaintiffs claim page 19 of the Annual Report shows an Iowa resident was named "Midwest Chiropractor of the Year." Resist. to Defs.' Mot. to Dismiss for Lack of Personal Juris. 8. Because this page has not been included in the record, this allegation carries no weight.

a seminar in Colorado sponsored by a company other than The Masters Circle. The remaining member—Kerkhoff—claims he joined in July 2004 after attending a seminar in Illinois. Plaintiffs argue Kerkhoff admitted he decided to join after receiving a flyer in the mail.[14] After joining The Masters Circle, Kerkhoff was a regular consumer of The Masters Circle's products, some of which he received through the mail.

Twenty-one other Iowa residents are former members of The Masters Circle. The record shows The Masters Circle derived $270,665 from dues paid by Iowa residents from 2001 to mid–2005. Many Iowa members also purchased products from the company, resulting in $36,582.11 in sales.

As noted above, a key service The Masters Circle provides is coaching services to its members. The record indicates approximately 1300 phone calls have occurred between coaches or employees of The Masters Circle and Iowa residents, but members typically initiate these communications. Markson relayed that member chiropractors regularly contact coaches for individual advice and consultation. Calls are directed from members to coaches located in states other than Iowa: eleven are residents of New York, three are residents of New Jersey, three are residents of Florida, and one is a Colorado resident.[15] Most coaches have coached or are coaching at least one Iowa resident. Some have not. Most who have coached Iowa residents contend the member initiated the call. In addition, most coaches have visited Iowa or had conversations with Iowa residents unrelated to coaching duties. Only one coach as had no contact with Iowa or its residents.

To support their allegations that Defendants have had continuous and systematic contacts with Iowa, Plaintiffs point to an affidavit prepared by Dr. Braxton Pulley, a Des Moines chiropractor. Pulley is not and never has been a member of The Masters Circle but claims to have received "numerous" invitations to join the company over the last several years. Markson contends Pulley cannot have received information in this manner because The Masters Circle does not solicit members of the public to join the company through the mail and does not advertise in publications targeted at Iowa. Markson conjectures Pulley must have either received a copy of a national publication equipped with an advertisement or received promotional materials he specifically requested.

Plaintiffs also point to an editorial published in a Palmer student newspaper, wherein the author boasts that Palmer

---

**14.** More specifically, Kerkhoff testified as follows:

Q: And how did you hear about [T]he Masters Circle?

A: Flier in the mail.

Q: That you received from them?

A: Yeah.

Kerkhoff Dep. 125:3–7. Defendants argue Kerkhoff was confused because he indicated he joined The Masters Circle in 1996, when the company had not yet been formed:

Q: [W]hen did you join?

A: You have my curriculum vitae. It might say there.

. . . .

A: I would say probably about nineteen ninety—I'd say probably '96 approximately. Kerkhoff Dep. 125:21–126:10. The implication, of course, is that the flyer in the mail was not from The Masters Circle.

**15.** See Antoine Aff. ¶ 2 (Florida); Axelrod Aff. ¶ 2 (New York); Corva Aff. ¶ 2 (New York); Culbert Aff. ¶ 2 (New Jersey); Freedman Aff. ¶ 2 (New Jersey); Hughes Aff. ¶ 2 (Colorado); Inselman Aff. ¶ 2 (Florida); Musaffi Aff. ¶ 2 (Florida); Pusateri Aff. ¶ 2 (New York); Rousso Aff. ¶ 2 (New York); Turk Aff. ¶ 2 (New York); Zeller Aff. ¶ 2 (New York); Zinberg Aff. ¶ 2 (New Jersey).

lacks negative pressures from advertising experienced by students at institutions educating different medical professionals. The author notes some companies—such as The Masters Circle—do have a presence on campus but claims their presence is symbiotic with the education Palmer offers. Plaintiffs claim this editorial establishes it is commonplace for The Masters Circle to be at Palmer selling its products and services.

### b. Virtual Presence.

The company's website is additional evidence of the company's success in transacting business with Iowa residents. The company's website provides the general public a portal to learn about the company and purchase its products. It contains a password-protected "members only" area for members to access materials and interact directly with each other and their coaches. The company's internet presence serves as a primary way to communicate with members.

There is no way to apply for membership through the website; interested chiropractors are directed to call a toll-free number for more information. The website provides contact information for The Masters Circle's offices, contains online registration forms for seminars, and presents a feedback form for comments and questions.

### 2. Individual Nonresident Defendants.

Turning to the individual nonresident Defendants, each has submitted an affidavit attesting to the fact that none now owns or leases or has ever owned or leased real or personal property in Iowa. None

has a mailing address, telephone number, bank account, or business or chiropractic license in Iowa. None maintain an office or staff here, pay taxes here, or receive mail in or send mail from this state. Hoffman and Perman do not currently and have never lived in Iowa.

### a. Markson.

Markson was an Iowa resident from October 1958 to December 1961 while he was a student at Palmer. After earning his degree from Palmer, he moved from Iowa and has not lived in this state since that time.

Since then, he has returned to Iowa "several times," frequently on business trips for The Masters Circle.[16] In August of each of 2001, 2002, 2003, and 2004, he was invited to be a guest speaker at the Palmer Lyceum, an annual celebration hosted by the college, and was present at a booth where members of the public could ask questions about The Masters Circle and buy the company's goods. The Masters Circle received an honorarium for each speech Markson provided. Markson claims no Iowa residents joined The Masters Circle as a result of his efforts at the Palmer Lyceum. Dr. Guy Riekeman, Palmer's president at the time, explained that The Masters Circle was invited to set up a booth to speak with members and other friends in attendance. Other speakers were afforded the same courtesy.

Markson returned to Palmer in June 2002, where he attended lectures by Palmer's president, two Palmer faculty members, and a chiropractic historian given to

---

**16.** Some of Markson's visits occurred before The Masters Circle was created. In 1965, he returned to Palmer to receive a Philosopher of Chiropractic degree. Markson Aff. ¶ 3. The record shows he completed this degree while he was on the faculty of the Columbia Institute of Chiropractic in New York. Markson

Aff. ¶ 11(a). In 1995—nearly six years before he joined The Masters Circle—he was invited to attend and be a guest speaker at a Chiropractic's Centennial Celebration in Davenport. Markson Aff. ¶ 11(b); and in 1999, he returned to Iowa for a seminar sponsored by The Masters LLC. Markson Aff. ¶ 11(c).

members of the Winners Circle Club.[17] Markson described the typical agenda at Winners Circle Club meetings as follows: "We just came in, sat in a classroom and we had three or four faculty members, a chiropractic historian, a chiropractic philosopher, the president of the college himself, address our people and that was the event, in and out." Markson Aff. 7:22–8:1. In addition to the June visit, Markson recalls returning to Iowa two other times 2002, upon being invited to speak to Palmer students. According to Markson, he did not discuss membership with The Masters Circle with anyone and did not sell any of the company's products.

Markson returned to Iowa in April 2004, where he attended an open house hosted by a colleague who had been a member of The Masters Circle since November 2002. Markson had previously provided advice to this member while she was redesigning and refurbishing her office. It was at this party he saw Kerkhoff. Kerkhoff mentioned he was interested in joining The Masters Circle and asked Markson for application materials and inquired of the date of the next seminar. Aside from physical visits to Iowa, Markson contends his only other contacts with Iowa have been limited to receiving periodic telephone calls or e-mails from Iowa members of The Masters Circle, all of which Markson did not initiate. While he does not specifically recall conversing with Iowa residents while he was coaching members, he is "sure" he has done so at least once. And, as noted above, the record shows some materials Markson authored were sent to the company's Iowa members.

**b. Hoffman.**

Hoffman has visited Iowa ten to twelve times. His first trip was for a celebration at Palmer in 1995. His second trip was in 1999 and was for the inauguration and investiture for a new president at Palmer. Neither of these expeditions was carried out for The Masters Circle.

His later visits were carried out as a representative of The Masters Circle. Like Markson, Perman attended lectures given by Palmer's president, two Palmer faculty members, and a chiropractic historian for members of the Winners Circle Club in 2002. The remaining seven to nine visits arose from invitations to appear, speak, or attend as a guest various events at Palmer. The Masters Circle received honoraria for Hoffman's speeches. The record also indicates that while he was at Palmer's Lyceums, Hoffman, like Markson, was present and interacted with the public at booths sponsored by The Masters Circle.

Hoffman contends his only other contacts with Iowa have been sparse, pointing to infrequent telephone or e-mail consultations initiated by Iowa residents or telephone conversations with faculty members and the president of Palmer. The record indicates he spoke over the telephone with Palmer students who were Masters Circle Club members and participated in a POD involving all Masters Circle Clubs' officers, presumably including Palmer's. Like Markson, Hoffman does not specifically recall coaching any Iowa residents, but he is "sure" he has. As with Markson, some materials he authored have been received electronically or through the mail by Iowa members of The Masters Circle.

**c. Perman.**

Perman's contacts with Iowa are even more sporadic, having visited Iowa just

---

17. The Winners Circle is a personal development club comprised of a select group of members of The Masters Circle nationwide. Markson Aff. ¶ 11(e). The Winners Club in Iowa is comprised of approximately 65 to 70 people. *See* Markson Aff. ¶ 11(e); Markson Dep. 7:14–18.

five times. In 1999, before becoming an employee of The Masters Circle, he attended a seminar in Davenport sponsored by The Masters LLC. He returned in August 2001 to attend classes and speak at Palmer. He ventured to Iowa in June 2002 to attend the same lectures attended by Hoffman and Markson and visited Palmer again in August 2002 and August 2003 to attend classes and give speeches. Perman's only other contacts with Iowa have been telephone calls and e-mails from Iowa members.

## II. Procedural History.

This action was most recently removed to this Court on July 21, 2006. Before removal, on June 15, 2006, the state court dismissed claims against The Masters Circle, Markson, Hoffman, and Perman, concluding Brown lacked standing. *Brown v. Kerkhoff*, No. LACV 032346, slip op., at 9 (Iowa Dist. Ct. June 15, 2006). The state court allowed Plaintiffs to amend their pleadings to add Christian as a plaintiff but directed that the breach of fiduciary duty claims against The Masters Circle, Markson, Perman, and Hoffman be omitted. *Id.* The Second Amended Petition resulted.

The Second Amended Petition reasserts claims by Brown, Rhiner, and Christian against The Masters Circle, Markson, Perman, and Hoffman for civil conspiracy, unjust enrichment, and violations of Iowa's ongoing criminal conduct statute.

In the present Order, the Court resolves a motion filed by Plaintiffs seeking leave to file a Third Amended Complaint, which would add allegations that Defendants violated federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and committed two species of tortious interference.

## DISCUSSION

### I. Issues Related to Standing.

#### A. Relevance of the State Court's June 2006 Order.

The Court must first consider the impact of the state court's June 15, 2006, order finding Brown and Rhiner lack standing to bring claims against The Masters Circle. Recalling, the state court found as follows:

Although conceding that Kerkhoff did not belong to [T]he Masters Circle at the time he treated Rhiner, the plaintiff contends that [T]he Masters Circle may still be held liable for Rhiner's alleged injuries because Kerkhoff at the time was following the teachings of The Masters L.L.C., a predecessor-in-interest to [T]he Masters Circle. Although these allegations would have been sufficient to establish standing for purposes of a motion to dismiss, these allegations are not contained in the plaintiff's petition.

Indeed, even in the plaintiffs' [proposed pleadings], [T]he Masters L.L.C. is mentioned only once. In this one instance, the plaintiffs seek to expand the plaintiff class to include patients treated by [T]he Masters L.L.C. Critically, however, the petition never alleges that Kerkhoff belonged to this organization. Therefore, this court is presented with a situation in which the plaintiff admits Kerkhoff did not belong to [T]he Masters Circle, but does not allege that he belonged to any other organization which could possibly be a defendant in this case. Therefore, Heidi Brown has not alleged a sufficient interest in this matter and therefore plaintiffs' claims against defendants [The] Masters Circle, Markson, Perman, and Hoffman must be dismissed for lack of standing.

*Brown v. Kerkhoff*, No. LACV 032346, slip op., at 7–8 (Iowa Dist. Ct. June 15,

2006) (footnotes and citations omitted). However, at the conclusion of its order, the state court ruled that "[t]he plaintiffs are allowed to file their Revised Second Amended Petition *as submitted*, but absent plaintiffs' claim against defendants [The] Masters Circle, Markson, Perman, and Hoffman based on breach of fiduciary duty." *Id.* at 19 (emphasis added).[18] The Revised Second Amended Petition, "as submitted," included claims by Brown and Rhiner against The Masters Circle, Hoffman, Markson, and Perman.

This Court is guided by 28 U.S.C. § 1450 when assessing what effect to give this conclusion:

> Whenever any action is removed from a State court to a district court of the United States ... [a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court.

28 U.S.C. § 1450. The state court's June 2006 order must therefore be given "full force and effect" until modified or dissolved by this Court. While this Court is therefore bound, at least for the time being, by the state court's decision that Rhiner and Brown lacked standing to sue The Masters Circle, Hoffman, Markson, and Perman, it is also bound, at least for the time being, by the state court's decision to allow Plaintiffs to revive those claims (excepting one for breach of fiduciary duty) by permitting them to file the Revised Second Amended Petition "as submitted." Therefore, the state court's June 2006 order did not extinguish all claims by Brown and Rhiner against The Masters Circle.

While the state court's ultimate conclusion was probably a result of an inadvertent drafting error, this Court is bound by what the state court said, not what it meant.

### B. Standing of Brown and Rhiner to Sue The Masters Circle, Hoffman, Markson, and Perman.

In papers filed in this Court, however, Defendants renew their argument that Brown and Rhiner lack standing to sue The Masters Circle, Hoffman, Markson, and Perman. As a result, this Court must decide whether these Plaintiffs have standing to sue these Defendants.

#### 1. Applicable Legal Standards.

■ It is "long-settled ... that standing cannot be 'inferred argumentatively from averments in the pleadings.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting *Grace v. Am. Cent. Ins. Co.*, 109 U.S. 278, 284, 3 S.Ct. 207, 27 L.Ed. 932 (1883)). Instead, each plaintiff's standing to bring claims "'must affirmatively appear in the record.'" *Id.* (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884)).

■ As the parties seeking the Court's exercise of jurisdiction, Plaintiffs bear the burden of proving each element of standing. *Id.* (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To meet their burden, Plaintiffs

---

18. This Court has previously determined that the state court probably meant to order Plaintiffs to file a document entitled "Second Amended Petition" rather than the "Revised Second Amended Petition." *Brown v. Kerkhoff*, 462 F.Supp.2d 976, 978–79 (S.D.Iowa2006). Neither document is the Second Amended Petition challenged by Defendants' duet of motions seeking dismissal. The ease for confusion when several documents carry the same name emphasizes the need for Plaintiffs to use care when labeling documents to ensure clarity.

must adduce "'facts demonstrating that [they are proper parties] to invoke judicial resolution of the dispute.'" *FW/PBS*, 493 U.S. at 231, 110 S.Ct. 596 (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Because the standing requirement is not a "mere pleading requirement[ ]," Plaintiffs must support each element "in the same way as any other matter on which [they bear] the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. Because this case is "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [it is] presum[ed] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (quotation marks omitted); *accord Bennett v. Spear*, 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

 The three-part test articulated by the United States Supreme Court in *Lujan v. Defenders of Wildlife* guides the constitutional standing analysis:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (citations and footnote omitted); *accord Elk Grove Unified Sch. Dist. v. Newdow*,

542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). To be injured in a "particularized" way, a plaintiff must be injured "in a personal and individual way." *Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130.

## 2. Discussion.

The crux of Defendants' argument hinges on the definition of the class included in the Second Amended Petition, which was filed shortly after issuance of the state court's June 2006 order:

This action is brought on behalf of a Class, consisting of all past, current and future patients (1) who have been treated by chiropractors who have been or are members of The Masters LLC or The Masters Circle, and (2) who underwent at least 12 chiropractic sessions, the minimum number of visits required by [T]he Masters Circle before a recheck of the patient's condition.

Second Am. Pet. ¶ 20. Plaintiffs have apparently conceded Kerkhoff was not a member of The Masters Circle when he treated Rhiner. Defendants also note the Second Amended Petition does not include allegations that Kerkhoff was a member of The Masters LLC when he treated Rhiner.

Plaintiffs note that when this action was initially filed, The Masters Circle was included as a defendant because Kerkhoff had testified at a 2005 deposition that he had joined The Masters Circle in 1996 or 1997 and continued to belong to that organization through 2005. Indeed, the record contains testimony from Kerkhoff indicating he joined the organization in 1996 or 1997. This cannot be so, because The Masters Circle did not then exist. Plaintiffs next point to various documents that they contend prove Kerkhoff actually

joined The Masters LLC, which in reality is a predecessor in interest to The Masters Circle. Unfortunately for Plaintiffs, they have not *alleged* in the Second Amended Petition or otherwise that Kerkhoff was a member of The Masters LLC at any time or that The Masters Circle is The Masters LLC's successor.

▮ This conclusion has two immediate implications. First, because Plaintiffs have not included allegations that Kerkhoff was ever a member of The Masters LLC, and because the basis of each of the named Plaintiffs' claims grows from treatment received from Kerkhoff alone, no named Plaintiff could have been injured in a way traceable to any action of The Masters LLC. *See Newdow,* 542 U.S. at 12, 124 S.Ct. 2301; *Friends of the Earth,* 528 U.S. at 180–81, 120 S.Ct. 693; *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. It follows that no named Plaintiff has included allegations sufficient to provide them standing to sue The Masters LLC. Second, even if Kerkhoff was a member of The Masters LLC and was following that organization's teachings when he allegedly harmed Rhiner and Brown, there are no allegations connecting any wrongful conduct of The Masters LLC to The Masters Circle. Therefore, Rhiner and Brown could not have been injured in a way traceable to any action of The Masters Circle or its employees. *See Newdow,* 542 U.S. at 12, 124 S.Ct. 2301; *Friends of the Earth,* 528 U.S. at 180–81, 120 S.Ct. 693; *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. It follows that Rhiner and Brown have not included allegations sufficient to provide them standing to sue The Masters Circle, Hoffman, Markson, and Perman.

### 3. The Third Amended Complaint.

Plaintiffs contend allegations found in a proposed Third Amended Complaint remedy the standing ills identified above. Specifically, Plaintiffs point to the following allegations:

Defendant Dr. Paul Kerkhoff is a practicing chiropractor in Waukee, Iowa. Defendant Kerkhoff at all times relevant hereto was or is a member of or practitioner following the principals [sic] of Markson Management, The Masters LLC and/or The Masters Circle.

. . . .

Defendant The Masters Circle is a New York corporation with its principal place of business in Jericho, New York. Upon information and belief, The Masters Circle is the successor in interest to Masters LLC, which was the successor in interest to Markson Management. Each of these entities has engaged in the ongoing and continuous course of conduct as alleged herein.

Upon information and belief, when The Masters LLC was operational it conducted business or was doing business as "The Masters Circle" at various times and used the name interchangeably at times with "The Masters."

Third Am. Compl. ¶¶ 9, 11–12. These paragraphs highlight allegations that Kerkhoff was a member of or was following treatment protocols of one or all of Markson Management, The Masters LLC, or The Masters Circle at the time the relevant treatment was provided.

Defendants reiterate Kerkhoff was not a member of The Masters Circle, Masters LLC, or Markson Management when he treated Rhiner. As a result, Defendants contend, Rhiner and Brown cannot have been harmed by those organizations. With respect to Christian, Defendants argue she lacks standing to bring claims against The Masters LLC because Kerkhoff was not a member of that organization when he treated Christian.

The Court will permit Plaintiffs to amend their pleadings to add The Masters LLC and Markson Management as parties but cautions Plaintiffs to carefully consider the claims brought against those Defendants in light of the resolution of Defendants' Rule 12(b)(6) motion below. If, after amendment, The Masters LLC and Markson Management feel Plaintiffs lack standing to bring claims against them, those parties may seek dismissal of whatever causes of action (if any) Plaintiffs bring.

## C. Conclusion.

In light of evidence Plaintiffs have adduced to repair these flaws, Plaintiffs are granted leave to amend their pleadings to include allegations that Kerkhoff was a member of The Masters LLC before he began treating Rhiner and was following that organization's teachings at the time of his treatment.[19] Plaintiffs are also permitted leave to amend their pleadings to include allegations that The Masters LLC is a predecessor company to The Masters Circle, Inc.[20]

## II. Motion to Dismiss for Lack of Personal Jurisdiction.

The Court turns to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction brought under Federal Rule of Civil Procedure 12(b)(2). The parties do not challenge the Court's exercise of personal jurisdiction over Kerkhoff and Kerkhoff Chiropractic.

Plaintiffs allege the Court may exercise jurisdiction over the person of each nonresident Defendant under the traditional "minimum contacts" test and under an assortment of more exotic theories, analyzed *seriatim,* after identifying the applicable legal standards.

## A. Applicable Legal Standards.

### 1. Burden of Proof.

When personal jurisdiction is challenged, the nonmoving party must prove jurisdiction is proper in the proposed forum. *Johnson v. Woodcock,* 444 F.3d 953, 955 (8th Cir.2006); *Romak USA, Inc. v. Rich,* 384 F.3d 979, 983–84 (8th Cir.2004); *Dever v. Hentzen Coatings, Inc.,* 380 F.3d 1070, 1072–73 (8th Cir.2004); *Epps v. Stewart Info. Servs. Corp.,* 327 F.3d 642, 647 (8th Cir.2003). Only a *prima facie* showing is required until either an evidentiary hearing or a trial—neither of which have occurred here—at which point then proof by a preponderance of the evidence is necessary. *Epps,* 327 F.3d at 647; *Lakin v. Prudential Sec., Inc.,* 348 F.3d 704, 706 n. 3 (8th Cir.2003); *Pecoraro v. Sky Ranch for Boys, Inc.,* 340 F.3d 558, 561 (8th Cir.2003); *Stanton v. St. Jude Med., Inc.,* 340 F.3d 690, 693 (8th Cir.2003); *St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.,* 270 F.3d 621, 623 (8th Cir. 2001). "[A]ffidavits, exhibits, [and] other evidence" outside the pleadings either "may," *see Romak USA,* 384 F.3d at 983, or "must," *see Dever,* 380 F.3d at 1072–73, be submitted by the party attempting to establish jurisdiction. The Court examines the record in a light favorable to resisting parties, who also benefit from a favorable resolution of any factual disputes. *See Romak USA,* 384 F.3d at 983–84; *Lakin,* 348 F.3d at 706; *Pecoraro,* 340

---

19. Defendants argue the assertion of any claims by Plaintiffs against The Masters LLC would be barred by the statute of limitations. This is, of course, an affirmative defense properly raised by that party.

20. The remainder of the Court's discussion assumes, *arguendo,* that each Plaintiff has standing to sue each Defendant. no evidence to the contrary.

F.3d at 561; *Stanton,* 340 F.3d at 693; *Epps,* 327 F.3d at 646–47.

### 2. Constitutional and Statutory Considerations.

"[B]efore a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There also must be a basis for the defendant's amenability to service of summons." *Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). In other words, the Court must first decide if the statutes upon which Plaintiffs' claims rest potentially allow for the exercise of personal jurisdiction by providing for service of process and, if so, decide whether the exercise of that power comports with due process. The analysis differs for Plaintiffs' state and federal claims.

#### a. Service of Process.

■ Service of process, the Supreme Court has noted, "is fundamental to any procedural imposition on a named defendant." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 350, 119 S.Ct. 1322, 143 L.Ed.2d 448 (1999). At common law, courts obtained jurisdiction over the person of a defendant by executing a writ of *capias ad respondendum,* which directed sheriffs to take defendants into custody. *Id.* The physical act of detention and delivery provided the court with jurisdiction over the person detained. Official service of process is the modern analog to the writ. *Id.; see also Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (" '[T]he *capias ad respondendum* has given way to personal service of summons or other form of notice.' " (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940))); *accord Shaffer v. Heitner,*

433 U.S. 186, 203, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (quoting same). The summons is "the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Murphy Bros.,* 526 U.S. at 351, 119 S.Ct. 1322. As a result, in the absence of service of process or waiver, a court typically cannot exercise power over the parties named in a complaint. *Id.* at 350, 119 S.Ct. 1322 (citing *Omni Capital Int'l,* 484 U.S. at 104, 108 S.Ct. 404 ("Before a ... court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.")); *Mississippi Publ'g Corp. v. Murphree,* 326 U.S. 438, 444–45, 66 S.Ct. 242, 90 L.Ed. 185 (1946) ("[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served.").

Service of process in federal actions is governed by Federal Rule of Civil Procedure 4. Rule 4(k)(1) provides, in relevant part, as follows:

> Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant
>
> (A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located, or
>
> . . . .
>
> (D) when authorized by a statute of the United States.

Fed.R.Civ.P. 4(k). By limiting the territorial reach of their process, Rule 4 necessarily restricts the persons over whom district courts may exercise personal jurisdiction. Rule 4(k)(1)(D) is potentially implicated by Plaintiffs' RICO claim, and Plaintiffs' state law causes of action impli-

cate Rule 4(k)(1)(A), which, in turn, draws the Iowa long-arm statute [21] into play.

### b. Constitutional Parameters.

If personal jurisdiction is to rest on Plaintiffs' state law claims, Fourteenth Amendment due process concerns guide the analysis. For Plaintiffs' RICO claims, the due process clause found in the Fifth Amendment provides constitutional guidance, provided the Court finds a statutory basis for subjecting the out-of-state Defendants to service of process.

### B. Personal Jurisdiction Under RICO.

#### 1. Statutory Authorization.

RICO, passed as Title IX of the Organized Crime Control Act of 1970, contains special venue and service of process provisions. *See* Organized Crime Control Act of 1970 § 901, 18 U.S.C. §§ 1961–1968 (2006). For ease of analysis, the Court sets forth the implicated sections.

#### a. Statutory Provisions.

Plaintiffs contend Defendants violated two liability provisions of RICO:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [section 1962].

18 U.S.C. § 1962(c)-(d); *see* Third Am. Compl. ¶¶ 105–112 (subsection (c) violations), ¶¶ 112–115 (subsection (d) violations).

The remedies available to plaintiffs successfully prosecuting violations of section 1962 are found in section 1964, which provides in relevant part as follows:

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders....

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

18 U.S.C. § 1964(a), (c). The venue and service of process provisions relevant for personal jurisdiction purposes are found in section 1965 and implicate section 1964:

Every corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact[s] with the state of Iowa shall be subject to the jurisdiction of the courts of this state, and the courts of this state shall hold such corporation, individual, personal representative, partnership or association amenable to suit in Iowa in every case not contrary to the provisions of the Constitution of the United States.

Iowa R. Civ. P. 1.306.

---

**21.** In relevant part, the Iowa long-arm statute provides as follows:

If a nonresident person makes a contract with a resident of Iowa to be performed in whole or in part by either party in Iowa, or if such person commits a tort in whole or in part in Iowa against a resident of Iowa, such acts shall be deemed to be doing business in Iowa by such person for the purpose of service of process or original notice on such person under this section....

Iowa Code § 617.3. Iowa Rule of Civil Procedure 1.306 provides for the broadest expanse of personal jurisdiction consistent with due process:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas [sic] issued by such court to compel the attendance of witnesses may be served in any other judicial district....

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965.

### b. Analysis.

The Court must first decide whether RICO potentially confers jurisdiction by permitting service of process on the nonresident Defendants and, if so, must decide if the Court's exercise of personal jurisdiction over the nonresident Defendants comports with the federal Constitution.

There is considerable debate regarding whether section 1965(b) or (d) is a "statute of the United States" authorizing service of process on a nationwide basis for purposes of Federal Rule of Civil Procedure 4(k)(1)(D). The decision matters: If the Court relies on subsection (b), it follows that when raised in the proper venue, RICO allows personal jurisdiction in "any judicial district of the United States" to the extent needed to satisfy "the ends of justice," *see* 18 U.S.C. § 1965(b); if subsection (d) is used, RICO supplies a statutory basis for the exercise of jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs," *id.* § 1965(d).

The Second, Fourth, Seventh, Ninth, Tenth, and Eleventh Circuits hold (and the Third Circuit has implied) that subsection (b) is a statute authorizing nationwide service of process for purposes of Rule 4(k)(1)(D). *See Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1230–31 (10th Cir. 2006); *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 71–72 (2d Cir. 1998); *Brink's Mat Ltd. v. Diamond,* 906 F.2d 1519, 1521 (11th Cir.1990); *Combs v. Bakker,* 886 F.2d 673, 675 (4th Cir.1989); *Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671–72 (7th Cir.1987); *Butcher's Union Local No. 498 v. SDC Inv., Inc.,* 788 F.2d 535, 538–39 (9th Cir.1986); *see also In re Bridgestone/Firestone, Inc., Tires Prods. Liability Litig.,* 333 F.3d 763, 768 (7th Cir.2003) (citing *Lisak,* 834 F.2d at 671); *United States v. Contents of Accounts Numbers 3034504504 & 144–07143 at Merrill, Lynch, Pierce, Fenner & Smith, Inc.* [herein after *Contents of Various Accounts* ], 971 F.2d 974, 982 (3d Cir. 1992) (dicta). The Fourth, Eleventh, and District of Columbia Circuits hold that subsection (d) is such a statute. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan,* 296 F.3d 1154, 1168 (D.C.Cir. 2002); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 942 (11th Cir.1997); *ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 627 (4th Cir. 1997).

The Eighth Circuit has yet to pass judgment on the issue. For reasons described below, this Court joins the former group.

### i. The Argument for Subsection (d).

As noted, the Fourth and Eleventh Circuits have identified section 1965(d) as the statutory basis governing nationwide service of process over RICO defendants. *See Republic of Panama*, 119 F.3d at 942; *ESAB Group*, 126 F.3d at 627. In *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, the Eleventh Circuit, without "paus[ing] long" over the question, summarily decided that "[s]ection 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is found." *Republic of Panama*, 119 F.3d at 942. Classifying subsection (d) as a nationwide service of process provision, the court ruled that because the defendants before it were "domestic corporations doing business in this country, the statutory basis for personal jurisdiction over" the defendants was satisfied. *Id.* Relying on *Republic of Panama*, but providing no independent analysis, the Fourth Circuit followed suit, classifying subsection (b) a venue provision. *See ESAB Group*, 126 F.3d at 626. And the District of Columbia Circuit provided no analysis whatsoever. *See World Wide Minerals*, 296 F.3d at 1168.

A variety of district courts have also reached the conclusion (with or without analysis) that subsection (d) governs na-

tionwide service of process.[22] The basic argument is that 1965(b) is implicated *only* when venue is proper as to at least one defendant but challenged as improper by another. *BankAtlantic v. Coast to Coast Contractors, Inc.*, 947 F.Supp. 480, 485 (S.D.Fla.1996) (discussing *Bridge v. Invest Am., Inc.*, 748 F.Supp. 948, 949 (D.R.I. 1990)). Section 1965(b), the argument goes, permits a court to assert venue over all defendants where (1) venue is proper as to at least one defendant, (2) venue is challenged by at least one defendant, (3) no other district would have venue over all defendants, and (4) the ends of justice require asserting venue over the improperly venued defendants. *Id.* at 485–86 (citing *Bridge*, 748 F.Supp. at 951–53). Subsection (b) thus supplements the generic venue provision found in subsection (a). *Id.* The language addressing service of process found in subsection (b) is triggered only so a court would have personal jurisdiction over any defendant brought before it through the special venue provision. *Id.* (citing *Bridge*, 748 F.Supp. at 951). Subsection (d) then addresses personal jurisdiction over defendants who do not challenge venue. *Id.*

### ii. The Argument for Subsection (b).

The majority of courts to consider the question have held that subsection (b) provides a statutory basis for service of process and subsection (d) is a venue provision. The seminal authority for this line of cases is *Butcher's Union Local No. 498 v. SDC Investment, Inc.*, decided by the Ninth Circuit in 1986. *See Butcher's Un-*

---

**22.** *E.g., Gatz v. Ponsoldt*, 271 F.Supp.2d 1143, 1159–60 (D.Neb.2003); *BankAtlantic v. Coast to Coast Contractors, Inc.*, 947 F.Supp. 480, 485–86 (S.D.Fla.1996); *Dooley v. United Techs. Corp.*, 786 F.Supp. 65, 70–71 (D.D.C. 1992); *Omni Video Games, Inc. v. Wing Co., Ltd.*, 754 F.Supp. 261, 263 (D.R.I.1991); *Bridge v. Invest Am., Inc.*, 748 F.Supp. 948 (D.R.I.1990); *Clement v. Pehar*, 575 F.Supp. 436, 438 (N.D.Ga.1983); *Univ. Savings Ass'n*

*v. Bank of New Haven*, 765 F.Supp. 35, 36 (D.Conn.1991); *Am. Trade Partners L.P. v. A–1 Int'l Importing Enters., Ltd.*, 755 F.Supp. 1292, 1302 (E.D.Pa.1990); *Abeloff v. Barth*, 119 F.R.D. 315, 329–30 (D.Mass.1988); *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040, 1055 & n. 10 (S.D.N.Y.1987); *Soltex Polymer Corp. v. Fortex Indus. Inc.*, 590 F.Supp. 1453, 1458 (E.D.N.Y.1984).

*ion*, 788 F.2d at 535. There, the court concluded subsection (b) "provided for service of process upon RICO defendants residing outside the federal court's district when it is shown that 'the ends of justice' require it." *Id.* at 538 (quoting 18 U.S.C. § 1965(b)). Subsection (d) went unmentioned in the court's analysis. Courts following *Butcher's Union* either cited the holding without comment, *see, e.g., Lisak,* 834 F.2d at 671, or simply declared subsection (b) to be the service of process provision without explaining why, *see, e.g., Combs,* 886 F.2d at 675; *Contents of Various Accounts,* 971 F.2d at 982.

The Second Circuit conducted the first true analysis of section 1965 in *PT United Can Co. v. Crown Cork & Seal Co.,* where the court fully explained situations where a district court could exercise personal jurisdiction over RICO defendants. *See PT United Can Co.,* 138 F.3d at 70–72. The court first noted "section 1965(a) grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs." *Id.* at 71. As a result, the court reasoned, a civil RICO case could only proceed in a particular court if personal jurisdiction based on the traditional minimum contacts is established as to at least one defendant. *Id.* Subsection (b), then, "provides for nationwide service and jurisdiction over 'other parties' not residing in the district, who may be additional defendants of any kind," if the "ends of justice" so required. *Id.* The court noted requiring some defendants to travel to a foreign court was a necessary consequence of the subsection (a) preference "to bring the action where suits are normally expected to be brought." *Id.* at 71–72. Thus, while "Congress expressed a preference in [section] 1965 to avoid, where possible, haling defendants into far flung fora," drawing defendants to a distant place to litigate is an unavoidable consequence of having the case proceed in one location. *Id.*

Subsection (c), the court held, refers only to the service of subpoenas on witnesses. *Id.* at 72. Consequently, the reference in subsection (d) to "[a]ll other process" must mean "process other than a summons of a defendant or subpoena of a witness." *Id.* Reading subsections (a) through (d) sequentially thus meant the words "other process" meant something "different from that already stated in subsections (a)-(c)." *Id.* (quotation marks omitted). To the Second Circuit, this interpretation gave effect to all pieces of the statute rendering any duplicative, while having the tangential benefit of not "impeding RICO actions and without unnecessarily burdening parties." *Id.* The Tenth Circuit recently adopted this analysis, adding this interpretation is consistent with the statute's legislative history. *See Cory,* 468 F.3d at 1229–31.[23] This interpretation enjoys broad support from various district courts as well.[24]

---

**23.** The Tenth Circuit noted that "[i]n its report on the Organized Crime Control Act of 1970, which gave birth to RICO, the House Judiciary Committee declared that '[s]ubsection (b) provides nationwide service of process ... in actions under section 1964 [providing civil remedies for RICO violations],' and that '[s]ubsection (d) provides ... all other process in actions under the [entire RICO] chapter.'" *Cory,* 468 F.3d at 1231 (quoting H.R.Rep. No. 911549 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4034). The court also harmonized this reading of subsection (b) with antitrust legislation in existence when RICO was adopted which RICO was designed to emulate. *Id.* at 1231 & n. 2 (discussing sections 12 and 15 of the Clayton Act, 15 U.S.C. §§ 22, 25).

**24.** *See Multi–Media Int'l, LLC v. Promag Retail Servs.,* 343 F.Supp.2d 1024, 1030 (D.Kan. 2004); *800537 Ontario Inc. v. Auto Enters., Inc.,* 113 F.Supp.2d 1116, 1126–28 (E.D.Mich.2000); *Suarez Corp. Indus. v.*

The Court finds the rationale adopted by the *PT United Can* court to be persuasive. Once a jurisdictional hook is established by the subsection (a) requirement that at least one defendant be located in the district court where an action is initiated, subsection (b) permits a court to bring before it "other parties residing in any other district" if "it is shown that the ends of justice require" it. 18 U.S.C. § 1965(a), (b). Nationwide service of "process for that purpose"—that is, bringing those "other part[ies]" before the court—is explicitly authorized by subsection (b). *Id.* § 1965(b). Also explicitly authorized is conduct causing parties "to be summoned." *Id.* Subsection (d)'s broad reference to "other process" must therefore mean a species of "process" *other* than "summonses" required to bring "other part[ies]" before the court. *Id.* § 1965(b), (d). Interpreting the statute in this manner renders the *PT United Can* interpretation of section 1965 as a whole consistent with the doctrine of *noscitur a sociis*.

Summarizing, this Court holds section 1965(b) provides a statutory basis for the exercise of personal jurisdiction over non-resident defendants in civil RICO initiated by entities other than the federal government in circumstances identified by the Second Circuit in *PT United Can:* summonses can be served nationwide on all defendants in a civil RICO action if required by the ends of justice, 18 U.S.C. § 1965(b), but only if the action is brought in a district court where personal jurisdiction can be established over at least one defendant, *id.* § 1965(a).[25]

### iii. Application of Subsection (b).

█ No party contends the Court cannot exercise personal jurisdiction over Kerkhoff and Kerkhoff Chiropractic, thereby satisfying section 1965(a). The analysis reduces to whether the "ends of justice" require the Court to exercise personal jurisdiction over the nonresident Defendants.

---

*McGraw,* 71 F.Supp.2d 769, 778 & n. 7 (N.D.Ohio 1999); *Sadighi v. Daghighfekr,* 36 F.Supp.2d 267, 274 (D.S.C.1999); *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.,* 23 F.Supp.2d 796, 803 & n. 16 (N.D.Ohio 1998); *Doe v. Unocal Corp.,* 27 F.Supp.2d 1174, 1182 & n. 4 (C.D.Cal.1998); *Gutierrez v. Givens,* 989 F.Supp. 1033, 1037–38 (S.D.Cal.1997); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists,* 945 F.Supp. 1355, 1366 n. 10 (D.Or.1996); *Hawkins v. Upjohn Co.,* 890 F.Supp. 601, 606 n. 8 (E.D.Tex.1994); *LeDuc v. Ky. Cent. Life Ins. Co.,* 814 F.Supp. 820, 826 (N.D.Cal.1992); *Magic Toyota, Inc. v. Southeast Toyota Distribs., Inc.,* 784 F.Supp. 306, 310–12 (D.S.C.1992); *Does 1–60 v. Republic Health Corp.,* 669 F.Supp. 1511, 1517–18 (D.Nev.1987). *Magic Toyota, Inc. v. Southeast Toyota Distributors, Inc.* was essentially overruled by the Fourth Circuit's conclusion that 1965(d) is the service of process provision. *See ESAB Group,* 126 F.3d at 626. However, courts in that circuit have urged the adoption of the more recent *PT United Can* analysis, which would effectively resuscitate

*Magic Toyota. E.g., Sadighi,* 36 F.Supp.2d at 273–74.

25. The Court is aware this conclusion differs from a recent opinion from a district found in this circuit. *See Gatz,* 271 F.Supp.2d at 1157–60. There, the court was faced with a scenario where venue was improper under 18 U.S.C. § 1965(a) for all of the plaintiffs' claims, and under 28 U.S.C. § 1391 for plaintiffs' claims against all but one defendant who happened to be an alien. *Id.* at 1159. Noting that section 1391(d) allowed an alien to be sued anywhere, *see* 28 U.S.C. § 1391(d), the court refused to permit that happenstance to render venue proper over all defendants under section 1965(b). *Id.* at 1160. Consequently, section 1965(b) was firmly established as a venue—and not a service of process—provision. Completing the classification of section 1965's various pieces, the court has since cited subsection (d) as a provision relating to personal jurisdiction. *See Hirt v. UM Leasing Corp.,* 614 F.Supp. 1066, 1069 (D.Neb.1985).

The "ends of justice" is not defined by RICO but appears in the lexicons of many disparate legal settings, *e.g.*, Fed.R.Civ.P. 15(a) (amendments to pleadings); 5 U.S.C. § 556(c)(4) (depositions for certain hearings under the Administrative Procedures Act); 18 U.S.C. § 3161(h)(8)(A) (continuances under the Speedy Trial Act), means different things depending on the setting, *see Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (noting that if "constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanically to defeat the ends of justice"); *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (administrative agencies may "relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it" (quotation marks omitted)), rendering its meaning difficult to fix. *Sanders v. United States*, 373 U.S. 1, 17, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) (the "ends of justice" standard "cannot be too finely particularized.").

### (a) The Ninth Circuit Approach.

The Ninth Circuit has suggested the meaning of the "ends of justice" provision could be espied by examining the statute and its legislative history. *Butcher's Union*, 788 F.2d at 538–39. The court noted Congress's "express statement that the purpose of the Act was to eradicate organized crime" nationwide, and then placed the "ends of justice" phrase in a section providing for nationwide service of process. *See id.* at 539. As a result, the court reasoned, "Congress intended the 'ends of justice' provision to enable plaintiffs to bring all members of a nationwide RICO conspiracy before a single court in a single trial" so long as the court has personal jurisdiction over at least one defendant in the multijurisdictional conspiracy. *Id.* As an illustration, the court stated that the "ends of justice" would be served by bringing all participants in a conspiracy together before one court where "there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Id.*[26] This interpretation is not without support.[27]

### (b) The Tenth Circuit Approach.

The Tenth Circuit rejected this line of reasoning, arguing that it insufficiently considers "the congressional directive to 'liberally construe ... [RICO] to effectuate its remedial purposes,' nor the antitrust legislation on which RICO was modeled." *Cory*, 468 F.3d at 1231–32 (quoting H.R.Rep. No. 91–1549 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4036, 4034). Opening with congressional intent, the court correctly noted that "RICO was intended as a means to eradicate organized crime." *Id.* at 1232. However, the court stated, this "purpose is not furthered by withholding nationwide service of process whenever all of the RICO defendants could be haled into one court for a single trial." *Id.* While that approach might preserve

---

26. In *PT United Can*, the Second Circuit noted the district court's understanding that *Butcher's Union* holds that " 'the ends of justice' [referred] to a case in which there is no district with personal jurisdiction over all defendants." *PT United Can*, 138 F.3d at 72 n. 5 (citing *Butcher's Union*, 788 F.2d at 538–39). This conclusion was unchallenged on appeal. *Id.*

27. *E.g., Multi–Media Int'l*, 343 F.Supp.2d at 1030–31; *Youming Jin v. Ministry of State Sec.*, 335 F.Supp.2d 72, 84 n. 8 (D.D.C.2004); *In re North*, 279 B.R. 845, 851 (Bankr.D.Ariz. 2002) (dicta); *Unocal Corp.*, 27 F.Supp.2d at 1182; *Gutierrez*, 989 F.Supp. at 1037–38; *Planned Parenthood of Columbia/Willamette*, 945 F.Supp. at 1366 n. 10; *LeDuc*, 814 F.Supp. at 826; *Republic Health Corp.*, 669 F.Supp. at 1517–18.

judicial resources, wrote the court, "it might also mean that some RICO violations would go unpunished whenever organized criminals operate within the same locale and cause harm in a distant state." *Id.* If the victim of such crime cannot finance long-distance litigation, for example, the criminal enterprise would be insulated from liability, creating a situation inconsistent with RICO's purpose. *Id.*

Turning to the antitrust statutes RICO was based upon, the *Cory* court noted the Clayton, Sherman, and Wilson–Gorman Tariff Acts each contained a similar "ends of justice" provision that described situations where the "ends of justice" allowed "other parties" to be summoned before the court, "whether they reside in the district in which the court is held or not." *Id.* The Tenth Circuit then noted that in a case interpreting the Sherman Act, the Supreme Court "has rejected the notion that a confluence of defendants within a single judicial district controls the 'ends of justice' analysis." *Id.* (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 46, 31 S.Ct. 502, 55 L.Ed. 619 (1911)). In *Standard Oil Co. v. United States*, the Supreme Court held that personal jurisdiction had been acquired over nonresident defendants under the Sherman Act's "ends of justice" language by the presence of only one defendant within the district. *Standard Oil*, 221 U.S. at 46, 31 S.Ct. 502. The *Standard Oil* Court did not require the non-existence of another district in which personal jurisdiction over each defendant would lie. *See id.* In reliance on this statement, the *Cory* court concluded, "the 'ends of justice' analysis is not controlled by the fact that all defendants may be amenable to suit in one forum." *Cory*, 468 F.3d at 1232.

The court stopped short of offering a competing definition, however, noting only that "the 'ends of justice' is a flexible.

concept uniquely tailored to the facts of each case." *Id.* Whatever the standard happened to be, on the facts before it— where the plaintiff urged nationwide service—where a Kansas resident urged nationwide service because he had "sustained damages and litigation costs in" Kansas but had not "claim[ed] a financial impediment to suit in" Pennsylvania the location of all defendants—the standard was not met. *Id.* As a result, the court disallowed nationwide service of process in the case before it. *See id.* Other courts have applied a flexible rule as well, recognizing under even a more flexible test that the availability of an alternative forum is an important factor. *See, e.g., Suarez Corp. Indus.*, 71 F.Supp.2d at 778–79 & n. 7; *Magic Toyota*, 784 F.Supp. at 311–12 ("In the face of evidence that an alternative forum is available, and in the absence of any evidence, other than convenience to the plaintiff, that justice requires haling to this district persons otherwise not amenable to suit in [the forum] when an alternative forum is available, this Court declines to extend personal jurisdiction pursuant to § 1965(b).").

### (c) Application of the Tests.

Beginning with dual criticisms of the *Butcher's Union* test set forth in *Cory*, the Court concludes neither militate against allowing nationwide service in the case at bar. The Tenth Circuit's concern that the *Butcher's Union* test would insulate from liability organized criminal enterprises operating in only one location but causing harm in a distant location is not implicated here because the purported activity did not occur in just one location. *Cory*, 468 F.3d at 1232. As a result, the hypothetical situation where a victim could not finance long-distance litigation is inapplicable because the purported victims of the alleged enterprise reside in this district. *See id.*

Turning to the second criticism of *Butcher's Union*, this Court expresses concern with the *Cory* court's understanding of the *Standard Oil* Court's treatment of section 5 of the Sherman Act, which, according to the Tenth Circuit, undercut the *Butcher's Union* rule that "the ends of justice" are served by drawing defendants to a distant place only if there exists no district which could exercise personal jurisdiction over all defendants in an action. *See id.* In *Georgia v. Pennsylvania Railroad Co.*, a divided Court noted that under section 5 of the Sherman Act, a court before which a section 4 action is pending may "bring in parties who reside outside the district in which the court is held." *Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 467, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (citing *Standard Oil*, 221 U.S. at 46, 31 S.Ct. 502) (5–4 opinion). However, the Court immediately recognized that "since [section] 4 is limited to suits brought by the United States, [section] 5 is similarly confined." *Id.* As a result, whether *Standard Oil* applies to permit the exercise of jurisdiction over Sherman Act defendants in actions initiated by plaintiffs *other* than the federal government is unlikely. *See, e.g., Kohn v. Telepromter Corp., Tele–Q Corp.*, 22 F.R.D. 259, 261 (S.D.N.Y.1958) (section 5 "permits joinder of all persons where the ends of justice require it but that section applies only to anti-trust suits brought by the United States"); *Kaeppler v. James H. Matthews & Co.*, 180 F.Supp. 691, 693 (E.D.Pa.1960) (a court has no authority under section 5 "to bring in defendants who reside outside the district in which the court is held").

Still, the Court determines the *Butcher's Union* test is too restrictive. Once venue is established over one defendant under section 1965(a), subsection (b) permits the court to cause "other parties residing in any other district [to] be brought before the court" if "it is shown that the ends of justice require" it. 18 U.S.C. § 1965(a), (b). The "express statement that the purpose of the Act was to eradicate organized crime" nationwide noted by the *Butcher's Union* court would be best served by *expanding*—not contracting—the scenarios in which all defendants could be brought to one place for trial. *Butcher's Union*, 788 F.2d at 539; *see also Suarez Corp. Indus.*, 71 F.Supp.2d at 778 & n. 7. While the situation where there exists "no other district in which a court [would] have personal jurisdiction over all of the alleged co-conspirators," *Butcher's Union*, 788 F.2d at 539, would certainly be one such instance where justice would require bringing defendants to a distant place to litigate, that is not the only reason the ends of justice would require such a course, *e.g., Cory*, 468 F.3d at 1232 (suggesting financial difficulties of forcing a plaintiff to litigate from afar or a showing by a forum resident of a harm exceeding litigation costs and nebulous damages would be sufficient); *Suarez Corp. Indus.*, 71 F.Supp.2d at 778 (requiring two trials in different places against parties who work together and who both have close involvement with events underlying the plaintiffs' case would not serve the ends of justice).

At bottom, the nonresident Defendants are not amenable to service of process under either test. While it is unlikely that Kerkhoff or his clinic could be haled to a place other than Iowa to defend against Plaintiffs' action, and Defendants do not argue either could be drawn into litigation in another place, it is *Plaintiffs'* obligation to demonstrate the existence of personal jurisdiction. Even though Plaintiffs could satisfy this minimal burden with minimal evidence, they have pointed to no evidence. Consequently, Plaintiffs cannot satisfy the *Butcher's Union* test.

Even under the more flexible approach advocated by the *Cory* court, Plaintiffs'

failure to include a showing that an alternative forum does not exist for prosecuting their actions is an important weight against bringing the nonresident Defendants to Iowa. Further, Plaintiffs have identified absolutely no way the ends of justice would be served by requiring The Masters Circle, Markson, Perman, or Hoffman to travel to Iowa to litigate. While the Court is aware that RICO was designed to prevent multiple trials in multiple locations focusing on the same alleged conspiracy, Plaintiffs have simply not shown that outcome would result.

The Court concludes the nonresident Defendants are not amenable to service of process in this district under RICO's nationwide service of process provision.

### 2. Constitutional Considerations.

As a result of the conclusion reached above, the Court need not consider whether exercising personal jurisdiction over these Defendants could comport with constitutional principles.

### 3. Conclusion.

The Court concludes that 18 U.S.C. § 1965 cannot operate to provide a basis for the exercise of personal jurisdiction over The Masters Circle, Hoffman, Markson, or Perman.

### C. Personal Jurisdiction Under the *Calder* "Effects" Test.

 Plaintiffs next contend the Court may exercise personal jurisdiction over the nonresident Defendants because the Second Amended Petition contains allegations that Defendants engaged in an intentional tort that was "aimed at" Iowa. This is an argument based on an "effects" test suggested by the United States Supreme Court in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

### 1. Applicable Legal Standards.

In *Calder*, the Supreme Court endorsed a test that allowed a court to assert personal jurisdiction over nonresident defendants who take acts performed for the specific purpose of having their consequences felt in the forum. There, a California resident brought a libel action in California against the editor and publisher of the newspaper publishing the offending story and the reporter who authored it. *Id.* at 784–85, 104 S.Ct. 1482. The reporter and the publisher and editor were Florida residents. *Id.* The story giving rise to the cause of action "concerned the California activities of a California resident," "impugned the professionalism of an entertainer whose television career was centered in California," was "drawn from California sources, and the brunt of the harm, in terms both of [the plaintiff]'s emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788–89, 104 S.Ct. 1482. Because "California [was] the focal point both of the story and of the harm suffered," jurisdiction over the Florida residents was proper "based on the 'effects' of their Florida conduct in California." *Id.* at 789, 104 S.Ct. 1482 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); Restatement (Second) Conflicts of Law § 37).

The defendants claimed the exercise of personal jurisdiction was improper because they "ha[d] no direct economic stake in their employer's sales in a distant State," and could not "control their employer's marketing activity" in a distant place. *Id.* As a result, they argued, the fact that they could foresee circulation of the article in California should not suffice for an assertion of jurisdiction. *Id.* Rejecting this argument, the Court first noted the defendants were "not charged with

mere untargeted negligence;" instead, they undertook "intentional, and allegedly tortious, actions [which] were expressly aimed at California." *Id.* Because one defendant wrote and the other edited an article they were each consciously aware "would have a potentially devastating impact upon" the plaintiff in a place where the plaintiff lived and the newspaper had its largest circulation, the defendants "must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article." *Id.* (quoting *World–Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. 559); *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780–81, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (publisher's exploitation of the market required finding the publisher "must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine"). Because both defendants participated in "an alleged wrongdoing intentionally directed at a California resident, ... jurisdiction over them [was] proper on that basis." *Calder*, 465 U.S. at 789, 104 S.Ct. 1482.

Our circuit has elaborated on the situations where the "effects" test can be used to exercise personal jurisdiction over an out-of-state defendant. *See Oriental Trading Co. v. Firetti*, 236 F.3d 938, 942–43 (8th Cir.2001) (holding that "[b]y purposely directing their fraudulent communications at residents of [the forum], the defendants should have realized that the brunt of the harm would be felt there"); *Finley v. River N. Records, Inc.*, 148 F.3d 913, 916–17 (8th Cir.1998) (fraudulent conduct by record company intended to induce commercial activity in the forum rendered exercise of personal jurisdiction proper); *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390–91 (8th Cir.1991) (*Calder* permits exercise of personal jurisdiction over nonresident who produced

products bearing infringing trademark with knowledge of infringement where the defendant's "actions were uniquely aimed at the forum state and that the 'brunt' of the injury would be felt there," even product sales resulted exclusively from others' unilateral actions). *But see Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir.1992) (per curiam) (written statements promoting defendant's products which were not published in the forum but were sent into the forum to plaintiff's customers deemed insufficient: while "promotion and solicitation may have an effect on a competitor, absent additional contacts, this effect alone will not be sufficient to bestow personal jurisdiction"). However, even when an intentional tort or fraud is alleged to have been specifically or expressly directed at the forum and foreseeably caused the "brunt" of its harm therein, personal jurisdiction does not necessarily lie. In the seminal case in our circuit, the court noted that by "relying on *Calder*, [it did] not abandon the five-part test of *Land–O–Nod [Co. v. Bassett Furniture Industries, Inc.*, 708 F.2d 1338, 1340 (8th Cir.1983), and instead] simply not[ed] that *Calder* requires the consideration of additional factors when an intentional tort is alleged." *Dakota Indus., Inc.*, 946 F.2d at 1391 (citing *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir.1986)).

## 2. Discussion.

In their brief, the only causes of action Plaintiffs use to support this type of personal jurisdiction are their tortious interference claims. *See* Br. in Supp. of Resist. to Mot. to Dismiss for Lack of Personal Juris. 18–19.

In neither the Second Amended Petition nor the Third Amended Complaint do Plaintiffs allege, however, that the nonresident Defendants' conduct was aimed spe-

cifically or uniquely at Iowa. *See Calder*, 465 U.S. at 789, 104 S.Ct. 1482 ("focal point" of conduct "aimed expressly at" the forum as well as the resulting harm's location in the forum served as the basis of litigation); *Oriental Trading Co.*, 236 F.3d at 943 (action aimed directed exclusively and "purposely" at the forum); *Finley*, 148 F.3d at 916–17 (fraudulent communications sent exclusively at the forum); *Dakota Indus., Inc.*, 946 F.2d at 1390–91 (noting defendant's "actions were uniquely aimed at the forum"). Instead, Plaintiffs' pleadings suggest the nonresident Defendants allegedly carpeted the nation with literature and instructions chiropractors used to boost their practices, which had the concomitant effect of rendering the chiropractor-patient relationship toxic enough to amount to intentional interference. Plaintiffs' pleadings are devoid of allegations that the nonresident Defendants intentionally *focused* their conduct at Iowa; instead, if Plaintiffs' allegations are correct, the nonresident Defendants spoke to whoever would listen. *See, e.g.,* Second Am. Pet. ¶ 47 ("Defendants intentionally aimed their conduct at potential patients *throughout the United States*, including those located in Iowa."). That is not indicative of a harm specifically directed at a particular place.

The record is also devoid of allegations that the "brunt" of the nonresident Defendants' actions manifested as a tangible harm in Iowa. *See Calder*, 465 U.S. at 788–89, 104 S.Ct. 1482 (brunt of harm focused in California as a result of the plaintiff's residence and comparatively large circulation of newspaper in that state); *Oriental Trading Co.*, 236 F.3d at 942–43 (personal jurisdiction existed because "defendants should have realized that the brunt of the harm would be felt" in the forum); *Finley*, 148 F.3d at 916–17 (same); *Dakota Indus., Inc.*, 946 F.2d at 1390–91 (brunt of injury occurred in the forum). Again, if Plaintiffs

are correct, Defendants' engaged in similar conduct nationwide, causing harm spread over a variety of states.

Plaintiffs' pleadings are simply insufficient. Accordingly, *Calder* does little to aid Plaintiffs.

### D. Personal Jurisdiction Under the Iowa Long–Arm Statute.

Next, Plaintiffs argue the Court may exercise personal jurisdiction over the nonresident Defendants under the Iowa long-arm statute.

#### 1. Applicable Legal Principles.

Federal Rule of Civil Procedure 4(k)(1)(A) provides that service of summons "is effective to establish jurisdiction over the person of a defendant who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." Fed.R.Civ.P. 4(k)(1)(A). As a result, for personal jurisdiction to lie, Iowa's long-arm statute must give the Court authority to exercise jurisdiction over each Defendant. *See* Fed.R.Civ.P. 4(k)(1)(A); *Omni Capital Int'l*, 484 U.S. at 108, 108 S.Ct. 404 (citing predecessor rule). This power is not unlimited; the Supreme Court has repeatedly explained how a state's ability to exercise personal jurisdiction over an out-of-state defendant is mitigated by the strictures of due process.

The jurisdictional reach of Iowa's state courts is commensurate with that permitted by due process principles embedded in the federal constitution. *Hammond v. Fla. Asset Fin. Corp.*, 695 N.W.2d 1, 5 (Iowa 2005); *see McCabe v. Basham*, 450 F.Supp.2d 916, 922 (N.D.Iowa 2006); *Wright v. City of Las Vegas*, 395 F.Supp.2d 789, 801 (S.D.Iowa 2005). As a result, the Court is left with the sole issue of whether exercising personal jurisdiction

over each nonresident Defendant is consistent with principles of due process.

"[D]ue process requires ... that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken*, 311 U.S. at 463, 61 S.Ct. 339). This requirement is met if the case or controversy is related to or arises out of a sufficient number of activities a defendant directs at the forum state (specific jurisdiction), or if a defendant has continuous and systematic contacts with the forum state (general jurisdiction). *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–76 & nn. 15, 17–18, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–15 & nn. 8–9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In either event, contacts that are more than random, fortuitous, or attenuated are needed; requiring a defendant to purposely direct conduct at the forum state ensures a defendant's connection with the forum state is sufficient to cause the defendant to "reasonably anticipate being haled into court" in the proposed forum, *World–Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. 559. The Supreme Court has articulated when a defendant should "reasonably anticipate" out-of-state litigation:

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

Of course, even if a nonresident defendant has intentionally established minimum contacts with the proposed forum, a federal court may still decline to exercise personal jurisdiction over that defendant if to do so is inconsistent with notions of "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154. It must be "reasonable ... to require the [defendant] to defend the particular suit which is brought there." *Id.* at 317, 66 S.Ct. 154. The Supreme Court has described when it is "reasonable" to require a defendant to travel to a foreign state to defend oneself:

> "[i]mplicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiff's power to choose the forum; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

*World–Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S.Ct. 559 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223; *Kulko v. California Superior Ct.*, 436 U.S. 84, 92, 93, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Shaffer*, 433 U.S. at 211 n. 37, 97 S.Ct. 2569).

The constitutional test has been distilled to a frequently, consistently, and

recently applied two-part five-factor test. The quintet of factors are (1) the nature and quality of the contacts with the forum, (2) the quantity of such contacts, (3) the relation of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *Johnson,* 444 F.3d at 956; *Romak USA,* 384 F.3d at 984; *Dever,* 380 F.3d at 1073–74; *Lakin,* 348 F.3d at 711–12 & n. 11; *Stanton,* 340 F.3d at 694; *Pecoraro,* 340 F.3d at 562; *Epps,* 327 F.3d at 648; *Porter v. Berall,* 293 F.3d 1073, 1076 (8th Cir.2002). Part one of the test, which carries the most weight, requires aggregation and application of first three factors and is used to test whether a defendant has established a "substantial connection" with the forum. Within this step, the third factor distinguishes cases invoking specific personal jurisdiction from those invoking general personal jurisdiction. *Burlington Indus., Inc. v. Maples Indus., Inc.,* 97 F.3d 1100, 1102 (8th Cir.1996); *Digi–Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.,* 89 F.3d 519, 522 n. 4 (8th Cir.1996); *Bell Paper Box, Inc. v. U.S. Kids, Inc.,* 22 F.3d 816, 819 (8th Cir.1994). Part two applies the final pair of factors and determines whether the exercise of personal jurisdiction is "reasonable." *See Lakin,* 348 F.3d at 712 n. 11.

### 2. Summary of Defendants' Contacts.

#### a. The Masters Circle.

The Masters Circle emphasizes it lacks many of the contacts which would make this analysis straightforward. It lacks an office, registered agent, bank account, mailing address, and telephone number in Iowa. It leases and owns no real or personal property here. All of its corporate records and personnel are located in states other than Iowa. The company sends no mail from and receives no mail in Iowa. The Masters Circle notes it has never been licensed to do business in Iowa and pays no taxes to this state's government. The company does not market itself in publications specifically directed at Iowa and does not tailor its business products to serve Iowa residents. While the record presently contains a fact question regarding whether The Masters Circle sends advertising fliers through the mail, the Plaintiffs receive the benefit of this dispute.

The record does show one employee, Hughes, worked for the company in 2003 and 2004 while she was an Iowa resident. While there, she provided coaching services for The Masters Circle, facilitated the establishment of a speakers program at Palmer that featured The Masters Circle's executives, and oversaw the establishment of a student group designed to emulate the teachings of the organization.

The record shows the organization has derived considerable revenue from Iowa residents. Seventeen Iowa residents were dues-paying members as of June 2005, and twenty-one others were once members. As a prerequisite to membership, each Iowa resident was required to sign a contract exceeding one year in length obligating the member to make payments aggregating to thousands of dollars.[28] The

---

**28.** Defendants imply that a mandatory forum selection clause in the contracts between The Masters Circle and its members indicating New York is the sole forum for litigating disputes related to the contract is evidence that The Masters Circle did not avail itself of the benefits and protections of Iowa law. Our circuit has held that " '[d]ue process is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause.' " *St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.,* 270 F.3d at 624 (quoting *Dominium Austin Partners, LLC v. Emerson,* 248 F.3d 720, 726 (8th Cir.2001)); *cf. Dunne v. Libbra,* 330 F.3d 1062, 1064 (8th Cir.2003)

company has realized more than a quarter-million dollars in membership dues from Iowa residents since 2001. Iowa chiropractors are also required to maintain contact with the company and comply with the company's rules regarding the provision of chiropractic care. They are encouraged to—and do—regularly contact The Masters Circle to avail themselves of its coaching services: More than 1300 telephone calls have accrued between The Masters Circle and Iowa residents. Nearly all of the coaches submitting affidavits in conjunction with this action have coached Iowa residents and most have visited Iowa during the time of their employment with the company. Hoffman, Perman, and Markson have all served as coaches, and each is confident that one coached an Iowa resident at some point.

Members are also encouraged to purchase the company's products. Products sold to Iowa residents over the last four years total more than $30,000 in value.

Still more contacts between The Masters Circle and Iowa stem from the company's relationship with Palmer. The Masters Circle's agents participated in a Winners Circle there in 2002, where speakers educated members of the organization. Other times, The Masters Circle constructed a booth at Palmer where corporate representatives answered questions about the company and made company materials available for sale. Principal figures of the company have delivered multiple speeches at the college, and students of the college have banded together to form a club in the company's namesake to study the philosophies and purposes of the organization, fueled with literature provided by the company itself.

The Masters Circle also maintains a website, accessible to any Iowa resident with an internet connection. The corporate website is not specifically directed at any one location, nor does it contain information useful or of interest to a specific locale.

The website provides contact information for The Masters Circle's offices, contains online registration forms for seminars, and presents a feedback form for comments and questions. The website gives visitors an opportunity to learn about the company and purchase its products. The public cannot apply for membership through the website; interested chiropractors are directed to call a toll-free number for more information. Iowa residents who are members are provided a password to a secure area of the company's website. Once inside, they can interact with each other and The Masters Circle's coaches and access members-only materials. An online bulletin board provides another medium of communications. The materials available include documents authored by Markson, Hoffman, and Perman, and are

("With [a permissive forum selection], a defendant is more strongly deterred from challenging personal jurisdiction in a suit that is filed in the consented-to-jurisdiction than he or she would be if such a clause were absent."). This language operates to confer jurisdiction over the person of a defendant in the place mentioned in the clause.

No party to this litigation contends the nonresident Defendants' amenability to personal jurisdiction in New York is a relevant issue. More saliently, no party has directed the Court to, and the Court's own research has not uncovered, binding precedent holding that a contract armed with a valid mandatory forum selection clause operates to eliminate *another* state's ability to exercise personal jurisdiction over a party to a such a contract. As a result, the Court concludes that while the forum selection clause is evidence that The Masters Circle and the Iowa residents signing the contracts in question may have waived any challenge to personal jurisdiction in New York, it is not evidence the nonresident Defendants do not have the necessary minimum contacts with Iowa to satisfy due process.

updated on a regular basis. The internet is the primary way The Masters Circle communicates with its members.

These contacts are supplemented by those of Hoffman, Markson, and Perman, to which the Court now turns.

### b. Individual Defendants.

While Markson was an Iowa resident from 1958 to 1961, that contact with Iowa is too long ago to carry relevance because the requisite contacts " 'must exist either at the time the cause of action arose, the time the suit was filed, or within a reasonable period of time immediately prior to the filing of the suit.' " *Johnson*, 444 F.3d at 955–56 (quoting *Pecoraro*, 340 F.3d at 562); *see also id.* at 956 (holding, in 2006, that "contacts asserted in the 1960s, 70s, and 80s are not within the reasonable timeframe"). So, too, is his return to Iowa in 1965 to receive his Philosopher of Chiropractic degree.

More important are his returns to Iowa in 2001, 2002, and 2003 to attend celebrations and give speeches at Palmer. These speeches netted honoraria for The Masters Circle. During his stays, he interacted with Iowa residents, making himself available to answer questions about The Masters Circle's products and services. The record also reveals a visit in June 2002 to attend lectures at a Winners Circle event at Palmer and at least one other visit in 2002 to speak to Palmer students. Another trip occurred in April 2004, where he attended an open house hosted by an Iowa member of The Masters Circle. At this event, he provided information to Kerkhoff that directly led to Kerkhoff's decision to join the organization. Markson has also received periodic telephone calls and e-mails from Iowa residents and is confident he has coached at least one Iowa resident. He also authored materials for The Masters Circle that were sent into Iowa either electronically or through the mail.

Hoffman has been to Iowa around a dozen times, some of which occurred before his affiliation with The Masters Circle. Otherwise, the nature of his visits mirrors Markson's: In 2002 he attended a lecture at Palmer followed by a Winners Circle meeting and visited Palmer seven to nine other times as a compensated lecturer or guest. Like Markson, he interacted with the public at a booth operated by The Masters Circle. Hoffman has also fielded sporadic telephone calls and e-mails by Iowa members and faculty members of Palmer and is confident he has coached at least one Iowa resident. He has spoken over the telephone to Masters Circle Club students at Palmer and participated in a POD available to all Masters Circle Club members nationwide. Like Markson, some of the materials he has authored have been distributed in Iowa.

Of the five times Perman has been to Iowa, one occurred before he became affiliated with The Masters Circle. As an agent of The Masters Circle, he came to Iowa in 2001 to attend classes and speak at Palmer. In June and August 2002, and again in August 2003, he visited Palmer to attend lectures, Winners Circle meetings, and classes. He has fielded occasional telephone calls and e-mails from Iowa members but has coached no Iowa residents.

### 3. Nature, Quality, and Quantity of the Nonresident Defendants' Contacts, and the Relation of Such Contacts to Plaintiffs' Causes of Action.

As directed, the Court considers the first three factors together.

### a. The Masters Circle.

 The Court opens by considering the effect of The Masters Circle's web site.

### i. Internet Contacts.

While The Masters Circle also communicates through the mail and over the tele-

phone, the record shows the internet is the primary way the company interacts with its members. At least some of this communication occurs through The Masters Circle's website. As a result, the level of interactivity of this website is of considerable debate in this litigation.

### (a) Legal Standards.

The continuous and illimitable presence of the internet has required fashioning special rules for applying the traditional due process test outlined above. This technological advance—like the automobile and telephone—has not rendered impotent the constitutional requirement that a defendant have some intentional connection with a forum before being haled into court to defend an action. In *Hanson v. Denckla,* the Supreme Court noted that

> [a]s technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase. At the same time, progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over nonresidents have evolved from the rigid rule of *Pennoyer v. Neff*[, 95 U.S. 714, 24 L.Ed. 565 (1900) ] to the flexible standard of *International Shoe Co. v. State of Washington.* But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.

*Hanson,* 357 U.S. at 250–51, 78 S.Ct. 1228 (citations omitted). As a result, only those persons within a state or having minimum contacts with a state may be subject to defend actions there. In other words, merely because the internet is accessible to virtually anyone with a cell phone or a phone jack and a computer, that accessibility does not expand the traditional geographically-based ability of a state to exercise its judicial power over only some individuals. As a result, courts must look at the types of contacts used to "symbolize those activities . . . within the state which courts will deem to be sufficient to satisfy the demands of due process." *Int'l Shoe,* 326 U.S. at 317, 66 S.Ct. 154. Signals transmitted through electromagnetic radio waves emitting from cellular phone or packets of data streaming through a telephone wire can be such an activity. Determining what kind of and how many contacts are needed to satisfy due process has proven a struggle.

In the context of website found on the internet, the United States District Court for the Western District of Pennsylvania established a "sliding scale" test to gauge whether contacts occurring through a website permit the exercise of personal jurisdiction. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997). There the court constructed a framework that classified website into three broad categories:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those

who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Zippo Mfg.*, 952 F.Supp. at 1124 (citations omitted). Courts adopting this test have emphasized that a defendant's digital activities must be intentionally directed into the forum. The Fourth Circuit, for example, has seasoned the *Zippo* test with a *Calder*-like flavor by requiring the defendant to have directed electronic activity into the forum creating a potential cause of action " 'with the manifested intent of engaging in business or other interactions within the State.' " *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 399 (4th Cir.2003) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir.2002)). The Ninth Circuit requires " 'something more' [than a passive web site containing advertising and contact information] to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state." *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir.1997). The "something more" has been shown upon an identification of contact sufficient to satisfy the

*Calder* "effects" test. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320–22 (9th Cir.1998). In the Sixth Circuit, the presence of a website that is "interactive to a degree that reveals specifically intended interaction with residents of the state" is sufficient to show purposeful availment. *Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir.2002); *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir.2002); *accord See, Inc. v. Imago Eyewear Pty, Ltd.*, 167 Fed.Appx. 518, 522 (6th Cir.2006). The Third Circuit questions whether a defendant conducted activity in the forum "by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir.2003). Similarly, the Second Circuit uses the *Zippo* model not as a separate analytical framework but as a tool to decide whether a defendant has "transacted business" in the forum. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 251–52 (2d Cir.2007).

The Eighth Circuit has said little regarding how the *Zippo* test is to be applied. However, the court recently analyzed the framework and concluded it was properly used in cases where specific personal jurisdiction was alleged. *See Lakin*, 348 F.3d at 711. Where general personal jurisdiction was alleged to exist, the court held "the *Zippo* test alone is insufficient for the general jurisdiction setting." *Id.* at 711–12.[29] Instead, the proper analytical

---

**29.** More specifically, the court noted that unlike in specific personal jurisdiction cases, the third of the five factors (the connection of contacts with the cause of action) is irrelevant in general jurisdiction cases because the cause of action need not arise out of a defendant's contact with the forum. *Lakin*, 348 F.3d at 712. The middle category of *Zippo's* sliding scale requires consideration of "the level of interactivity and commercial nature

of the exchange of information that occurs on the Web site." *Zippo Mfg.*, 952 F.Supp. at 1124. This analysis is an excellent indicator of whether a defendant's contacts relate to the cause of action but is a poor detector of the type of substantial and continuous contacts required for general personal jurisdiction. *Lakin*, 348 F.3d at 711–12. To illustrate, it would be possible for a website to be extremely interactive but lack the quantity of contacts

framework is to "first apply the *Zippo* test and then also look at the quantity of those contacts with [the forum's] residents." *Id.* at 712. Both approaches require fixing The Masters Circle's website on *Zippo's* sliding scale.

### (b) Analysis.

The Masters Circle website is not passive because it does much "more than make information available to those who are interested in it." *Zippo Mfg.,* 952 F.Supp. at 1124; *see Soma Med. Int'l v. Standard Chartered Bank,* 196 F.3d 1292, 1296–97 (10th Cir.1999) (informational website insufficient to establish purposeful availment); *Mink v. AAAA Development LLC,* 190 F.3d 333, 336–37 (5th Cir.1999) (website listing an e-mail address, a printable order form, and the defendant's toll-free telephone number deemed passive in the absence of some interactive feature (such as the ability of consumers to order or purchase products)); *Cybersell,* 130 F.3d at 419–20 (website through which nonresident defendant "conducted no commercial activity" except collecting the visitor's name, address, and expression of interest, and merely described the defendant's services insufficient to constitute purposeful availment, particularly because the defendant did nothing to encourage forum residents to access its website); *United Fire & Cas. Co. v. Applied Fin., Inc.,* 397 F.Supp.2d 1086, 1093 (N.D.Iowa 2005) (operation of a website that Iowa residents could view without additional evidence of conduct directed at Iowa insufficient to establish necessary connection with the forum); *Med–Tec Iowa, Inc. v. Computerized Imaging Reference Sys., Inc.,* 223 F.Supp.2d 1034, 1038 (S.D.Iowa 2002) (website containing a description of the defendant's products, technical and other product information, instructions for customers wishing to place orders for products, and a link to download the defendant's catalog deemed passive because the website "does not permit online placement of orders or any other 'exchange of information' "). To the contrary, the website in question is one "where a user can exchange information with the host computer." *Zippo Mfg.,* 952 F.Supp. at 1124; *see also Carefirst of Md.,* 334 F.3d at 400 (semi-interactive website are those "through which there have not occurred a high volume of transactions between the defendant and residents of the foreign jurisdiction, yet which do enable users to exchange information with the host computer"). In addition to learning about the company, visitors can browse the company's bookstore and send feedback about their experiences to the company. *Christian Science Bd. of Directors of First Church of Christ, Scientist v. Nolan,* 259 F.3d 209, 218 n. 11 (4th Cir.2001) (observing in dicta that a website "invit[ing] visitors to the site to e-mail questions and information requests" is not passive, but is "minimally interactive"). *But see See,* 167 Fed.Appx. at 520, 522–23 (website which did not permit purchases but allowed visitors to view products and submit a form detailing whether the individual might need the defendant's products (eyeglasses), the individual's contact information, how the individual learned about the website, and any other feedback is insufficient to establish purposeful availment). Members of the public can purchase products or submit a feedback form with their contact information. *See Mink,* 190 F.3d at 337 (ability to purchase products through a website is evidence of interactivity); *see also Carefirst of Md.,* 334 F.3d at 394–95, 400–01 (website through which members of the public could submit

required to find general personal jurisdiction. *See id.* at 712. As a result, the *Zippo* test

alone is insufficient where general personal jurisdiction is alleged.

their addresses and names along with a credit card donation and thereafter receive advertising materials through the mail is semi-interactive); *Bird,* 289 F.3d at 874–75 (showing that defendant established a website through which forum residents could register domain names and allegedly accepted the business of 4,666 forum residents sufficient to demonstrate purposeful availment); *cf. See,* 167 Fed. Appx. at 522–23 (inability to purchase products evidence of low level of interactivity).[30]

Chiropractors are given the opportunity to sign long-term contracts in exchange for a password to secure areas of the site. The establishment of a "members only" area accessible by password is characteristic of a website with a high degree of interactivity. *See Neogen,* 282 F.3d at 890–91 (company providing passwords to forum residents "as part of a contract for [the defendant]'s services is an interactive usage showing that [the defendant] has intentionally reached out to [forum] customers and enabled them to use [the defendant]'s services from [the forum]"); *see also Lakin,* 348 F.3d at 712 (ability to establish secure accounts and complete online applications for home-equity lines of credit makes a website semi-interactive); *Lindgren v. GDT, LLC,* 312 F.Supp.2d 1125, 1131 (S.D.Iowa 2004) (allowing visitors to establish secure accounts is characteristic of a semi-interactive website). Once inside the "members only" area, members are encouraged to interact with other members and coaches through bulletin boards, read columns and other written materials potentially useful to their practices, and can register for conferences. *See Lakin,* 348 F.3d at 712 (website allowing users to view corporate information, exchange e-mail with the company, establish and access secure accounts, calculate home mortgage rates, and complete applications for home-equity loans or lines of credit is interactive); *Revell v. Lidov,* 317 F.3d 467, 472 (5th Cir.2002) (website permitting participation in an open forum which allowed individuals to post information and receive information others posted is interactive). Written materials are regularly updated, rewarding frequent visitors with the freshest information.

While members are not contractually required to send and receive files over the internet, the record shows they do: Online communications are the primary way the company interacts with its members. For example, electronic newsletters and updates are regularly and intentionally sent to the company's members, some of whom are in Iowa. *Compare Toys "R" Us,* 318 F.3d at 454–55 (company's distribution of e-mails and electronic newsletters insufficient to establish jurisdiction even when combined with two sales of products to forum residents, because the commercial and interactive website was not designed or intended to reach customers in the forum: the website was in Spanish, prices for merchandise were listed in pesetas or Euros, merchandise could only be shipped to addresses in Spain, and none of the fields in the website were designed to accommodate United States addresses). Because the company is aware that some of

---

**30.** The Court notes the actual transactions where customers purchase some of The Masters Circle's products may be with a third party, such as Amazon.com or Yahoo.com. In an analogous situation, the Federal Circuit has held that availability (and purchase) of a defendant's products on website of third parties supports the exercise of personal jurisdiction only if the defendant had some responsibility for the third party's placement of hyperlinks to the products sold. *See Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.,* 395 F.3d 1275, 1281 (Fed.Cir.2005). This is an argument unmade by The Masters Circle, so the Court does not consider it.

its members are Iowa residents, each time the company responds to an e-mail from an Iowa member who asks a question about his practice or requests a coaching tip, the company intentionally establishes a contact with the State of Iowa. *Cf. Intercon, Inc. v. Bell Atlantic Internet Solutions,* 205 F.3d 1244, 1246, 1248–49 (10th Cir.2000) (nonresident company offering dial-up internet service who mistakenly funneled customers' e-mail messages into forum deemed to have intentionally and purposely continued contacts when it persisted in conduct after being informed of the mistake).

Because of its level of interactivity coupled with the use, the Court concludes Plaintiffs have made a *prima facie* showing that The Masters Circle's website is at least semi-interactive, and that The Masters Circle has intentionally directed electronic activity at the State of Iowa.[31] However, as a result of a complete lack of evidence showing the number of times Iowa residents have used the company's website, the number of times The Masters Circle has shipped products into Iowa as a result of a resident's online request, or the number of times a coach has directed an e-mail into Iowa, the Court does not have an adequate evidentiary foundation on the current record upon which to base a conclusion that it may exercise general personal jurisdiction based on the company's internet activities alone. The Court does, however, consider these contacts in conjunction with the company's more traditional contacts presently.

### ii. Non–Internet Contacts.

■ With the exception of Hughes, this is not a case where a nonresident Defendant employs or has ever employed workers in Iowa. It is not a case where a nonresident Defendant owns or leases property in Iowa. It is not a case where a nonresident Defendant has designated an agent for service of process in the state and is registered to do business here. *Compare, e.g., Dever,* 380 F.3d at 1075 (conducting business, employing workers, owning and leasing property, and designating an agent for service of process sufficient to establish general personal jurisdiction), *with, e.g., Burlington Indus., Inc.,* 97 F.3d at 1103 (even though defendant's products were sold to in-state retailers, defendant's officers traveled to the forum to obtain business accounts, and defendant's products were incorporated into products sold at retail or by catalog in the forum, improper to exercise general personal jurisdiction because the defendant had no place of business in the forum, was not registered to do business in the forum, and had no offices, inventory, bank accounts, real or personal property, employees, or agents in the forum). Placing advertisements in national publications like The Masters Circle is not purposeful availment of any specific state's laws. *Wines v. Lake Havasu Boat Mfg., Inc.,* 846 F.2d 40, 43 (8th Cir.1988). And The Masters Circle has not advertised in Iowa, weighing against a finding of the necessary contacts to find personal jurisdiction is proper. *See Porter,* 293 F.3d at 1076–77; *Vandelune v. 4B Elevator Components Unlimited,* 148 F.3d 943, 948 (8th Cir.1998); *FDIC v. Mal-*

---

**31.** Of course, Plaintiffs must adduce additional proof as the standard of proof on this element rises. *See Lakin,* 348 F.3d at 712–13 (suggesting the following data would be helpful to a determination of general personal jurisdiction: the number of times forum residents have accessed the website, requested information about services the owner provides, and used the services provided through the website; the number of times corporate representatives have responded to forum residents' online requests; and the number of requests from forum residents resulting in business for the website's owners).

*mo,* 939 F.2d 535, 537 (8th Cir.1991); *Austad Co. v. Pennie & Edmonds,* 823 F.2d 223, 226 (8th Cir.1987).

This is, however, a case where a nonresident Defendant entered into long-term agreements with Iowa residents creating a continuous obligation on the part of the nonresident to provide an ongoing service to Iowa residents. *Compare Burger King Corp.,* 471 U.S. at 478, 105 S.Ct. 2174 (mere making of a contract with a resident is not sufficient to confer jurisdiction), *accord Morris v. Barkbuster,* 923 F.2d 1277, 1281–82 (8th Cir.1991); *Wines,* 846 F.2d at 43 (per curiam), *with Burger King Corp.,* 471 U.S. at 475–76, 105 S.Ct. 2174 ("[W]here the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws, it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." (quotation marks and citations omitted)); *Lakin,* 348 F.3d at 708–10 (suggesting, but not holding, that home equity loans and lines of credit (contracts measured in years) totaling $10–million in value extended to hundreds or thousands of forum residents likely secured by forum residents' property would support a finding of general personal jurisdiction). The contracts between The Masters Circle and its Iowa members require the company to provide ongoing and intensive consulting services to Iowa chiropractors.

The Court is aware that mere correspondence between an out-of-state defendant and a resident plaintiff cannot typically suffice to establish minimum contacts for purposes of general personal jurisdiction, *Johnson,* 444 F.3d at 956, that even regular purchases of a nonresident's products by resident customers is alone insufficient to exercise general personal jurisdiction, *see Hall,* 466 U.S. at 418, 104 S.Ct. 1868, and that the presence of corporate agents into the forum to train resident customers on the use of the defendant's products is not enough to establish general personal jurisdiction, *see Hall,* 466 U.S. at 418, 104 S.Ct. 1868; *see also Rosenberg Bros. & Co. v. Curtis Brown Co.,* 260 U.S. 516, 517–18, 43 S.Ct. 170, 67 L.Ed. 372 (1923) (insufficient contact between Oklahoma retailer and New York where retailer purchased a large percentage of his wares from New York and the transactions were occasionally made by correspondence and sometimes by visits to New York by an officer of the retailer; "[v]isits on such business, even if occurring at regular intervals, would not warrant the inference that the corporation was present within the jurisdiction of [New York]"). Here, The Masters Circle's agents have visited Iowa to give speeches and disseminated information about the organization to students at an Iowa college though lectures and at a booth. If Plaintiffs' version of the facts is correct, the company has solicited Iowa chiropractors by sending fliers and other materials through the mail. The company has collected over a quarter-million dollars in membership fees and has realized thousands of dollars from product sales.[32] And while many of the thousand

---

**32.** The Court appreciates the distinction between availment of a *market* and availment of a *forum.* *See Soo Line R. Co. v. Hawker Siddeley Canada, Inc.,* 950 F.2d 526, 529 (8th Cir.1991) (error to equate "purposeful availment of the opportunity to enter a market

with purposeful availment of a forum state's benefits and protections"). Sales must be directed at a specific *place* and not at a generic *market* to be relevant. *See Jarvis & Sons, Inc. v. Freeport Shipbuilding & Marine Repair, Inc.,* 966 F.2d 1247, 1250 (8th Cir.1992) (find-

or so telephone calls between The Masters Circle and Iowa residents were initiated by Iowa residents, the record shows The Masters Circle encouraged all of its members to telephone the company regularly for advice and coaching services.

Still, the Court concludes these contacts lack the numerosity and the intensity required to support a finding of general personal jurisdiction over The Masters Circle. The company lacks continuous contacts with Iowa typical of or analogous to a company having a bricks-and-mortar presence here, a registered agent for service of process here, or employees. *See Dever,* 380 F.3d at 1075.

All is not lost for Plaintiffs, however, because the Court concludes their causes of action arise out of a sufficient number of the company's intentional contacts with Iowa to tip the first three factors in favor of finding specific personal jurisdiction. Again, because The Masters Circle is not authorized to do business in Iowa, does not have a place of business in Iowa, and lacks a mailing address, a bank account, personal property, and regular employees in Iowa, the outcome is not obvious. *See, e.g., Epps,* 327 F.3d at 650 (insufficient contacts for specific personal jurisdiction where out-of-state defendant lacked authorization to do business, had no physical place of business, mailing address, bank accounts, or personal property in the forum); *Porter,* 293 F.3d at 1075, 1077 (attorney defendants who were not licensed in the forum, did not maintain offices there, and did not solicit business there could not have foreseen being haled into

the forum state even though they retained a resident agent to transact business in the forum); *Guinness Import Co. v. Mark VII Distrib., Inc.,* 153 F.3d 607, 614–15 (8th Cir.1998) (insufficient contacts between foreign brewer and forum where the brewer was not licensed to do business there, had never maintained a bank account, phone number, or mailing address there, had never owned property there, had never maintained employees or agents for service of process there, and had no control over the distribution of the products once they entered the country); *Soo Line R. Co. v. Hawker Siddeley Canada, Inc.,* 950 F.2d 526, 530 (8th Cir.1991) (lack of intentional business presence in the forum coupled with lack of control defendant exercised over products moved into forum by third party rendered exercise of personal jurisdiction inappropriate).

■ While The Masters Circle's telephone contacts with Iowa have been substantial, as with general personal jurisdiction, contacts by phone or mail are typically insufficient to justify the exercise of specific personal jurisdiction. *See Romak USA,* 384 F.3d at 984–85 (one telephone call not shown to give rise to the causes of action insufficient to render conferral of specific personal jurisdiction proper); *Porter,* 293 F.3d at 1075–76 ("numerous" telephone calls and letters insufficient); *Burlington Indus., Inc.,* 97 F.3d at 1103 (at least 100 telephone calls insufficient alone); *Digi–Tel Holdings,* 89 F.3d at 523 (phone calls, letters, and faxes directed into the forum, even when considered alongside a

ing a lack of attempts by the defendant to modify products for use in a specific market persuasive evidence of a lack of purposeful availment). Here, of course, The Masters Circle did not release products into the general marketplace and then express surprise when some goods made their way to Iowa; the record shows The Masters Circle's products

were either distributed to Iowa on a regular basis as a byproduct of the contractual bargain the company reached with its Iowa members or were specifically shipped to Iowa at the request of the company's customers. This is therefore not a "stream of commerce" case.

contract containing a choice of law clause requiring application of forum state's law and sporadic shipment of products into the forum deemed insufficient); *Wines,* 846 F.2d at 43 (phone calls by a resident to an out-of-state defendant cannot suffice because they are "unilateral activities" of a party other than the defendant (quotation marks omitted)). Such contacts are relevant, of course, because they are *evidence* of a more sustained connection between the forum and the nonresident defendant. *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.,* 111 F.3d 1386, 1390 (8th Cir.1997); *Digi–Tel Holdings,* 89 F.3d at 523; *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.,* 65 F.3d 1427, 1433 (8th Cir. 1995). Here, the bulk of the telephone calls occurring between Iowa residents and The Masters Circle were for the specific purpose of educating Iowa chiropractors on the goals, purposes, and philosophy of the organization. The practices taught by The Masters Circle form the nucleus of Plaintiffs' causes of action.

Additionally, where telephone conversations are accompanied by other contacts—such as visits by corporate representatives or the formation of long-term contracts arising out of the nonresident's contacts with the forum—specific personal jurisdiction can exist. *See, e.g., Dean v. Olibas,* 129 F.3d 1001, 1004 (8th Cir.1997) (nonresident defendant bail bondsman had sufficient contacts with forum after making numerous telephone calls into the forum to locate the plaintiff arrestee, made a personal visit there to locate the plaintiff, and submitted an affidavit to a court in the forum requesting the arrest of the plaintiff that led directly to the plaintiff's claims); *Watlow Elec. Mfg. Co. v. Patch Rubber Co.,* 838 F.2d 999, 1001–03 (8th Cir.1988) (specific personal jurisdiction found where communications occurred between nonresident defendant and a company residing in

the forum, followed by visits by corporate representatives and shipments of products into the forum for inclusion in resident company's products with an eye toward reaching a profitable contract and the plaintiff's claims arose from the contracts in question). The existence of long-term contracts between The Masters Circle and Iowa residents, the fact that shipments of products into Iowa have crossed hundreds of thousands of dollars headed out of Iowa, as well as the frequent and extensive electronic communications occurring over the internet described above are three weighty considerations. *See Wessels, Arnold & Henderson,* 65 F.3d at 1432–34 (specific personal jurisdiction appropriate where a nonresident defendant pursued a business contact with, ratified agent's continued contact with, and negotiated a contract with resident plaintiff, especially viewed in light of telephone and mail contacts into the forum, a choice-of-law provision in requiring application of forum's law, and the performance of the vast majority of the contract within the forum state's borders); *Morris,* 923 F.2d at 1281–82 (while a contract with a resident is alone insufficient to exercise personal jurisdiction, when combined with the distribution of products to the forum pursuant to a contract and visits to the forum by corporate employees to implement the contract contacts "might support" specific personal jurisdiction).

For purposes of specific personal jurisdiction, of course, Plaintiffs must explain how the claims brought relate to the contacts alleged. *Compare Johnson,* 444 F.3d at 956 (contract and related contacts related to agreement by nonresident defendant, Minnesota resident, and Minnesota publishing company to publish a test insufficient where the plaintiff made no effort to explain how the contacts related to his claims), with *Northwest Airlines, Inc.,* 111 F.3d at 1390–91 (contracts with forum se-

lection clauses pointing to the proposed forum, location of negotiations in the forum, more than 200 telephone calls directed into the forum, and presence of corporate agents in the forum "at least three more times" after contracts' execution supported a finding of specific personal jurisdiction for claims arising out of the contracts). Plaintiffs have done so here: They allege the services chiropractors rendered pursuant to education and practice techniques taught by The Masters Circle through the contacts identified caused them harm.

The Masters Circle's contacts with Iowa are not random, fortuitous, or attenuated. These contacts were designed to cultivate relationships with Iowa chiropractors and students and encourage more individuals to become members. These contacts existed for the specific purpose of establishing and developing the very practice techniques Plaintiffs contend caused them harm. These contacts are sufficient in number and type to permit the Court to conclude the first three factors weigh in favor of exercising specific personal jurisdiction over The Masters Circle.

### iii. Individual Defendants.

The contacts between the individual Defendants and Iowa are sparse. Over the last decade, Hoffman has visited Iowa ten times, Perman four, and Markson a dozen. Each visited Iowa to deliver speeches at Palmer, where they promoted The Masters Circle and interacted with Iowa residents. They have each authored material directed into Iowa either through the mail or through the company's website. At one point, each served as a coach, and at least two admit to coaching Iowa residents. Although hardly "continuous" or "systematic," these types of business contacts weigh in favor of exercising jurisdiction if Plaintiffs' claims arise out of these contacts.

Plaintiffs still have alleged a connection between *these Defendants'* contacts with Iowa and their claims. For example, there are no allegations that Hoffman, Markson, or Perman traveled to Iowa to initiate or foster contact with any chiropractor whose conduct gives rise to Plaintiffs' claims. While the record shows Kerkhoff met with Markson at a party, which led to Kerkhoff's decision to join the organization, the record does not show Markson relayed anything to Kerkhoff during that visit to give rise to Plaintiffs' causes of action.

The best argument Plaintiffs muster is related to the observation that Defendants author electronic material that is sent to the company's Iowa members. However, the act of disseminating this material into Iowa belongs to The Masters Circle, not the individual Defendants.

The number of contacts between Iowa and the individual Defendants is low, the quality of the contacts is poor, and the relationship between the contacts and Plaintiffs' claims is unsubstantiated. As a result, consideration of the first three factors in the analysis weighs against exercising personal jurisdiction of any type over the nonresident individual Defendants.

### iv. Conclusion.

Consideration of the first three factors weighs in favor of exercising specific personal jurisdiction over The Masters Circle and against exercising personal jurisdiction in any form over the remaining nonresident Defendants.

### 4. Interest of the Forum State and Convenience of the Parties.

The Court turns to the final two factors with respect to The Masters Circle. Recalling, the Court must assess the interest of the forum in providing a place for its residents to litigate and the convenience of the parties if this matter were litigated in Iowa. *Johnson,* 444 F.3d at 956; *Romak*

*USA*, 384 F.3d at 984; *Dever*, 380 F.3d at 1073–74; *Lakin*, 348 F.3d at 711–12 & n. 11; *Stanton*, 340 F.3d at 694; *Pecoraro*, 340 F.3d at 562; *Epps*, 327 F.3d at 648; *Porter*, 293 F.3d at 1076.

Clearly, Iowa has an interest in resolving the disputes of its citizens. *See Burger King Corp.*, 471 U.S. at 473–74, 105 S.Ct. 2174 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."). The three named Plaintiffs are each residents of Iowa.

With respect to the convenience of the parties, The Masters Circle already conducts business here, and the individual Masters Circle Defendants have each visited Iowa on a number of occasions, having claimed no difficulty or hardship in traveling here. The named Plaintiffs reside in Iowa, and the chiropractors they claim harmed them also reside and do business here. These factors do not militate against the exercise of personal jurisdiction.

### 5. Conclusion.

The Court concludes that the exercise of specific personal jurisdiction over The Masters Circle is appropriate under the Iowa long-arm statute and also comports with due process. The Court concludes the exercise of personal jurisdiction over the remaining Defendants would be improper under this approach.

### E. Personal Jurisdiction Under A "Conspiracy Jurisdiction" Theory.

██ Next, Plaintiffs urge the Court to exercise jurisdiction over the person of each nonresident Defendant because each allegedly participated in a civil conspiracy having an effect or presence in Iowa. Plaintiffs wish this Court to join others which have exercised jurisdiction over nonresident co-conspirators whose acts further a conspiracy which had an effect or caused damage in the forum.[33] For rea-

---

**33.** A variety of courts have either accepted variants of the theory, noted the facts before it were insufficient to satisfy the theory's requirements, or failed to reject the theory when given the opportunity. *See, e.g., Lolavar v. De Santibanes*, 430 F.3d 221, 230 (4th Cir. 2005); *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 Fed.Appx. 662, 666 n. 16 (5th Cir.2004); *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 523–24 (D.C.Cir.2001); *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C.Cir.2000); *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217–18 (11th Cir. 1999); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030–31 (D.C.Cir. 1997); *Stauffacher v. Bennett*, 969 F.2d 455, 459–60 (7th Cir.1992) (Posner, J.); *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424–25 (D.C.Cir.1991); *Chandler v. Barclays Bank PLC*, 898 F.2d 1148, 1155 n. 3 (6th Cir.1990); *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 116 (6th Cir.1988) (per curiam); *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378–79 (D.C.Cir.1988); *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787–88 (D.C.Cir.1983); *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392–93 (7th Cir.1983); *McLaughlin v. McPhail*, 707 F.2d 800, 806–07 (4th Cir.1983); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1236–37 (6th Cir.1981); *Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1208 n. 5 (9th Cir.1980); *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir.1975); *Baldridge v. McPike, Inc.*, 466 F.2d 65, 68 & n. 1 (10th Cir.1972); *Richards v. Duke Univ.*, 480 F.Supp.2d 222, 229 (D.D.C.2007); *Matthews v. Brookstone Stores, Inc.*, 469 F.Supp.2d 1056, 1066–67 (S.D.Ala. 2007); *FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F.Supp.2d 30, 41 (D.D.C.2007); *Am. Copper & Brass, Inc. v. Mueller Europe, Ltd.*, 452 F.Supp.2d 821, 830 (W.D.Tenn.2006); *Compass Mktg., Inc. v. Schering–Plough Corp.*, 438 F.Supp.2d 592, 595 (D.Md.2006); *Flag Co. v. Maynard*, 376 F.Supp.2d 849, 854–55 (N.D.Ill. 2005); *In re Nazi Era Cases Against German Defs. Litig.*, 320 F.Supp.2d 204, 221–22 (D.N.J.2004); *Youming Jin v. Ministry of State Sec.*, 335 F.Supp.2d 72, 78 (D.D.C.2004); *Jung v. Ass'n of Am. Med. Colls.*, 300 F.Supp.2d 119, 141 (D.D.C.2004); *Kohler Co.*

sons identified below, adoption of this theory has not been uniformly embraced.[34]

Because the Iowa long-arm statute is coextensive with constitutional limitations, the sole issue is whether this theory comports the constitutional limitations of due process.

In *Remmes v. International Flavors & Fragrances*, our sister district concluded the conspiracy theory of personal jurisdiction complied with the Fourteenth Amendment's due process clause. *Remmes*, 389 F.Supp.2d at 1093–96. The court first noted that a majority of courts considering the issue have concluded the theory is constitutionally viable. *Id.* at 1093 (collecting authorities). In terms of analysis, the court found it "noteworthy that under Iowa's long arm statute, Iowa may exercise personal jurisdiction over those who commit torts, within or without the state, that cause injury to persons in Iowa." *Id.* (citing *Norton v. Local Loan,* 251 N.W.2d 520, 521 (Iowa 1977)). The court then observed that under Iowa law, a civil conspiracy is itself not actionable, but acts taken to further a conspiracy are, rendering civil conspiracy a mere avenue for imposing liability upon a party for wrongful conduct of others with whom the party has acted in concert. *Id.* (discussing

*v. Kohler Int'l, Ltd.,* 196 F.Supp.2d 690, 696 (N.D.Ill.2002); *In re Vitamins Antitrust Litig.,* 94 F.Supp.2d 26, 32–33 (D.D.C.2000); *Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95, 119–20 (E.D.N.Y.2000); *United Phosphorus, Ltd. v. Angus Chem. Co.,* 43 F.Supp.2d 904, 912 (N.D.Ill.1999); *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1266 (S.D.N.Y.1991); *In re N. Dakota Personal Injury Asbestos Litig. No. 1,* 737 F.Supp. 1087, 1097–98 (D.N.D.1990); *Gudaitis v. Adomonis,* 643 F.Supp. 383, 385 (E.D.N.Y.1986); *Grosser v. Commodity Exch., Inc.,* 639 F.Supp. 1293, 1308 (S.D.N.Y.1986); *Soltex Polymer Corp.,* 590 F.Supp. at 1456–57; *Singer v. Bell,* 585 F.Supp. 300, 302–03 (S.D.N.Y.1984); *Mandaglio v. United Bhd. of Carpenters and Joiners of Am.,* 528 F.Supp. 468, 471 (E.D.N.Y.1981); *Dixon v. Mack,* 507 F.Supp. 345, 348–51 (S.D.N.Y.1980); *Gemini Enters., Inc. v. WFMY Television Corp.,* 470 F.Supp. 559, 564–65 (M.D.N.C.1979); *Louis Marx & Co. v. Fuji Seiko Co.,* 453 F.Supp. 385, 391–92 (S.D.N.Y.1978); *Prof'l Investors Life Ins. Co. v. Roussel,* 445 F.Supp. 687, 692 (D.Kan. 1978); *McLaughlin v. Copeland,* 435 F.Supp. 513, 529–33 (D.M@d.1977); *Nat'l Van Lines, Inc. v. Atlas Van Lines, Inc.,* 406 F.Supp. 1087, 1089 (N.D.Ill.1975); *Merkel Assocs., Inc. v. Bellofram Corp.,* 437 F.Supp. 612, 617 (W.D.N.Y.1977); *Ghazoul v. Int'l Mgmt. Servs., Inc.,* 398 F.Supp. 307, 312 (S.D.N.Y. 1975); *Chem. Bank v. World Hockey Ass'n,* 403 F.Supp. 1374, 1379 (S.D.N.Y.1975); *Socialist Workers Party v. Attorney Gen. of the United States,* 375 F.Supp. 318, 321–22 (S.D.N.Y.1974); *Leasco Data Processing Equip. Corp. v. Maxwell,* 319 F.Supp. 1256, 1260–61 (S.D.N.Y.1970), *rev'd in part,* 468 F.2d 1326 (2d Cir.1972).

**34.** Other courts have expressed doubt over the theory's validity or held that an application of the theory would violate a defendant's due process rights. *See Chirila v. Conforte,* 47 Fed.Appx. 838, 842–43 (9th Cir.2002); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 142 F.3d 26, 37 (1st Cir.1998); *Paolino v. Argyll Equities, LLC,* 401 F.Supp.2d 712, 720 (W.D.Tex.2005); *Silver Valley Partners, LLC v. De Motte,* 400 F.Supp.2d 1262, 1268 (W.D.Wash.2005); *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 307 F.Supp.2d 145, 158 (D.Me.2004); *Steinke v. Safeco Ins. Co. of Am.,* 270 F.Supp.2d 1196, 1200 (D.Mont.2003); *Insolia v. Philip Morris Inc.,* 31 F.Supp.2d 660, 672 (W.D.Wis.1998); *Karsten Mfg. Corp. v. United States Golf Ass'n,* 728 F.Supp. 1429, 1434 (D.Ariz.1990) *Kipperman v. McCone,* 422 F.Supp. 860, 873 n. 14 (N.D.Cal.1976); *I.S. Joseph Co. v. Mannesmann Pipe & Steel Corp.,* 408 F.Supp. 1023, 1024–25 (D.Minn.1976). Commentators are also skeptical about the theory's ability to satisfy due process considerations. For outstanding critiques of the theory lighting the constitutional difficulties of conspiracy jurisdiction, *see* Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis,* 52 Fordham L.Rev. 234 (1983), and Stuart M. Riback, Note, *The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction,* 84 Colum. L.Rev. 506 (1984).

*Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 172 (Iowa 2002)). The court concluded that "[t]he exercise of personal jurisdiction based on the conspiracy theory meets the standards of due process because it is based on a tortious act being committed in the forum state by a member of the conspiracy." *Id.* Relying on a Seventh Circuit case, the court questioned "why personal jurisdiction should be an exception to the general rule of attributing the acts of one conspirator within the scope of the conspiracy to the other conspirators." *Id.* (citing *Stauffacher*, 969 F.2d at 459). After all, the court reasoned, "[t]he imposition of such vicarious liability would be defeated, if, even though one member of a conspiracy inflicted an actionable wrong in Iowa, the other members of that conspiracy were permitted to escape being sued in Iowa because they reside in another jurisdiction." *Id.*[35]

With respect, this Court disagrees. First, the viability of *Norton v. Local Loan* is questionable. There, the Iowa Supreme Court held that a single telephone call made by a defendant's agent could provide a basis for the exercise of in personam jurisdiction over a nonresident defendant for an intentional infliction of emotional distress claim arising out of the telephone call. *See Norton*, 251 N.W.2d at 520–22. The court noted that under the rules set out in *Edmundson v. Miley Trailer Co.*, 211 N.W.2d 269 (1973), the plaintiffs' claim was one for tortious conduct committed "in whole or in part" in Iowa. *See Norton*, 251 N.W.2d at 521 (citing Iowa Code § 617.3). As a result, the court held, "[u]nder *Edmundson* in personam jurisdiction" existed

for the claims of intentional infliction of emotional distress. *Id.*

*Edmundson*, though, is damaged goods. In that case, the Iowa Supreme Court recognized "a national tendency that generally has required less and less contact for the constitutional minimum." *Edmundson*, 211 N.W.2d at 272. There, the court held that it was "reasonable" for the nonresident manufacturer and retailer of a trailer and hitch to be subject to a lawsuit anywhere the trailer and hitch traveled. *Id. Edmundson* has been overruled. *See Smalley v. Dewberry*, 379 N.W.2d 922, 924–25 (Iowa 1986) (recognizing *World–Wide Volkswagen Corp.*, 444 U.S. at 286, 100 S.Ct. 559, "is a rejection of *Edmundson*," so "*Edmundson* . . . must be, and is, overruled"). As a result, while the portion of *Norton* used by the *Remmes* court has not been directly overruled, the major pillar of its reasoning has been.

Second, even if *Norton* is still good law, the *Remmes* court's analysis conflates the recognition that tortious conduct directed at Iowa can sometimes form the basis for the exercise of personal jurisdiction under the Iowa long-arm statute, with the rule that the power authorized by any state's long-arm statute must comport with due process. In other words, a court cannot take the square peg principle of state law resulting from the combination of the legal principle that the existence of a civil conspiracy imposes vicarious liability on nonresident co-conspirators with the principle that the applicable long-arm statute would authorize service of process in such a case and expect the amalgam will always fit into the round hole of due process. That analysis misses a crucial—and constitutional—

---

**35.** The argument that all parties to all conspiracies having an "effect" in Iowa should be subject to personal jurisdiction in Iowa is a non sequitur because conspirators need not agree to commit an intentional tort to be liable under Iowa law. *Wright v. Brooke*

*Group Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002). Under *Calder*, parties must commit "intentional, and allegedly tortious, actions . . . expressly aimed at" the forum. *Calder*, 465 U.S. at 789–90, 104 S.Ct. 1482.

phase of analysis. Permitting nonresidents to escape being sued in Iowa because they reside in another jurisdiction is the frequent price of due process. In short, because liability does not equal jurisdiction, potential liability does not mean courts can mitigate the constitutional step.

Third, the approach employed by the *Remmes* court apparently does not consider *Bankers Life and Casualty Co. v. Holland,* 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106 (1953), where the Supreme Court rejected an analogous attempt to exercise "co-conspirator venue." There, an Illinois insurance corporation brought an action in the United States District Court for the Southern District of Florida, alleging the existence of a conspiracy to injure its business in violation of the Sherman and Clayton Acts. *Id.* at 380, 74 S.Ct. 145. Among the defendants was the insurance commissioner of Georgia. *Id.* The Georgia insurance commissioner was personally served in the Northern District of Florida and, before entering an appearance or waiving venue, moved to quash the summons and return of service and dismiss the action against him for improper venue. *Id.*

The applicable venue statute provided that the action could proceed in any "district in which the defendant resides or is found or has an agent." 15 U.S.C. § 15(a). The plaintiff alleged the Georgia commissioner "was a member of a conspiracy whose other members were residing and carrying on the illegal business of the conspiracy in the Southern District of Florida, ... that a conspiracy is a partnership and that co-conspirators are each other's agents ... and that the [c]ommissioner therefore was 'found' and had 'agents' in the district, within the meaning of the statute." *Bankers Life & Cas.,* 346 U.S. at 380, 74 S.Ct. 145 (quotation marks omitted). The district court ruled venue was not properly laid against the defendant

under 28 U.S.C. § 1406(a) and ordered the actions against the Georgia commissioner severed and transferred to the Northern District of Georgia. *Id.* at 380–81, 74 S.Ct. 145. The plaintiff sought a writ of mandamus from the Fifth Circuit Court of Appeals, which concluded such a writ was not a proper remedy. *Id.* at 381, 74 S.Ct. 145. The question presented for the Supreme Court was whether a writ of mandamus was an appropriate remedy to vacate a severance and transfer order entered by a district court on the basis of improper venue. *Id.* at 379, 74 S.Ct. 145.

By a six to three vote, the Supreme Court ultimately decided a writ of mandamus was an inappropriate remedy in such a setting. *See id.* at 381–84, 74 S.Ct. 145. The Court went on to comment on the plaintiff's attempt to establish venue through an alleged conspiracy. *See id.* at 384, 74 S.Ct. 145. The Court noted that "[w]hile a criminal action under the antitrust laws lies in any district where the conspiracy was formed or in part carried on or where an overt act was committed in furtherance thereof, Congress by 15 U.S.C. § 15 placed definite limits on venue in treble damage actions." *Id.* The Court reasoned that by drafting that language, Congress realized that "many such cases would not lie in one district as to all defendants, unless venue was waived." *Id.* The Court concluded that Congress "must, therefore, have contemplated that such proceedings might be severed and transferred or filed in separate districts originally." *Id.* As a result, the theory of co-conspirator venue, the Court wrote, "has all the earmarks of a frivolous albeit ingenious attempt to expand the statute." *Id.* Even the three dissenting Justices agreed this attempt was "frivolous," arguing the mandamus question should not have been considered when the severance order was based on such "obviously compelling reasons." *Id.* at 388, 74 S.Ct. 145 (Frankfurt-

er, J., dissenting). Justice Frankfurter, writing for himself and two others, wrote that "[i]f we now had to decide whether a co-conspirator as such is an 'agent' for purposes of venue under 15 U.S.C. § 15, it cannot be doubted that we would have to conclude that the district judge was right in finding that the Georgia [c]ommissioner could not be kept in the suit." *Id.* at 385, 74 S.Ct. 145 (citation omitted).

Personal jurisdiction, unlike venue, is governed by strict constitutional standards. As a result, if the argument that *venue* could lie based on the acts of co-conspirators was unanimously rejected, it is unlikely the Supreme Court would embrace such a theory in the personal jurisdiction arena. *See Chirila,* 47 Fed.Appx. at 842–43 (citing *Piedmont Label Co. v. Sun Garden Packing Co.,* 598 F.2d 491, 492 (9th Cir.1979)); *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 307 F.Supp.2d at 158; *Kipperman,* 422 F.Supp. at 873 n. 14.

Fourth, the *Remmes* approach is under-appreciative of Supreme Court precedent. The Supreme Court has repeatedly emphasized actions of third parties not controlled by a nonresident are not sufficient to satisfy due process considerations unless the nonresident defendant also purposely avails himself of the privilege of conducting activities within the forum. *See World–Wide Volkswagen Corp.,* 444 U.S. at 295–96, 100 S.Ct. 559; *Hanson,* 357 U.S. at 253–54, 78 S.Ct. 1228; *Kulko,* 436 U.S. at 92–94, 98 S.Ct. 1690. The key inquiry is not whether the defendant's *associates* have minimum contacts with the proposed forum, the key inquiry is whether there has been a sufficient showing of a deliberate connection between the *defendant* and the forum to make it fair to require the defendant to defend the action there. *See Quill Corp. v. N. Dakota ex rel. Heitkamp,* 504 U.S. 298, 307–08, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992); *Burger*

*King Corp.,* 471 U.S. at 475–76, 105 S.Ct. 2174; *Hall,* 466 U.S. at 417, 104 S.Ct. 1868; *Keeton,* 465 U.S. at 779–81, 104 S.Ct. 1473; *Rush v. Savchuk,* 444 U.S. 320, 327, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980); *Kulko,* 436 U.S. at 91, 98 S.Ct. 1690 (citing *Milliken,* 311 U.S. at 463–64, 61 S.Ct. 339); *McGee,* 355 U.S. at 222–23, 78 S.Ct. 199; *cf. Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 619–20, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). While a co-conspirator might act more under the control of and at the direction of another co-conspirator than an automobile company's customer with free reign on this country's highways, *see World–Wide Volkswagen Corp.,* 444 U.S. at 295–98, 100 S.Ct. 559, a divorced wife who moves across the country with the former couple's minor daughter in tow, *see Kulko,* 436 U.S. at 91–96, 98 S.Ct. 1690, or a settlor of a trust who simply decided to move to a different state and execute a power of appointment, *Hanson,* 357 U.S. at 253–54, 78 S.Ct. 1228, the mere fact that two or more individuals experienced a meeting of the minds to work in concert toward a common objective is not always a sufficient connection with the forum for constitutional purposes even if the nonresident is aware of precisely what the resident is doing and where he is doing it, *cf. Burger King Corp.,* 471 U.S. at 478, 105 S.Ct. 2174 (mere making of a contract with a resident is not sufficient to confer jurisdiction). Knowledge of *where* a conspiracy is carried out is rarely, if ever, required to impose vicarious liability.

Clearly, nonresident co-conspirator defendants cannot hunker in distant states and claim the lack of a physical presence in the forum defeats personal jurisdiction. *See Quill Corp.,* 504 U.S. at 307–08, 112 S.Ct. 1904; *Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. 2174; *Keeton,* 465 U.S. at 779–80, 104 S.Ct. 1473. And co-conspirators must take care not to be agents of

each other, lest both be haled into a forum where either resides. *See, e.g. Romak USA*, 384 F.3d at 985; *Wessels, Arnold & Henderson*, 65 F.3d at 1433. Of course, co-conspirators are not always each other's agents. *Cf. Bankers Life & Cas.*, 346 U.S. at 384, 74 S.Ct. 145; *id.* at 385, 74 S.Ct. 145 (Frankfurter, J., dissenting). Further, a mechanical rule stating that simply because a pleading contains sufficient allegations that a conspiracy occurred means personal jurisdiction must therefore exist over all co-conspirators wherever they reside gives short shrift to the constitutional mandate that there be some connection between each defendant and the forum.[36]

This Court concludes a nonresident's alleged participation in a conspiracy cannot serve as a constitutionally sufficient basis to exercise in personam jurisdiction over that individual in situations which would otherwise fail the "minimum contacts" approach. As a result, Plaintiffs' allegations of a conspiracy cannot serve as an independent basis for the exercise of in personam jurisdiction over the nonresident Defendants.

### F. Conclusion.

Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is **granted in part and denied in part.** The motion is **granted** with respect to Hoffman, Markson, and Perman, but **denied** with respect to The Masters Circle.

## III. Motion to Dismiss for Failure to State a Claim.

Defendants have also moved to dismiss each of Plaintiffs' claims on the basis that they fail to state claims upon which relief could be granted. *See* Fed.R.Civ.P. 12(b)(6).

### A. Applicable Legal Standards.
#### 1. Rule 8(a) Claims (Non–Fraud Based Claims).

The Supreme Court has recently revisited the legal standards applicable to motions to dismiss premised on Rule 12(b)(6) for cases implicating Rule 8(a). *See Bell Atl. Corp. v. Twombly*, ⎯ U.S. ⎯, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The unusual nature of the claims and alleged facts herein compel an analysis of this development. There, the Court assayed

**36.** If the Court were forced to adopt this theory of personal jurisdiction, the approach explained by the Untied States District Court for the District of Columbia in *Youming Jin v. Ministry of State Security* comes the closest to preserving the constitutional command that there be a showing of a connection between each defendant and the forum. In addition to showing the existence of a conspiracy having an injury in the forum in which the nonresident participated, the *Youming Jin* court also required proof of "the defendant's awareness or knowledge of the co-conspirator's acts in the forum." *Youming Jin*, 335 F.Supp.2d at 83–84. This additional requirement would ensure the court was presented with evidence of purposeful availment. *Id.* at 84. The court noted in a footnote that,

Admittedly, once the more rigorous purposeful availment requirement is applied to the three traditional elements of conspiracy

jurisdiction, it becomes quite difficult to articulate the purpose of conspiracy jurisdiction—or indeed, the point of continuing to complicate cases with the additional analytical framework of civil conspiracy. To a plaintiff, of course, the benefit of conspiracy jurisdiction without the purposeful-availment requirement is clear: the law of civil conspiracy casts a far wider net over potential defendants than the purposeful availment test. But the court cannot find any cases that convincingly hold that due process can be sidestepped under the guise of conspiracy jurisdiction.

*Id.* at 80 n. 5. Indeed, this Court cannot think of a case where adoption of the *Youming Jin* test would not cause the traditional minimum contacts approach to swallow the conspiracy theory in whole. The reason why, of course, is that requiring a showing of purposeful availment remedies the constitutional flaw.

whether a plaintiff's complaint adequately pleaded a violation of section 1 of the Sherman Act, ch. 647, 26 Stat. 209 (codified as amended at 15 U.S.C. § 1 (2006)), by alleging the existence of a conspiracy or agreement among Incumbent Local Exchange Carriers ("ILECs") to undertake conduct resulting in higher charges for local telephone and high-speed internet services. *See Bell Atlantic*, 127 S.Ct. at 1961–63. The plaintiffs claimed certain ILECs violated the Sherman Act by engaging in "parallel conduct" to inhibit the growth of upstart competitive local exchange carriers and by making agreements to refrain from competing directly against one another. *See id.* at 1962–63. The Court held the plaintiff's allegations were insufficient, modifying standards by which Rule 12(b)(6) motions are governed along the way.

The Court at first routinely noted the purpose of the Rule 8(a)(2) requirement that a plaintiff only include "a short and plain statement of the claim showing that the pleader is entitled to relief" is to " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* at 1964 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (alteration in the original)). To provide "grounds" for relief, though, the Court observed a plaintiff must do more than set forth "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 1964–65.[37] While the adoption of the "Federal Rules eliminated the cumbersome requirement that a claimant 'set out *in detail* the facts upon which he bases his claim,' Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 1965 n. 3 (quoting *Conley*, 355 U.S. at 47, 78 S.Ct.

99); *see also id.* ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." (quotation marks omitted)). This "showing" must include allegations that, if presumed true, contain enough detail "to raise a right to relief above a speculative level." *Id.* at 1965. Relief must be "plausible," not merely "possible." *See id.* at 1966.

While preserving the rule that even those factual allegations doubtful in fact can save a claim from Rule 12(b)(6), *see id.* (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations."); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely")), the Court appeared to tighten the liberal rules that historically governing pleadings assailed by that rule. Before *Bell Atlantic*, a plaintiff's pleadings stated a claim upon which relief could be granted "unless it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. The *Bell Atlantic* Court explained that this standard could be read to hold that "any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings." *Bell Atlantic*, 127 S.Ct. at 1968. Reading this narrowly, a conclusory allegation

---

**37.** The Court did not, however, intimate any alteration of the specificity with which plaintiffs must allege causes of action carrying the heightened pleading standard of Rule 9(b) (such as civil RICO claims).

would survive a motion to dismiss if the pleadings left open the mere possibility that a plaintiff could later establish some set of undisclosed facts to support its claim. *Id.* (quotation marks omitted). Wrote the Court: "It seems fair to say that this approach to pleading would dispense with any showing of a reasonably founded hope that a plaintiff would be able to make a case; Mr. Micawber's optimism would be enough." [38] *Id.* at 1969 (citations and quotation marks omitted). The *Conley* standard thus was viewed as an "incomplete, negative gloss on an accepted pleading standard: Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969.[39] Consequently, the Court joined courts and commentators "balk[ing] at taking the literal terms of the *Conley* passage as a pleading standard," sending the standard to a well-earned "retirement" to a place where it "is best forgotten." *Id.*

But while the *Bell Atlantic* Court swiftly discarded *Conley*, it was slow to construct a concise replacement rule. And despite *Conley's* rejection, some linguistic clues suggest the Court either constructed no higher pleading standard or intended a higher pleading standard would be applicable only (or perhaps applied most strictly) in all or a subset of Sherman Act cases. Aside from explicitly stating that it was not "requir[ing] heightened fact pleading of specifics," the Court cited *Swierkiewicz v. Sorema N.A.,* in support of its new rule. *Bell Atlantic,* 127 S.Ct. at 1973–74. In *Swierkiewicz,* the Court specifically rejected a rule requiring plaintiff in Title VII cases to plead "specific facts establishing a *prima* facie case of discrimination" under the *McDonnell Douglas Corp v. Green* framework. *See Swierkiewicz,* 534 U.S. at 508, 122 S.Ct. 992. Of course, preserving *Swierkiewicz* does not mean the Court did not create a pleading standard higher than that called for in *Conley.* By approvingly citing *Swierkiewicz,* the *Bell Atlantic* Court did not intend to endorse a test requiring inclusion of "specific facts" beyond those needed to provide the "grounds" for relief required by Rule 8. The Court did, however change the rules governing the specificity with which the "grounds" must be set forth to comply with Rule 8. That is to say, a plaintiff need not plead those "specific facts" *beyond those* required to state a claim but which might be useful at trial, but must still plead sufficient predicate facts to state a claim. It is the latter standard *Bell Atlantic* endorsed and the former that *Swierkiewicz* barred.

A second argument in favor of interpreting *Bell Atlantic* to effect little change on Rule 12(b)(6) standards in ordinary Rule 8(a) cases is the Court's reference to Form 9 of the Federal Rules of Civil Procedure as a model for pleading. *See Bell Atlantic,* 127 S.Ct. at 1970 n. 10. Form 9 provides guidance to parties bringing garden variety negligence actions and includes as a model allegation that on an identified date on an identified road, the "defendant negli-

---

**38.** Lifted from Charles Dickens' *David Copperfield,* Wilkins Micawber was the title character's landlord and a heavily indebted but eternal optimist who always waited for "something to turn up." *See* Charles Dickens, *David Copperfield* 146, 147, 157 (Hurd & Houghton 1870) (1850).

**39.** Courts were apparently guilty of "gloss[ing]" over the fact that *Conley's* "no set of facts" rule was not designed to govern whether plaintiffs had stated a claim, but was designed to rule the "breadth of opportunity to prove what an adequate complaint claims." *See Bell Atlantic,* 127 S.Ct. at 1969. Only after a complaint stated a claim—not before— did a pleading receive the benefit of an imaginative and expansive reading and the benefit of a rule barring courts from assessing whether a plaintiff could find support during discovery for its allegations.

gently drove a motor vehicle against plaintiff who was then crossing said highway." Fed.R.Civ.P. Form 9. The form *does* not require allegations describing *how* the defendant was negligent. However, the Court noted, Form 9 does identify who was involved and where, when, and what wrongful act occurred. *See id.* ("Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs [or their employees] supposedly agreed, or when and where the illicit agreement took place."). Consequently, the Court's use of Form 9 is only evidence that simple causes of action with a few elements require allegations less labyrinthine than complex actions. In other words, that is the difference between a two-party tort action and a nationwide multi-party Sherman Act case with Telecommunications Act implications.

Finally, the Court's treatment of *Bell Atlantic* in an even more recent opinion suggests no heightened pleading standard was pioneered. In *Erickson v. Pardus,* a prisoner brought a *pro se* action under 42 U.S.C. § 1983 against certain prison officials claiming he acquired a liver condition resulting from a hepatitis C treatment program commenced and then wrongfully terminated, amounting to an alleged deliberate indifference to his medical needs. *Erickson v. Pardus,* —— U.S. ——, —— —— ——, 127 S.Ct. 2197, 2197–99, 167 L.Ed.2d 1081 (2007) (per curiam). The complaint revealed allegations prison officials had ceased and suspended his treatment for a period of around eighteen months on suspicions he had stolen a syringe and modified it in a manner suggestive of use for illegal drugs. *Id.* at 2198. Affirming dismissal, the Eleventh Circuit held the prisoner "had made only conclusory allegations to the effect that he ha[d] suffered a cognizable independent harm as a result of

his removal from the ... treatment program." *Id.* at 2199 (quotation marks omitted).

The Supreme Court reversed. *See id.* at 2200. The Court opened by repeating that Rule 8(a)(2) does not require a plaintiff to point to "[s]pecific facts," but only allegations giving " 'the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Id.* (quoting *Bell Atlantic,* 127 S.Ct. at 1964 (quotation marks omitted)). Allegations that the decision to cease treatment shortly after commencing a new regimen endangered his life and that prison officials were withholding needed treatment were sufficient to satisfy Rule 8(a), particularly in light of the heavy deference given to *pro se* litigants' papers. *Id. Erickson's* affirmance that a plaintiff need not plead "specific facts" but must only give "fair notice" of the grounds for claims brought reaffirms *Bell Atlantic's* assurance that *Swierkiewicz* has indeed survived the guillotine expiring *Conley. Bell Atlantic* simply changed the kinds of allegations comprising the "grounds" used to anchor a plaintiff's claims. Perhaps most importantly, the *Erickson* plaintiff appeared *pro se,* rendering his complaint subject to even greater leniency than usual.

Still, the Court's rejection of the "no set of facts" language popularized by *Conley, id.* at 1968–69, and suggested replacement language strongly indicates the Court made more rigorous the types of allegations a plaintiff must make to survive a motion to dismiss:

- A plaintiff must arm "a complaint with enough factual matter (taken as true) to suggest" unlawful conduct. *Id.* at 1965.
- A plaintiff must include "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [activity]." *Id.*

- A plaintiff must allege "facts that are suggestive enough to render [the alleged unlawful activity] plausible." *Id.* at 1965–66.
- A plaintiff must allege facts which are "placed in a context that raises a suggestion of" unlawful—instead of innocent—activity. *Id.* at 1966.
- A plaintiff must make "allegations plausibly suggesting (not merely consistent with)" unlawful activity. *Id.*
- A plaintiff's complaint must pass "the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Id.* (quoting Fed.R.Civ.P. 8(a)(2); alteration in the original).
- A plaintiff's pleadings must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.
- A plaintiff's allegations must be on the correct side of the line "between the factually neutral and the factually suggestive" to be in the sector giving rise to "plausible liability." *Id.* at 1966 n. 5.
- A plaintiff's complaint must "render . . . entitlement to relief plausible." *Id.* at 1973 n. 14.

Aside from noting the repeated use of the root word "plausible," little can be synthesized from these pronouncements in terms of a concise, clear, and usable test.[40]

At the conclusion of a detailed analysis spanning two opinions, the Second Circuit adopted a "plausibility standard" that requires plaintiffs to point to "allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 97–98 & n. 2 (2d Cir.2007). A pleader must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 158 (2d Cir.2007). The First and Tenth Circuits' standards are similar. *See Rodriguez–Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92, 95 (1st Cir.2007) (holding that "a complaint must allege 'a plausible entitlement to relief'" (quoting *Bell Atlantic,* 127 S.Ct. at 1967)); *TON Servs., Inc. v. Qwest Corp.,* 493 F.3d 1225, 1236 (10th Cir.2007) (a plaintiff must include "'enough facts to state a claim to relief that is plausible on its face'" (quoting *Bell Atlantic,* 127 S.Ct. at 1974)).

Anticipating the Eighth Circuit, this Court adopts this approach: To state a claim upon which relief can be granted, a plaintiff must provide "enough factual matter (taken as true) to suggest" unlawful or otherwise actionable conduct. *Bell Atlantic,* 127 S.Ct. at 1965. To accomplish this goal, a plaintiff must include factual allegations "suggesting enough to render [the unlawful activity] plausible." *Id.* at 1965–66. The merits of the claim need not be such that the plaintiff plausibly *succeeds;* the claim must merely be supported with enough factual fodder that the claim can plausibly be *proven.* This standard may require a plaintiff to place allegations "in a context that raises a suggestion of" unlawful conduct, such that the plaintiff's allegations hurdle the line "between the factually neutral and the factually suggestive." *Id.* at 1966 & n. 5.

**40.** Our circuit has cited *Bell Atlantic* once. *See Gregory v. Dillards, Inc.,* 494 F.3d 694 (8th Cir.2007) (2–1 opinion). In *Gregory v. Dillards, Inc.,* a divided panel noted the complaint before it stated "how, when, and where [the plaintiffs] were discriminated against," and thus, the allegations were "'more than labels and conclusions' or 'a formulaic recitation of the elements of the cause of action.'" *Id.* (quoting *Bell Atlantic,* 127 S.Ct. at 1965). The court provided no guidance to courts applying *Bell Atlantic* in closer or more complex cases.

### 2. Rule 9(b) Claims (Fraud Based Claims).

■ In actions implicating Fed. R.Civ.P. 9(b), a heightened pleading standard applies. Relevant here, Rule 9(b) applies to Plaintiffs' RICO claim because the alleged acts of racketeering are mail and wire fraud. Third Am. Compl. ¶¶ 109–110, 114; *see Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir.2001) (Rule 9(b) applies to RICO claims using mail and/or wire fraud as predicate offenses); *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir.1995) (same); *Flowers v. Continental Grain Co.*, 775 F.2d 1051, 1054 (8th Cir.1985) (same); *see also Rotella v. Wood,* 528 U.S. 549, 560, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (fraud portions of RICO claim must comply with Rule 9(b)); *Regions Bank v. J.R. Oil Co.,* 387 F.3d 721, 727 (8th Cir.2004) (instances of fraud alleged in a RICO action must meet the pleading standard set forth by Rule 9(b)). Plaintiffs' ongoing criminal conduct claim alleges the occurrence of certain types of frauds, *e.g.,* Third Am. Compl. ¶ 96(b), (e), (f), so Rule 9(b) applies to certain aspects of that claim as well.

■ Where fraud is alleged, "a plaintiff must plead 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *BJC Health Sys. v. Columbia Cas. Co.,* 478 F.3d 908, 917 (8th Cir.2007) (quoting *Abels,* 259 F.3d at 920); *accord United States ex rel. Joshi v. St. Luke's Hosp., Inc.,* 441 F.3d 552, 556 (8th Cir.2006) (requiring a plaintiff to "plead such facts as the time, place, and content of the false representations, as well as details of the fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained"); *Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 746 (8th Cir.2002) (same);

*Roberts v. Francis,* 128 F.3d 647, 651 (8th Cir.1997) (plaintiff must identify "the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud" (citing *Commercial Prop. Invs., Inc. v. Quality Inns Int'l,* 61 F.3d 639, 644 (8th Cir. 1995))); *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 549–50 (8th Cir.1997) (citing same); *Murr Plumbing,* 48 F.3d at 1069 (citing *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982), *adhered to on reh'g,* 710 F.2d 1361 (8th Cir.1983) (en banc)). Stated another way, the plaintiff must "identify the 'who, what, where, when, and how' of the alleged fraud." *BJC Health Sys.,* 478 F.3d at 917 (quoting *United States ex rel. Costner v. United States,* 317 F.3d 883, 888 (8th Cir.2003)); *accord Great Plains Trust Co. v. Union P.R.R. Co.,* 492 F.3d 986, 995–96 (8th Cir.2007); *Joshi,* 441 F.3d at 556; *Parnes,* 122 F.3d at 550. As a result, "'[c]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule.'" *BJC Health Sys.,* 478 F.3d at 917 (quoting *Commercial Prop. Invs.,* 61 F.3d at 644); *see also Great Plains Trust Co.,* 492 F.3d at 995 (no need to "accept conclusory legal allegations as true" when viewing a complaint against Rule 9(b)); *Joshi,* 441 F.3d at 557 ("conclusory and generalized allegations" are not sufficient); *Schaller Tel. Co.,* 298 F.3d at 746 (same); *Roberts,* 128 F.3d at 651 ("When pleading fraud, a plaintiff cannot simply make conclusory allegations."); *see also In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 320 (8th Cir.1997) (allegations that defendants "misrepresented negative business trends, misrepresented the costs of opening new stores, and omitted material information" insufficient without allegations "quantif[ying] these business trends or say[ing] which business trends were described inaccurately" and "demonstrat[ing]

how" the information was false and material); *Parnes,* 122 F.3d at 550 (dismissing a securities fraud claim because the plaintiffs did not describe "the goods and services allegedly purchased and sold by [the defendant] at deflated and inflated prices," did not "allege the amount of fraudulent profit allegedly obtained by [the defendant]," did not "provide the source for the gross amounts of" the value of good and services bought and sold, provided only "the barest clue as to when the alleged fraud took place," and left the defendants "to guess which controlling shareholders were responsible for this alleged fraud"). Requiring fraudulent conduct to be pleaded with specificity enables defendants "to respond 'specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct.'" *BJC Health Sys.,* 478 F.3d at 917 (quoting *Abels,* 259 F.3d at 920); *accord Joshi,* 441 F.3d at 556; *Costner,* 317 F.3d at 888; *Schaller Tel. Co.,* 298 F.3d at 746; *Commercial Prop. Invs.,* 61 F.3d at 644.

Recognizing this is no easy burden, many circuits apply a "relaxed" Rule 9(b) standard in RICO cases where frauds are alleged. *See, e.g., Peskoff v. Faber,* 230 F.R.D. 25, 31–32 (D.D.C.2005); *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 228–29 (1st Cir. 2004) (dicta); *Emery v. American General Finance, Inc.,* 134 F.3d 1321, 1323 (7th Cir.1998); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1417–18 (3d Cir.1997); *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1279 n. 3 (D.C.Cir.1994); *Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 679–80 (6th Cir.1988); *see also Joshi,* 441 F.3d at 560 n. 4 (observing, but not holding, that relaxing "Rule 9(b) may be appropriate under certain circumstances in the RICO context" (quotation marks omitted)); *Abels,* 259 F.3d at 921 (noting that for mail and wire fraud allegations in the RICO context, "[w]here a plaintiff is not a party to a communication,

particularity in pleading may become impracticable," resulting in some circuits to "decline[ ] to require, before discovery, the pleading of dates and times of communications in furtherance of a scheme to defraud, where the complaint alleges facts supporting the inference that the mails or wires were used"). *Contra First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 179–80 (2d Cir.2004); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 405 (1991); *Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). Judge Posner, writing for the Seventh Circuit, explained why a less stringent Rule 9(b) standard is appropriate until the completion of a limited period for discovery:

> We are mindful of the difficulty that a plaintiff's lawyer can encounter in trying to gather enough evidence of multiple frauds in advance of filing suit to satisfy the requirements of Rule 9(b), especially in a RICO fraud case, where the plaintiff needs to allege more than one fraud, and thus satisfy Rule 9(b) as it were twice. . . .
>
> We don't want to create a Catch–22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery (normally of the defendant, because the essential information is in his possession and he will not reveal it voluntarily) that she could not conduct before filing the complaint. But Rule 9(b) is relaxed upon a showing of such inability. . . . Rule 9(b) is satisfied by a showing that further particulars of the alleged fraud could not have been obtained without discovery.

*Emery,* 134 F.3d at 1323 (citations omitted). This Court is also wary of requiring *too* high a standard: Our circuit has cautioned that Rule 9(b) must be read in harmony with Rule 8 and the Federal

Rules as a whole, which have the overarching purpose of simplifying pleading generally. *See BJC Health Sys.*, 478 F.3d at 917; *Costner*, 317 F.3d at 888; *Schaller Tel. Co.*, 298 F.3d at 746; *Abels*, 259 F.3d at 920.

Further, it is unlikely the drafters of the Federal Rules intended to punish plaintiffs by siphoning from the pool of information available to satiate Rule 9(b) all but that sanitized information defendants voluntarily turn over.[41] As a result, as suggested by our circuit, *see Joshi*, 441 F.3d at 560 n. 4, the Court will treat with particular delicacy those elements of Plaintiffs' mail and wire fraud allegations lacking not as a result of Plaintiffs' inability to plead a claim, but because Defendants have the evidence Plaintiffs would use to fashion a claim.

### B. Civil Conspiracy.

■ The Court opens with Defendants' challenge to Plaintiffs' civil conspiracy claim. Because Plaintiffs need not allege any conduct requiring application of Rule 9(b), the *Bell Atlantic* rule applies to this claim.

#### 1. Elements of the Claim.

The principles found in section 876 of the Restatement (Second) of Torts provide the parameters for civil conspiracy. *See Wright*, 652 N.W.2d at 171–72; *Ezzone v. Riccardi*, 525 N.W.2d 388, 398 (Iowa 1994). That section provides that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he does a tortious act in concert with the other or pursuant to a common design with him...." Restatement (Second) of Torts § 876(a) (1979). Expanding on these principles, the Supreme Court of Iowa has explained that " '[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful

purpose, or to accomplish by unlawful means some purpose not in itself unlawful.' " *Wright*, 652 N.W.2d at 171 (quoting *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232 (Iowa 1977) (alteration in the original)); *Locksley v. Anesthesiologists of Cedar Rapids, P.C.*, 333 N.W.2d 451, 456 (quoting same).

■ A prerequisite to a conspiracy is an agreement between at least two persons to engage in conduct resulting in a wrong against another. *Wright*, 652 N.W.2d at 172; *Ezzone*, 525 N.W.2d at 398; *Locksley*, 333 N.W.2d at 456; *Benson*, 251 N.W.2d at 233; *see also* Restatement (Second) of Torts § 876 cmt. *a* ("Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result."). The agreement alleged "must involve some mutual mental action coupled with an intent to commit the act that causes injury." *Ezzone*, 525 N.W.2d at 398 (citing *Adam v. Mt. Pleasant Bank & Trust Co.*, 387 N.W.2d 771, 773 (Iowa 1986)); *accord Locksley*, 333 N.W.2d at 456; *Benson*, 251 N.W.2d at 233; *State v. Boyer*, 342 N.W.2d 497, 499 (Iowa 1984) (dicta). A plaintiff must allege "knowing and voluntary participation in a common scheme [by each defendant] to take action, lawful or unlawful, that ultimately subjects the actor to liability to another." *Wright*, 652 N.W.2d at 174. By contrast, mere "[s]peculation, relationship, or association and companionship do not establish a conspiracy." *Ezzone*, 525 N.W.2d at 398 (citing *American Sec. Benevolent Ass'n, Inc. v. District Court*, 259 Iowa 983, 147 N.W.2d 55, 63 (Iowa 1966)); *see Wright*, 652 N.W.2d at 174 ("[M]ere membership in an industry group would not make that company liable for the tortious acts of other members of the group.").

---

**41.** Plaintiffs have not asserted a position un- der Fed.R.Civ.P. 11(b)(3).

Because " '[c]ivil conspiracy is not in itself actionable' " but "is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert," another prerequisite to relief is the existence of " 'acts causing injury undertaken in furtherance of the conspiracy.' " *Wright*, 652 N.W.2d at 172 (quoting *Benson*, 251 N.W.2d at 233); *Locksley*, 333 N.W.2d at 456 (quoting same). It is not necessary for the underlying wrongful act to be an intentional tort, but it must be in some way actionable in the absence of the conspiracy. *Wright*, 652 N.W.2d at 172–74. The conspiracy must also result in some cognizable harm to the plaintiff. "[U]nless actual damage has resulted from something done by one or more of the conspirators in furtherance of the object of the conspiracy, no civil action lies against anyone." *S. N.Y. Ry., Inc. v. Fort Dodge, Des Moines, & S. Ry. Co.*, 316 N.W.2d 840, 844 (Iowa 1982) (citing *Benson*, 251 N.W.2d at 233).

Defendants argue Plaintiffs' civil conspiracy claim fails for a pair of reasons. First, Defendants contend Plaintiffs have insufficiently alleged the existence of an agreement or understanding to commit an actionable wrong. Second, Defendants argue Plaintiffs have not identified an injury suffered as a result of any conspiracy. These arguments are addressed in turn.

### 2. Allegations of an Agreement or Understanding to Effect a Wrong.

#### a. Allegations of the Second Amended Petition.

The Court opens by scouring the Second Amended Petition for allegations of an agreement or understanding among one or more Defendants to undertake conduct resulting in a harm to Plaintiffs.

The most critical allegation on this point appears as paragraph 41 of Plaintiffs' Second Amended Petition: "[w]hen a chiropractor joins [T]he Masters Circle the chiropractor must agree to study and follow [The Masters Circle] Manual, be compliant with [T]he Masters Circle's practices and policies, and follow the recommendations and advice of [T]he Masters Circle's coaches." Second Am. Pet. ¶ 41. Plaintiffs allege these practices and policies were taught "through meetings, e-mails, telephone calls, one-on-one coaching, advertising and the distribution and use of [T]he Masters Circle's Manual" chiropractors agreed to follow. Second Am. Pet. ¶ 88.

According to Plaintiffs, member chiropractors "provided patients with misinformation regarding their need for chiropractic services," resulting in patients who "agreed to pay for services based upon a mistaken belief as to what type of care was necessary." Second Am. Pet. ¶ 85; *see also* Second Am. Pet. ¶¶ 3 (based on chiropractors' misrepresentations, Plaintiffs "wrongly assumed that based on the doctor/patient relationship, their chiropractor[s] would strive to put the patien[ts'] best interest[s] ahead of the doctor[s'] personal interest[s]"); 84 (patients were "misled into believing that their chiropractic physician was making recommendations to them regarding their health care based upon the patient's best interest"). The services patients were persuaded to purchase included "pre-set care plans" that were allegedly sold "before the patients were initially seen for treatment." Second Am. Pet. ¶ 86.

Focusing on the alleged harm they suffered, Plaintiffs specify how Kerkhoff used The Masters Circle's program to " 'target, leverage and close' the sale of chiropractic services" to them. Second Am. Pet. ¶ 71. Kerkhoff purportedly used "his position as a doctor by using negative consequences to ensure [Plaintiffs complied with his] recommendations for long term care." Second Am. Pet. ¶ 72. For example, he required Plaintiffs to "attend a 'Special

Consultation' and bring another family member or friend" without disclosing the consultation's purpose, which was "to ensure that new patients brought new potential customers to a presentation about the benefits of chiropractic service." Second Am. Pet. ¶¶ 73–74. Kerkhoff also allegedly followed the policy that re-checks be conducted only annually and delayed answering Plaintiffs' questions about their care "until the re-check in order to ensure the patient continues with treatment and to add 'drama' to the re-check appointment." Second Am. Pet. ¶ 75. Kerkhoff also allegedly followed The Masters Circle Manual by requiring his patients "to receive full back x-rays even if they are only complaining of one area of pain," and failed to reduce the frequency of their visits even after their symptoms subsided to ensure Plaintiffs did "not associate the required frequency of visits with the patient's symptoms or the re-check appointment." Second Am. Pet. ¶¶ 76–77.

#### b. Analysis.

Initially, Plaintiffs allege numerous times the existence of a "conspiracy" among Defendants to cause harm to Plaintiffs. *E.g.*, Second Am. Pet. ¶¶ 3, 78, 80, 82–85, 87–90. While Plaintiffs may very well mean "agreement" or "understanding" when they say "conspiracy," the Court cannot convert Plaintiffs' legal conclusions into sufficient factual allegations for them. Further, the fact chiropractors were aware of and used literature disseminated by the company is not evidence of a conscious agreement between chiropractors and The Masters Circle to engage in a particular course of conduct. Insufficient, too, is the mere fact that chiropractors were members of The Masters Circle. *Cf. Wright*, 652 N.W.2d at 174 (membership in a group does not render a defendant liable for tortious acts of other group members).

However, Plaintiffs allege—and the Court must accept as true—that when chi-

ropractors join the organization they agree to study and comply with The Masters Circle's Manual and policies, and agree to follow their coaches' advice. By knowingly and voluntarily agreeing to participate in and follow the company's programs, each chiropractor took some mental action (*i.e.*, formed an understanding that he would follow the organization's policies) and intended to commit acts in furtherance of the agreement (*i.e.*, provide care in compliance with those practices).

*Locksley v. Anesthesiologists of Cedar Rapids, P.C.*, cited by Defendants, is inapposite. There, a group of anesthesiologists advised the plaintiff neurosurgeon they would no longer administer anesthesia services for him until the conclusion of an investigation into the surgeon's competence to practice medicine. *See Locksley*, 333 N.W.2d at 453. The investigation documented errors the surgeon had committed but permitted him to continue practicing with "temporary guidelines," and a peer review committee concluded the plaintiff was "not incompetent." *Id.* at 452–53. The anesthesiologists persisted in refusing to provide services to the plaintiff, making it impossible for the plaintiff to practice. *Id.* at 453–54.

The plaintiff claimed the anesthesiologists conspired with each other and the hospitals at which the plaintiff practiced to remove him from the practice of medicine. *Id.* at 456. At trial, the plaintiff admitted he lacked direct evidence of a conspiracy and testified "he did not think [the anesthesiologists] intended to interfere with his business and that such a result was 'quite incidental.'" *Id.* The anesthesiologists submitted evidence showing a lack of intent to harm the plaintiff, proving instead that they decided to stop providing services out of concern for patient safety. *Id.* Hospital administrators and a trio of anesthesiologists denied participating in a conspiracy. *Id.* On appeal, the Iowa Supreme

Court reviewed the trial court's denial of the plaintiff's motion for a directed verdict on his civil conspiracy claim. *Id.* at 456. Finding "conflicting claims," the court affirmed. *Id.*

Of course, the burden upon a party moving for a directed verdict under Iowa law (especially when the moving party seeks a directed verdict on its own claim) is much heavier than that upon a party defending a motion to dismiss for failure to state a claim under federal law. A plaintiff seeking a directed verdict must demonstrate satisfaction of each element of its claim as a matter of law even when the evidence is viewed against it. *See* Iowa R.App. P. 6.14(6)(b). When considering a motion to dismiss, by contrast the Court need only find sufficient factual matter that "suggest[s] enough to render [the alleged unlawful activity] plausible." *Bell Atlantic,* 127 S.Ct. at 1965–66. Both types of motions are "'[s]eldom'" granted, *Locksley,* 333 N.W.2d at 456 (quoting *Freese v. Lemmon,* 267 N.W.2d 680, 686 (Iowa 1978) (alteration by the *Locksley* court)), or granted only in "unusual" cases, *see, e.g., Strand v. Diversified Collection Serv., Inc.,* 380 F.3d 316, 317 (8th Cir.2004); *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995). Viewed favorably to Plaintiffs, this is not such an unusual case: Plaintiffs have alleged the intentional making of an agreement between The Masters Circle and its members that required the members to administer care in a manner Plaintiffs allege is otherwise actionable.

### 3. Allegations of Injury or Damage.

Defendants next argue Plaintiffs have not included allegations positing any Plaintiff suffered an injury as a result of the alleged conspiracy. Defendants argue Plaintiffs admit Rhiner and Christian sought treatment from Kerkhoff and ceased treatment when each became symptom-free. Consequently, Defendants argue, no harm could have resulted.

In some portions of the Second Amended Petition, Plaintiffs' allegations are entirely conclusory. *See* Second Am. Pet. ¶¶ 5, 89, 100. And while Plaintiffs contend "[t]he heart of the conspiracy was *aimed at* interfering with and breaching the fiduciary, confidential and ethical duties owed by a chiropractor to a patient," they do not point to allegations that these duties were breached or that any harm arose from any breach. Second Am. Pet. ¶ 84 (emphasis added). While Plaintiffs claim harm resulted because they "were deprived of their right to make informed medical decisions based upon unbiased medical advice," Second Am. Pet. ¶¶ 3, 80, they have not illustrated how the deprivation of information needed to make an informed medical decision is itself a remediable injury or that a lack of information caused an independently remediable harm.

The only harm that appears sufficiently pled arises out treatments for which Plaintiffs paid that were recommended and mandated by The Masters Circle's policies but were medically unnecessary. For example, Plaintiffs allege they "paid more for chiropractic evaluations, x-rays and care based upon [T]he Masters Circle's undisclosed pre-set policy." Second Am. Pet. ¶ 80. They further contend they were "deprived of their property when they made payments for services that were unethical and pre-determined." Second Am. Pet. ¶ 104. And they allege that as a result of purchasing a set number of visits up front, they were forced to "continue[ ] to pay for unnecessary chiropractic treatments" administered after their condition improved. Second Am. Pet. ¶ 69. If proven, these allegations would support a finding that Plaintiffs were injured.

### 4. Conclusion.

The Court is satisfied Plaintiffs have provided allegations sufficient to state a claim for civil conspiracy.

## C. Ongoing Criminal Conduct.

■ The next claim challenged is Plaintiffs' contention that Defendants participated in conduct violative of Iowa's ongoing criminal conduct statute, specifically, Iowa Code section 706A.2(1), (2), and (4).

### 1. Overview of the Statute.

Iowa law permits an "aggrieved person" to initiate a civil proceeding against any person violating Iowa's ongoing criminal conduct statute. Iowa Code § 706A.3(1). Iowa Code sections 706A.2(1), (2), and (4)—the provisions Defendants allegedly violated—provide in relevant part as follows:

1. Specified unlawful activity influenced enterprises.

a. It is unlawful for any person who has knowingly received any proceeds of specified unlawful activity to use or invest, directly or indirectly, any part of such proceeds in the acquisition of any interest in any enterprise or any real property, or in the establishment or operation of any enterprise.

b. It is unlawful for any person to knowingly acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property through specified unlawful activity.

c. It is unlawful for any person to knowingly conduct the affairs of any enterprise through specified unlawful activity or to knowingly participate, directly or indirectly, in any enterprise that the person knows is being conducted through specified unlawful activity.

d. It is unlawful for any person to conspire or attempt to violate or to solicit or facilitate the violations of the provisions of paragraphs "a", "b", or "c."

2. Facilitation of a criminal network. It is unlawful for a person acting with knowledge of the financial goals and criminal objectives of a criminal network to knowingly facilitate criminal objectives of the network by doing any of the following:

. . . .

f. Making any property available to a member of the criminal network.

g. Making any service other than legal services available to a member of the criminal network.

. . . .

Obtaining any benefit for a member of a criminal network by means of false or fraudulent pretenses, representation, promises or material omissions. . . .

. . . .

4. Acts of specified unlawful activity. It is unlawful for a person to commit specified unlawful activity as defined in section 706A.1.

Iowa Code § 706A.2(1)-(2), (4).[42] Importantly, *each* of sections 706A.2(1), (2) and (4) requires "specified unlawful activity."

A variety of words in section 706A.2 have special meanings, defined by section 706A.1:

1. "Criminal network" means any combination of persons engaging, for financial gain on a continuing basis, in conduct which is an indictable offense under the laws of this state regardless of whether such conduct is charged or indicted. As used in this subsection, persons combine if they collaborate or act in concert in carrying on or furthering the activities or purposes of a network even though such persons may not know

---

**42.** Plaintiffs have not identified which of the ten possible ways Defendants facilitated a criminal network. *See* Iowa Code § 706A.2(2). The three quoted are the only three *arguable* ways Defendants violated this statute.

each other's identity, membership in the network changes from time to time, or one or more members of the network stand in a wholesaler-retailer, service provider, or other arm's length relationship with others as to conduct in the furtherance of the financial goals of the network.

2. "Enterprise" includes any sole proprietorship, partnership, corporation, trust, or other legal entity, or any unchartered union, association, or group of persons associated in fact although not a legal entity, and includes unlawful as well as lawful enterprises.

3. "Proceeds" means property acquired or derived directly or indirectly from, produced through, realized through, or caused by an act or omission and includes any property of any kind.

4. "Property" means anything of value, and includes any interest in property, including any benefit, privilege, claim, or right with respect to anything of value, whether real or personal, tangible, or intangible, without reduction for expenses incurred for acquisition, maintenance, production, or any other purpose.

5. "Specified unlawful activity" means any act, including any preparatory or completed offense,[43] committed for financial gain on a continuing basis, that is punishable as an indictable offense under the laws of the state in which it occurred and under the laws of this state.

Iowa Code § 706A.1.

Insofar as Plaintiffs allege Defendants engaged in ongoing criminal conduct through "specified unlawful activity," they identify the following offenses: theft by deception, in violation of Iowa Code section 714.1; insurance fraud, in violation of Iowa Code section 507E.3 and New York Penal

Law sections 176.10, .15, and .20; criminal conspiracy, in violation of Iowa Code section 706.1; money laundering, in violation of Iowa Code section 706B.2; and scheming to defraud, in violation of New York Penal Law section 190.60.

**2. Purported Pleading Deficiencies.**

Defendants argue Plaintiffs' ongoing criminal conduct claim fails for two basic reasons. First, Defendants argue that while Plaintiffs have pointed to five crimes as forming the alleged "specified unlawful activity," they have not shown how or which Defendants violated these statutes and have not connected any unlawful conduct of Defendants to any injury. The Court construes this somewhat vague argument as an attack on the sufficiency with which Plaintiffs have pleaded the "specified unlawful activity" the statute requires. Second, Defendants contend Plaintiffs have not sufficiently alleged the occurrence of any misconduct occurring on a "continuing basis" as required for a criminal network, *see* Iowa Code § 706A.1(1), or "specified unlawful activity," *see id.* § 706A.1(5).

**3. "Specified Unlawful Activity" Allegations.**

For Plaintiffs to prevail, they must allege Defendants committed acts amounting to indictable offenses under both Iowa law and the state where the allegedly wrongful act occurred. *See* Iowa Code § 706A.1(5). Because a number of the offenses identified allege the occurrence of fraud, Plaintiffs' claims must be gauged against the exacting requirements of Rule 9(b).

**a. Theft by Deception Under Iowa Law.[44]**

**i. Legal Standards.**

Plaintiffs contend Defendants "committed an act constituting deception ... and

---

**43.** Plaintiffs restrict their allegations to completed offenses.

**44.** Because "fraud is an element of theft by deception," *State v. Wilson,* 573 N.W.2d 248,

Defendants obtained the Plaintiffs' money." Second Am. Pet. ¶ 96(a). Theft by deception occurs when a person "[o]btains the labor or services of another, or a transfer of possession, control, or ownership of the property of another, or the beneficial use of property of another, by deception." Iowa Code § 714.1(3). As applicable here, deception means to

knowingly do[ ] any of the following:

1. Creat[e] or confirm[ ] another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true.

2. Fail[ ] to correct a false belief or impression as to the existence or nonexistence of a fact or condition which the actor previously has created or confirmed.

. . . .

Iowa Code § 702.9(1)-(2). It is essential that the actor know the statement or representation causing deception is false at the time it is made, *State v. Rivers*, 588 N.W.2d 408, 410 (Iowa 1998), and the defendant must make the knowingly false statement with intent to deceive, *State v. Williams*, 674 N.W.2d 69, 73 (Iowa 2004); *see also State v. Hogrefe*, 557 N.W.2d 871, 880 (Iowa 1996) (the actor "must have the purpose to obtain the property of another," and he must have a purpose to deceive). That is, if the actor believed the statement or representation was true at the time it was made, he cannot be guilty of theft by deception. *Hogrefe*, 557 N.W.2d at 880. Typically this analysis requires a "thorough inquiry of all the facts and circumstances." *Hogrefe*, 557 N.W.2d at 878. In fact, theft by deception is an elastic concept: It " 'is meant as a catch-all crime to encompass the full and ever changing varieties of deception.' " *State v. Miller*, 590

252 (Iowa 1998); *see also State v. Williams*, 674 N.W.2d 69, 72 (Iowa 2004) (theft by deception requires evidence of specific intent

N.W.2d 45, 46–47 (Iowa 1999) (quoting *Hogrefe*, 557 N.W.2d at 878).

### ii. Arguments of the Parties.

Defendants contend Plaintiffs have alleged "no knowingly false diagnoses, no knowing misrepresentations of the severity of [Plaintiffs'] conditions, and nothing Kerkhoff told them that he had to know was false." Br. in Supp. of Defs.' Mot. to Dismiss for Failure to State a Claim 11. To Defendants, Plaintiffs' allegations demonstrate either disagreement with Kerkhoff's diagnosis or (at worst) a misdiagnosis, but either scenario does not prove Kerkhoff had the requisite criminal intent. Responding, Plaintiffs correctly note one key aspect is whether the Defendant obtained the victim's money or property after creating a deception. Applied here, Plaintiffs argue the Second Amended Petition sufficiently alleges that the patients Kerkhoff treated did not have the chance to "make a decision about paying for health care treatment by their doctor that [was] not influenced by the deception created at the outset of the relationship before any money change[d] hands." Br. in Supp. of Resist. to Defs.' Mot. to Dismiss for Failure to State a Claim 12.

### iii. Allegations of the Second Amended Petition.

Plaintiffs allege Kerkhoff used "heavy-handed" leverage, scripts, and other ploys advertised and taught by "The Masters Circle" to convince them to pay for unneeded care. More specifically, Plaintiffs contend Kerkhoff told Christian she would be unable to hold her head up upon reaching age sixty if she did not undergo long-term treatment. As a result of Kerkhoff's statements, Christian purchased nine months of care. Plaintiffs allege that even

to defraud), allegations connected to this crime must pass Rule 9(b).

though Christian's symptoms improved, she continued to receive care. As a result, Plaintiffs contend, Christian paid for and received unnecessary treatments she paid for only as a result of some deception on the part of Kerkhoff.

With respect to Brown and Rhiner, Plaintiffs allege Kerkhoff informed them that Rhiner had a serious case of scoliosis and that "based on his x-rays [Rhiner] would develop arthritis in his early twenties, would not be able to continue to play sports, and was at risk of a serious debilitating injury in the future without intense and immediate chiropractic treatment." Second Am. Pet. ¶ 55. Brown and Rhiner were allegedly told that Rhiner required a year of treatment, but they were eligible for a discount because a relative referred them. After Rhiner became symptom free, Rhiner and Brown consulted an orthopedic surgeon, who informed them he believed Rhiner did not have scoliosis, that any representations indicating Rhiner would be impaired later in life were untrue, and that some of Kerkhoff's treatment methods could be harmful. Plaintiffs contend Kerkhoff submitted a claim to Rhiner's insurance company seeking payment for diagnosis and treatment, and that the insurer paid some bills. Plaintiffs claim they were forced to pay "more for chiropractic evaluations, x-rays and care based upon [T]he Masters Circle's undisclosed pre-set policy," Second Am. Pet. ¶ 80, were "deprived of their property when they made payments for services that were unethical and pre-determined," Second Am. Pet. ¶ 104, and that as a result of purchasing a set number of visits up front, were forced to "continue[ ] to pay for unnecessary chiropractic treatments" administered after Rhiner's condition improved, Second Am. Pet. ¶ 69.

### iv. Analysis.

Plaintiffs contend "[i]t does not take a stretch of the imagination to foresee how plaintiffs have been given the false impression through the use of … tactics that they needed long-term chiropractic care." Br. in Supp. of Resist. to Defs.' Mot. to Dismiss for Failure to State a Claim 11. Unfortunately for Plaintiffs, a successful resistance hinges on allegations found in the pleadings, not the elasticity of the Court's imagination.

Turning to the pleadings, Plaintiffs contend Kerkhoff received payment for services that were actually unnecessary. Such payments would constitute the "property of another" for purposes of Iowa Code section 714.1(3). *See, e.g., Miller,* 590 N.W.2d at 46–47 (transfers of money sufficient); *Rivers,* 588 N.W.2d at 411–12 (down payments for services sufficient); *State v. Cornelius,* 293 N.W.2d 267, 271 (Iowa 1980) (payment for pest removal services).

The primary weakness in Plaintiffs' allegations relates to the requirement that the one accused knowingly deceive. *See* Iowa Code §§ 702.9, 714.1(3). It is critical that Plaintiffs point to specific allegations that Kerkhoff made a representation that he knew was false and that it was made for the purpose of deceiving patients to pay for services that were unnecessary. *Compare Williams,* 674 N.W.2d at 71–73 (intent to deceive where the defendant obtained a car from a dealership after "presenting a bogus letter indicating a source of payment for the car" and falsely represented he was employed); *Miller,* 590 N.W.2d at 46–47 (false statements of "romantic intentions" inducing victims to send money to the defendant sufficient because the defendant "deliberately use[d] her false promises as a vehicle for parting her victims from their money"); *Rivers,* 588 N.W.2d at 410–11 (evidence proved the defendant knowingly promised payment for hotel rooms that he did not intend to pay for or knew he would not be

able to pay for where he failed to pay for rooms at the conclusion of his stay and chose to give the hotel contact information for his insurance company for billing purposes after he was told he—not his insurance company—would be required to pay for the rooms, and where the defendant did not check out of the hotel but abandoned property there to leave the "false impression that [he was] coming back"); *Rivers*, 588 N.W.2d at 411–12 (evidence proved intent to deceive where the same defendant "used various ploys and reasons to persuade the customer to make additional and premature payments" for home remodeling jobs, suggested to customers he could complete additional work upon payment of additional money, and then failed to complete any work and threatened litigation if customers demanded completion; evidence suggested the defendant engaged in a similar scheme before and that he had filed for bankruptcy an abnormally high number of times); *Hogrefe*, 557 N.W.2d at 878–80 (postdated checks show intent to deceive if other evidence proves criminal intent; evidence supported such a finding where a defendant received chemicals on the strength of post-dated checks he knew he had insufficient funds to cover), *Cornelius*, 293 N.W.2d at 271 (exhibition of criminal intent where a defendant who charged $21,600 to an elderly customer to rid her home of pests falsely represented a test had revealed pests, indicated spraying was expensive and required four to five one-half to two-hour visits, did not submit bills but instead chose to "write out the amount or fill[ ] out the checks" provided by the victim, and a professional inspection found no pests and would have cost about 2 percent of the defendant's charges); with *State v. Tovar*, 580 N.W.2d 768, 771–73 (Iowa 1998) (insufficient evidence that defendant knowingly created a false belief that customers' down payment money would be used to purchase supplies

for customers' projects where customers assumed money was to be used for that purpose and the defendant never told or inferred to customers he was using that money for that purpose); *Hogrefe*, 557 N.W.2d at 880–81 (insufficient evidence of deception where the defendant received funds by "mistake" that he immediately assigned to a different party to cover a debt, even though the defendant wrote two post-dated checks to reimburse the funds wrongly received).

Beginning with the legal conclusion that Kerkhoff knowingly "creat[ed] ... another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true," Iowa Code § 702.9(1), the Court first notes a lack of factual allegations contending Kerkhoff knew the full course of treatments would be unnecessary at the time he recommended them. Kerkhoff could not have knowingly "creat[ed]" a belief or impression about a fact he did not believe was true if he did not himself believe the course of treatments were unnecessary. *See id.*

Plaintiffs have alleged, however, that Kerkhoff recommended Rhiner and Christian complete their treatment programs *even after* their symptoms subsided, and both patients completed at least some of these treatments. While it is deception for one to knowingly "confirm[ ] another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true," or to knowingly "fail[ ] to correct a false belief or impression as to the existence or nonexistence of a fact or condition which the actor previously ... confirmed," *id.* § 702.9(1)-(2), Plaintiffs have not alleged Kerkhoff assured any Plaintiff that a particular treatment for which he was paid but which Kerkhoff knew *at the time of the assurance or ad-*

*ministration* was unnecessary. For example, Plaintiffs allege Kerkhoff told Christian she required care or would suffer debilitating injuries later in life, but they do not allege he made that statement with knowledge that it was false. Similarly, Plaintiffs do not allege Kerkhoff carried out a single treatment on Rhiner with knowledge that it was unnecessary. While an orthopedic surgeon later disagreed with Kerkhoff, there is a difference between a disagreement among medical professionals and an allegation that one is being deceitful. Consequently, the Second Amended Petition does not allege Kerkhoff committed theft by deception.[45]

Even though Plaintiffs' allegations are restricted to conduct undertaken by Kerkhoff, it is unlawful for one to "knowingly receive[ ] any proceeds of specified unlawful activity, to use or invest, directly or indirectly, any part of such proceeds in the acquisition of any interest in any enterprise . . . , or in the establishment or operation of any enterprise." Iowa Code § 706A.2(1)(a). An individual is also liable for "facilitat[ing]" such conduct. *Id.* § 706A.2(1)(d). Further, it is unlawful for an individual "acting with knowledge of the financial goals and criminal objectives of a criminal network to knowingly facilitate criminal objectives of the network by . . . [m]aking any property available to a member of the criminal network," "[m]aking any service other than legal services available to a member of the criminal network," or "[o]btaining any benefit for a member of a criminal network by means of false of

fraudulent pretenses, representation, promises, or material omissions." *Id.* § 706A.2(2)(f)-(g), (I). As a result, even though Plaintiffs have not alleged The Masters Circle, Hoffman, Markson, and Perman engaged in the conduct underlying the theft by deception claim, these Defendants can still be liable upon a showing of a violation of any of these sections.

First, because no cause of action is asserted that Kerkhoff committed theft by deception, there is no "specified unlawful activity." As a result, The Masters Circle, Hoffman, Markson, and Perman cannot be liable under section 706A.2(1). *See* Iowa Code § 706A.2(1)(a)-(d) (each requiring "specified unlawful activity"). Second, "an indictable offense under the laws of [Iowa]" must have occurred for there to have been a criminal network. *Id.* § 706A.1(1). Because as postured no indictable offense occurred, no criminal network can exist on the basis of this offense. With no criminal network in this manner, The Masters Circle, Hoffman, Markson, and Perman would not be liable under Iowa Code section 706A.2(2)(f), (g), or (I). *See id.* § 701A.2(2) (requiring a criminal network).

### v. Conclusion.

Plaintiffs have not included sufficient allegations for theft by deception to serve as a predicate offense for purposes of the Iowa ongoing criminal conduct statute.

### b. Insurance Fraud Under Iowa and New York Law.[46]

#### i. Legal Standards.

---

45. Plaintiffs' argument that Kerkhoff deceived them by failing to disclose his membership in The Masters Circle, leading them to wrongly assume Kerkhoff would put their interests ahead of his, is misplaced. As noted above, it is necessary that an actor "obtain . . . ownership of the property of another" by the deception alleged. Iowa Code § 714.1(3). Plaintiffs allege theft occurred because they paid for unnecessary treatments or paid more for the services they received, but they do not

allege they gave money to Kerkhoff because he failed to tell them he was a member of The Masters Circle. As a result, even assuming Kerkhoff placed his interests above that of his patients, Plaintiffs have not alleged any theft arose from such conduct.

46. Plaintiffs' allegations with respect to this crime must be pled with particularly pursuant to Rule 9(b).

A person commits insurance fraud pursuant to Iowa Code section 507E.3(2) when he or she,

with the intent to defraud an insurer, does any of the following:

a. Presents or causes to be presented to an insurer, any written document or oral statement, including a computer-generated document, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that such document or statement contains any false information concerning a material fact.

b. Assists, abets, solicits, or conspires with another to present or cause to be presented to an insurer, any written document or oral statement, including a computer-generated document, that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy, knowing that such document or statement contains any false information concerning a material fact.

. . . .

Iowa Code § 507E.3(2)(a)-(b). The term "statement" includes "any notice, statement, proof of loss, bill of lading, receipt for payment, invoice, account, estimate of property damage, bill for services, diagnosis, prescription, hospital or physician record, X-ray, test result, or other evidence of loss, injury, or expense." *Id.* § 507E.3(1).

A person is guilty of insurance fraud under New York Penal Law section 176.10 "when he commits a fraudulent insurance act." N.Y. Penal Law § 176.10. A person commits insurance fraud under New York Penal Law section 176.15 when "he commits a fraudulent insurance act and thereby wrongfully takes, obtains or withholds, or attempts to wrongfully take, obtain or withhold property with a value in excess of one thousand dollars." N.Y. Penal Law § 176.15. A violation of New York Penal

Law section 176.20 occurs when the property has value in excess of three thousand dollars. *Id.* § 176.20. A person commits a "fraudulent insurance act" if he

knowingly and with intent to defraud presents, causes to be presented, or prepares with knowledge or belief that it will be presented to or by an insurer, self insurer, or purported insurer, or purported self insurer, or any agent thereof, any written statement as part of, or in support of ... a claim for payment or other benefit pursuant to an insurance policy or self insurance program for commercial or personal insurance which he knows to: (I) contain materially false information concerning any fact material thereto; or (ii) conceal, for the purpose of misleading, information concerning any fact material thereto.

*Id.* § 176.05(1).

### ii. Arguments of the Parties.

Defendants contend the Second Amended Petition is vacant of allegation that Defendants submitted any document to an insurance carrier for a patient other than Rhiner. And with respect to the claim submitted, Defendants argue Plaintiffs have not alleged any Defendant submitted false statements or documents to obtain or attempt to obtain property. Plaintiffs claim this argument "glosses over" allegations of unnecessary care administered by Kerkhoff.

### c. Allegations of the Second Amended Petition.

Plaintiffs allege "Defendants, by their acts, caused claims for payment of chiropractic services, x-rays, diagnosis and long-term care plans to be submitted to health care insurance providers for payment that contained false information relating to a material fact." Second Am. Pet. ¶ 96(b) (citing Iowa Code § 507E.3); *ac-*

*cord id.* ¶ 96(e) (citing N.Y. Penal Law §§ 176.10, .15, .20). Generically, Plaintiffs contend some of the treatments received "were not necessary but rather were based upon [Kerkhoff's] goal of selling them a long term care plan." Second Am. Pet. ¶ 4. More specifically, Plaintiffs contend Kerkhoff "submitted a claim to Trevor Rhiner's insurance carrier seeking payment for the diagnosis and treatment," and that the insurer paid for "[s]ome of the treatments." Second Am. Pet. ¶ 61.

#### d. Analysis.

Plaintiffs' primary argument is that "a fair inference" from the paragraphs they identify (numbering three), "would be that out of all of the Plaintiffs in the class (including Trevor Rhiner and Cynthia Christian) a chiropractor has submitted a claim to an insurance provider based upon [T]he Masters Circle's practice methods which would constitute making a false claim to an insurance company." Br. in Supp. of Resist. to Defs.' Mot. to Dismiss for Failure to State a Claim 13.

The Court's discussion need only be as scant as Plaintiffs' allegations.

Because Plaintiffs allege the occurrence of fraud, they are not entitled to "natural inferences," *id.* at 13; they "must plead 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *BJC Health Sys.,* 478 F.3d at 917 (quoting *Abels,* 259 F.3d at 920); *accord Joshi,* 441 F.3d at 556; *Schaller Tel. Co.,* 298 F.3d at 746; *Roberts,* 128 F.3d at 651; *Parnes,* 122 F.3d at 549–50; *Murr Plumbing,* 48 F.3d at 1069. "[T]he 'who, what, where, when, and how' of the alleged fraud" must be identified. *BJC Health Sys.,* 478 F.3d at 917; *accord Great Plains Trust Co.,* 492 F.3d at 995–96; *Joshi,* 441 F.3d at 556; *Parnes,* 122 F.3d at 550. Plaintiffs contend Kerkhoff submitted "a claim" to Rhiner's—but not

Christian's—insurance company. Out of this one "claim," Plaintiffs conclude Kerkhoff "caused claims for payments" for unnecessary chiropractic services to be remitted to a variety of unidentified "health care insurance providers." Second Am. Pet. 96(b), (e). These allegations fail on multiple levels.

Beginning with Christian, Plaintiffs have not alleged any claim was submitted to her insurance company. In fact, Plaintiffs have not alleged Christian was insured. Consequently, no insurance fraud could have occurred with respect to care performed on Christian.

■ Turning to Rhiner, while the Second Amended Petition indicates Kerkhoff sought—and apparently received—payment from one insurance company with respect to his care, there are a variety of allegations missing for this count to be pled with particularity. Plaintiffs do not identify when Kerkhoff submitted this claim or when payment was made. The identity of the insurance company is unknown. While Plaintiffs contend claims were submitted for "payments of chiropractic services, x-rays, diagnosis and long-term plans," the record is devoid of allegations delineating which submissions were truthful and which were false. It is unclear what was fraudulent about any submission or how much Kerkhoff attempted to or did net from the claim. Finally, and most importantly, nowhere have Plaintiffs contended a single representation was made by Kerkhoff to any insurance company with knowledge the representation contained materially false information or was made with the intent to defraud an insurer. Plaintiffs' Second Amended Petition falls well short of stating a claim with respect to any insurance fraud undertaken by Kerkhoff. Therefore, insurance fraud cannot serve as a predi-

cate offense for purposes of an ongoing criminal conduct claim.

Because *Kerkhoff* is not sufficiently alleged to have committed insurance fraud, there is no "specified unlawful activity." As a result, The Masters Circle, Hoffman, Markson, and Perman cannot be liable under section 706A.2(1). *See* Iowa Code § 706A.2(1)(a)-(d) (each requiring "specified unlawful activity"). Because no indictable offense arises in the form of insurance fraud, no criminal network can exist on the basis this offense. *Id.* § 706A.1(1). And because there can be no criminal network based on insurance fraud, The Masters Circle, Hoffman, Markson, and Perman are not liable under Iowa Code section 706A.2(2). *See id.* § 701A.2(2) (each requiring a criminal network).

### e. Conclusion.

Plaintiffs have not included sufficient allegations for insurance fraud to serve as a predicate offense for purposes of the Iowa ongoing criminal conduct statute.

### 4. Scheme to Defraud.

### a. Legal Standards.

Plaintiffs next allege a violation of New York Penal Law section 190.60, which provides as follows:

> 1. A person is guilty of a scheme to defraud in the second degree when he engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pre-

tenses, representations or promises, and so obtains property from one or more of such persons.

> 2. In any prosecution under this section, it shall be necessary to prove the identity of at least one person from whom the defendant so obtained property, but it shall not be necessary to prove the identity of any other intended victim.

N.Y. Penal Law § 190.60. This statute requires that a defendant intend to defraud multiple victims and that multiple victims are actually defrauded. *People v. Mikuszewski*, 73 N.Y.2d 407, 413, 541 N.Y.S.2d 196, 538 N.E.2d 1017 (N.Y.1989). Evidence of intent can either be direct, *see, e.g., People v. Wolf,* 98 N.Y.2d 105, 117-18, 745 N.Y.S.2d 766, 772 N.E.2d 1124 (N.Y. 2002) (evidence sufficient to support finding of scheme to defraud where co-conspirators' confessions and business records documented a conspiracy to defraud insurance companies), or circumstantial, *People v. Sala,* 95 N.Y.2d 254, 260, 716 N.Y.S.2d 361, 739 N.E.2d 727 (N.Y.2000) (intent to defraud proven where defendants disguised a business "as an objective financial planning institution that employed expert advisors who developed individualized investment strategies for its investors" when, in fact, the business was used to secretly channel investors' assets to risky investment vehicles and defendants misrepresented risks involved and concealed the fact that the company earned commissions on the investments).

This statute and its companion, New York Penal Law section 190.65,[47] were "de-

---

47. Section 190.65(1) provides,

> A person is guilty of a scheme to defraud in the first degree when he: (a) engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons or to obtain property from ten or more persons by false or fraudulent pretenses, representations or promises, and so obtains property from one or more of such persons; or (b) engages in a scheme constituting a systematic ongoing course of

> conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtains property with a value in excess of one thousand dollars from one or more such persons.

N.Y. Penal Law § 190.65. Section 190.65(2) is identical to section 190.60(2). *See id.* §§ 190.60(2), .65(2).

signed to aid in the prosecution of consumer fraud schemes where many victims are bilked mainly of small amounts of money." *Mikuszewski*, 73 N.Y.2d at 413, 541 N.Y.S.2d 196, 538 N.E.2d 1017. The scheme to defraud statute "borrowed from the traditional larceny category of false pretense and false representation, but shifted the focus away from the amount of loss suffered by a particular victim and placed it instead on the nature and extent of the scam." *Id.* The statute was modeled on the federal mail fraud statute described above but requires property to have actually been obtained from at least one of the persons sought to be defrauded. *Mikuszewski*, 73 N.Y.2d at 413, 541 N.Y.S.2d 196, 538 N.E.2d 1017 (citing 18 U.S.C. § 1341); *see also People v. First Meridian Planning Corp.*, 86 N.Y.2d 608, 616, 635 N.Y.S.2d 144, 658 N.E.2d 1017 (N.Y.1995). At issue in the case at bar is whether the Second Amended Petition alleges each of these things.

### b. Allegations of the Second Amended Petition.

Plaintiffs allege "Defendants, by their acts, engaged in a scheme constituting ongoing course of conduct with the intent to defraud Plaintiffs to obtain their property by using false or fraudulent pretenses, representations or promises and obtained Plaintiffs' funds using this scheme." Second Am. Pet. ¶ 96(f). In their brief, Plaintiffs point to no other allegations supporting this claim.

### c. Arguments of the Parties.

Defendants argue Plaintiffs' claim against Kerkhoff fails on a factual basis because the Second Amended Petition fails to allege Kerkhoff had the necessary intent to defraud. Defendants also argue Plaintiffs' claim fails on a legal basis because there has been no showing that Kerkhoff could be indicted under this statute for treatment of Iowa residents in Iowa.

Plaintiffs' response is twofold. First, they contend that because this action is a class action, their allegations "undoubtedly include[ ] John Doe chiropractors in New York and their patients who fell victim to the scheme." Second, Plaintiffs contend they need only "allege that *one* of the Defendant's conduct rose to the level of constituting an indictable offense in the [S]tate of Iowa *or* the [s]tate where the alleged act occurred." As a result, Plaintiffs allege, because The Masters Circle, Hoffman, Markson, and Perman "conspired to teach Kerkhoff and the other John Doe chiropractors how to use [certain allegedly unlawful techniques]," their activities render them subject to indictment in New York. Their allegedly indictable conduct in New York, the argument goes, is sufficient to state a claim under Iowa's ongoing criminal conduct statute.

### d. Analysis.

■ Plaintiffs' argument departs from a misunderstanding of the statute under which their claims are brought. To be "specified unlawful activity," an offense must be "punishable as an indictable offense under the laws of the state in which it occurred *and* under the laws of [Iowa]." Iowa Code § 706A.1(5) (emphasis added). If the offense is, as Plaintiffs allege, "indictable ... in the [S]tate of Iowa *or* the [s]tate where the alleged act occurred"— but not both—it is not "specified unlawful activity."

Assuming Plaintiffs' argument is that The Masters Circle, Hoffman, Markson, and Perman were engaged in a scheme to defraud, Plaintiffs have not shown how that conduct would be indictable in Iowa. Conversely, Plaintiffs have failed to demonstrate how Kerkhoff could be indicted under this statute for conduct occurring wholly in Iowa. Because Plaintiffs have not shown how a person committing acts sufficient to satisfy New York Penal Law sec-

tion 190.60 has committed an indictable offense in Iowa, Plaintiffs cannot rely on a scheme to defraud as a predicate offense to "specified unlawful activity" for purposes of Iowa Code section 706A.1(5).

■ Alternatively, as with Plaintiffs' insurance fraud claim, their pleadings must comply with Rule 9(b). As a result, the Second Amended Petition must contain " 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.' " *BJC Health Sys.*, 478 F.3d at 917 (quoting *Abels*, 259 F.3d at 920); *accord Joshi*, 441 F.3d at 556; *Schaller Tel. Co.*, 298 F.3d at 746; *Roberts*, 128 F.3d at 651; *Parnes*, 122 F.3d at 549–50; *Murr Plumbing*, 48 F.3d at 1069. "[T]he 'who, what, where, when, and how' of the alleged fraud" must be clearly identified. *BJC Health Sys.*, 478 F.3d at 917; *accord Great Plains Trust Co.*, 492 F.3d at 995–96; *Joshi*, 441 F.3d at 556; *Parnes*, 122 F.3d at 550. As a result, Plaintiffs' claim that the scheme to defraud "undoubtedly includes John Doe chiropractors in New York and their patients who fell victim to the scheme" is too imprecise. The Second Amended Petition does not allege when the purported "systematic ongoing course of conduct" occurred or what specific acts formed that conduct. It does not identify what "fraudulent pretenses, representations or promises" were made, when they were made, who made them, and why they were misleading or fraudulent. In short, even if the conduct forbidden by New York Penal Law section 190.60 were indictable in Iowa, Plaintiffs have not pleaded a violation of the New York statute with the specificity required to survive a motion to dismiss.

### e. Conclusion.

Plaintiffs have not sufficiently alleged a violation of New York Penal Law 190.60. Consequently, Plaintiffs cannot use that crime as a predicate offense for an ongoing criminal conduct claim.

## 5. Money Laundering.

### a. Legal Standards.

■ Plaintiffs also alleged Defendants engaged in money laundering under Iowa Code section 706B.2. Under that statute,

> It is unlawful for a person to commit money laundering by doing any of the following:
>
> a. To knowingly transport, receive, or acquire property or to conduct a transaction involving property, knowing that the property involved is the proceeds of some form of unlawful activity, when, in fact, the property is the proceeds of specified unlawful activity.
>
> b. To make property available to another, by transaction, transportation, or otherwise, knowing that it is intended to be used for the purpose of committing or furthering the commission of specified unlawful activity.
>
> . . . .
>
> d. To knowingly engage in the business of conducting, directing, planning, organizing, initiating, financing, managing, supervising, or facilitating transactions involving property, knowing that the property involved in the transaction is the proceeds of some form of unlawful activity, that, in fact, is the proceeds of specified unlawful activity.

Iowa Code § 706B.2(1)(a)-(b), (d).[48] A number of terms have special definitions. "Proceeds," for example, "means property

---

48. While the Second Amended Petition contains allegations that Defendants violated a standard similar to Iowa Code section 706B.2(1)(b), in their brief, Plaintiffs expand their argument to include allegations of conduct amounting to violations of sections 706B.2(1)(a) and (d).

acquired or derived directly or indirectly from, produced through, realized through, or caused by an act or omission and includes any property of any kind." *Id.* § 706B.1(1). "Property" is defined as "anything of value, and includes any interest in property, including any benefit, privilege, claim, or right with respect to anything of value, whether real or personal, tangible or intangible." *Id.* § 706B.1(2). "Unlawful activity" is an act "chargeable or indictable as a public offense of any degree under the laws of the state in which the act occurred or under federal law and, if the act occurred in a state other than this state, would be chargeable or indictable as a public offense of any degree under the laws of this state or under federal law." *Id.* § 706B.1(5). "Specified unlawful activity" includes "any act, including any preparatory or completed offense, committed for financial gain on a continuing basis, that is punishable by confinement of one year or more under the laws of this state, or, if the act occurred outside this state, would be punishable by confinement of one year or more under the laws of the state in which it occurred and under the laws of this state." *Id.* § 706B.1(3). And a " '[t]ransaction' includes a purchase, sale, trade, loan, pledge, investment, gift, transfer, transmission, delivery, deposit, withdrawal, payment, transfer between accounts, exchange of currency, extension of credit, purchase, or sale of any monetary instrument, use of a safe deposit box, or any other acquisition or disposition of property by whatever means effected." *Id.* § 706B.1(4).

### b. Allegations of the Second Amended Petition.

Turning to the pleadings, Plaintiffs allege "Defendants made property (the proceeds form [sic] the sale of chiropractic services) available to another knowing that the property was intended for the use of either the commission or furtherance of a commission of a 'specified unlawful activity.'" Second Am. Pet. ¶ 96(d). To carry out the alleged criminal activity, Plaintiffs contend The Masters Circle, Hoffman, Markson, Perman, and others trained chiropractors to persuade patients to purchase long-term care plans. Defendants purportedly benefitted from this arrangement. For example, Plaintiffs contend chiropractors used techniques taught by the organization "to induce more patients to pay for chiropractic services" and then received more "money back from the member chiropractors through the monthly membership fee, seminar costs and sales of ... products." Second Am. Pet. ¶ 45. These funds were "used or invested, directly or indirectly, by the Defendants back into the enterprise and into [T]he Masters Circle and [T]he Masters Circle's assets." *Id.* ¶ 97. The Masters Circle then "use[d] its success rate to attract new chiropractors," thereby expanding its business. *Id.* ¶ 45.

### c. Arguments of the Parties.

Defendants claim the Second Amended Petition is devoid of allegations that any Defendant received or accepted funds with knowledge those funds were the proceeds of unlawful activity and with the intent to conceal or disguise the nature, location, source, ownership, or control of the funds. Defendants also argue Plaintiffs have not identified conduct amounting to "specified unlawful activity" under the money laundering statute. Additionally, Defendants argue that because Plaintiffs have not adequately alleged any Defendant committed an indictable offense, there are insufficient allegations to demonstrate a violation of Iowa Code section 706B.2(1). Responding, Plaintiffs argue they need not allege Defendants had an intent to conceal or disguise the nature of the money. Instead, they posit that a showing that money was transported, received, or made available

with knowledge that the funds were part of an unlawful activity is sufficient. Under this standard, Plaintiffs argue, the Second Amended Petition sufficiently alleges money laundering.

### d. Analysis.

The gist of Plaintiffs' argument is that money laundering occurred when chiropractors received payments from patients for unnecessary chiropractic services that were sent to The Masters Circle in the form of membership dues and purchases of publications, seminar fees, and other services, which the company invested into itself to further its allegedly criminal enterprise.

A primary dispute among the parties is whether Plaintiffs' pleadings must include allegations that Defendants intended to conceal or disguise the nature of the money involved in the alleged laundering activity. Broadly speaking, a person violates section 706B.2(1)(a) when he knowingly transports, receives, or acquires property or conducts a transaction involving property which he knows is the proceeds of an unlawful activity, but which are actually the proceeds of specified unlawful activity. Iowa Code § 706B.2(1)(a). An offense under subsection (b) occurs if the person makes property available to another knowing the other intends to use the property to commit or further a specified unlawful activity. Id. § 706B.2(1)(b). And subsection (d) is violated if a person is engaged in the business of facilitating transactions involving property which is the proceeds of a specified unlawful activity with knowledge that the property is actually proceeds of some unlawful activity. Id. § 706B.2(1)(d). Under none of these statutes must a person conceal or disguise the nature of the property that is the subject of the transaction in question.

However, Plaintiffs must still point to allegations sufficient to demonstrate a violation of section 706B.2(1). Subsections (a) and (d) each require the identification of proceeds from a section 706B.1(3) specified unlawful activity. The only criminal offenses alleged in the Second Amended Petition which could serve as the basis for the crime of money laundering are theft by deception, scheme to defraud, and two forms of insurance fraud. See Second Am. Pet. ¶ 96(a)(b), (e)-(f). Because Plaintiffs have not sufficiently alleged the occurrence of any of these crimes, they have not alleged a specified unlawful activity for purposes of the money laundering statute.[49] It follows there can be no proceeds from a specified unlawful activity for Defendants to launder. As a result, no violation of subsections 706B.2(1)(a) or (d) could have occurred.

For subsection (b), Plaintiffs must point to property Defendants made available to another with knowledge the property was to be used to commit or further a specified unlawful activity. Here, Kerkhoff is accused of making available proceeds from chiropractic services to The Masters Circle

---

**49.** Some of the crimes alleged are not punishable by confinement of one year or more. A scheme to defraud in violation of New York Penal Law section 190.60 is a class A misdemeanor, punishable by confinement not to exceed one year. N.Y. Penal Law §§ 70.15, 190.60. Depending on the amount of money taken, a person convicted of theft by deception in violation of Iowa Code section 714.1 may not necessarily be punished by imprisonment for one year or more. See Iowa Code §§ 714.2(4)-(5) (theft of property exceeding $200 but not exceeding $500 is a serious misdemeanor; theft of property not exceeding $200 is a simple misdemeanor); 903.1(a)-(b) (simple misdemeanors punishable by a fine or imprisonment not to exceed thirty days; serious misdemeanors punishable by a fine and possible imprisonment not to exceed one year). As a result, even if Plaintiffs sufficiently pled every crime they claim occurred, they could not use these crimes as a predicate offense for the Iowa money laundering statute.

in the form of membership dues and purchases of seminars, literature, and other services with knowledge of their use in the commission or furtherance of a specified unlawful activity. However, as above, Plaintiffs have failed to identify a specified unlawful activity for purposes of money laundering. Consequently, there can be no section 706B.2(1)(b) violation.

### e. Conclusion.

Without sufficient allegations of a specified unlawful activity as that term is used in the context of the money laundering statute, there can be no money laundering. Absent money laundering, there can be no specified unlawful activity for purposes of the Iowa ongoing criminal conduct statute. Therefore, Plaintiffs' attempt to rely on money laundering as a predicate offense for purposes of their ongoing criminal conduct cannot be sustained.

### 6. Conspiracy.

### a. Legal Standards.

██ . Finally, Plaintiffs contend Defendants engaged a criminal conspiracy. Pursuant to Iowa Code section 706.1(1),

[a] person commits conspiracy with another if, with the intent to promote or facilitate the commission of a crime which is an aggravated misdemeanor or felony, the person does either of the following:

a. Agrees with another that they or one or more of them will engage in conduct constituting the crime or an attempt or solicitation to commit the crime.

b. Agrees to aid another in the planning or commission of the crime or of an attempt or solicitation to commit the crime.

Iowa Code § 706.1(1). It is necessary for "at least one conspirator [to commit] an overt act evidencing a design to accomplish the purpose of the conspiracy by criminal means." *Id.* § 706.1(3).

### b. Allegations of the Second Amended Petition.

Plaintiffs contend "Defendants had an agreement to commit a felony or aggravated misdemeanor, and intent to promote the offense at the time of [sic] the agreement, an overt act in furtherance of the agreement and the alleged co-conspirators were not law enforcement officers or agents." Second Am. Pet. ¶ 96(c). In their brief, Plaintiffs identify other portions of their pleadings to flesh out this conclusory allegation.

As noted above, Plaintiffs allege that when a chiropractor joins The Masters Circle, he agrees to study and follow the company's procedures, practices, and policies, and to follow the advise and recommendations of his coaches. According to Plaintiffs, Defendants effected the conspiracy through The Masters Circle's literature, coaching sessions, seminars, and training sessions where the "high pressure sales tactics, admittedly 'heavy handed' scripts and unethical practices and policies" which "induce[d] patients ... to agree to pay for long-term chiropractic care" were taught. *Id.* ¶ 42; *see also id.* ¶ 44 (alleging Defendants exchanged "information relating to [the] conspiracy through their seminars, telephone calls, PODs, e-mails and mailed newsletters"). Members allegedly furthered the conspiracy with the company by participating in meetings and conventions where they learned "unethical practices, scare tactics, scripts and other unlawful and unethical methods in order to work together to dramatically increase the number of patients seeking chiropractic care." *Id.* ¶ 46(a).

### c. Arguments of the Parties.

Defendants contend the Second Amended Petition lacks allegations showing how any two Defendants agreed with each other to engage, attempt to engage, or solicit the engagement of any aggravated misde-

meanor or felony. As a result, Defendants contend, the pleadings do not demonstrate the undertaking of any conduct rising to the level of a criminal conspiracy.

Responding, Plaintiffs note they have allege Defendants "knowingly conducted the affairs and mission of [a criminal] enterprise ... through actions which included preparatory or completed offenses, committed for financial gain on a continuing basis." *Id.* ¶ 95. According to Plaintiffs, this allegation, when read with the allegations supporting the specific preparatory or completed offenses alleged, is sufficient to state a claim.

### d. Discussion.

While the Second Amended Petition does allege the existence of an agreement between The Masters Circle and its chiropractor members to follow the company's policies and procedures, *see* Second Am. Pet. ¶ 41, for a criminal conspiracy to exist the conduct agreed to must be an aggravated misdemeanor or a felony. The only criminal offenses alleged in the Second Amended Petition that could serve as predicate offenses for criminal conspiracy are theft by deception, scheme to defraud, two forms of insurance fraud, and money laundering. *See* Second Am. Pet. ¶ 96(a)-(b), (d)-(f).[50] As with Plaintiffs' attempt to allege money laundering, Plaintiffs have not identified an aggravated misdemeanor for Defendants to intend to promote or facilitate by agreement. Therefore, there can be no criminal conspiracy.

### e. Conclusion.

Plaintiffs have not demonstrated the existence of an aggravated misdemeanor or felony for Defendants to intend to promote or facilitate. As a result, criminal conspiracy cannot be a "specified unlawful activi-

ty" under the Iowa ongoing criminal conduct statute.

### 7. Conclusion.

Because Plaintiffs cannot demonstrate the presence of specified unlawful activity in any form, their ongoing criminal conduct claim must be dismissed.

## D. Unjust Enrichment.

Defendants next seek dismissal of Plaintiffs' unjust enrichment claim.

### 1. Elements.

■ "Unjust enrichment is an equitable principle mandating that one shall not be permitted to unjustly enrich oneself at the expense of another or to receive property or benefits without making compensation for them." *W. Branch State Bank v. Gates,* 477 N.W.2d 848, 851–52 (Iowa 1991) (citing *Johnson v. Dodgen,* 451 N.W.2d 168, 175 (Iowa 1990)). Unjust enrichment presents in a wide variety of settings: foreclosure actions, *see W. Branch State Bank,* 477 N.W.2d at 852; tangential to contracts, torts, or other wrongs, *Dept' of Hum. Servs. v. Unisys Corp.,* 637 N.W.2d 142, 154 & n. 1 (Iowa 2001); where a constructive trust or equitable lien exists, *see In re Marriage of Keener,* 728 N.W.2d 188, 197 (Iowa 2007) (equitable lien); *In re Estate of Thomann,* 649 N.W.2d 1, 8 (Iowa 2002); or, as in the present case, as an independent ground for restitution. The principle is "broad ... with few limitations." *Unisys Corp.,* 637 N.W.2d at 155.

■ Regardless of the context, the elements of the claim are the same. To recover on a theory of unjust enrichment under Iowa law, a plaintiff must plead and prove three elements: "(1) defendant was enriched by the receipt of a benefit; (2) the

---

**50.** The Court assumes for purposes of discussion that a class A misdemeanor under New York law is analogous to an aggravated misdemeanor under Iowa law, that Plaintiffs' theft by deception allegations are intended to include allegations that the amount misappropriated exceeded $500.

enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *Unisys Corp.*, 637 N.W.2d at 154–55 (collecting authorities). So long as "the benefit received [is] at the expense of the plaintiff," it is unnecessary that the benefit be conferred directly by the plaintiff: Direct or indirect benefits or benefits conferred by third parties obtained from the plaintiff are sufficient. *Unisys Corp.*, 637 N.W.2d at 155 (citing *Iconco v. Jensen Constr. Co.*, 622 F.2d 1291, 1301–02 (8th Cir.1980); *Guldberg v. Greenfield*, 259 Iowa 873, 146 N.W.2d 298, 301 (Iowa 1966)).

## 2. Allegations of the Second Amended Petition.

■ Plaintiffs direct the Court to a battery of locations in the Second Amended Petition that, they claim, sufficiently allege a claim for unjust enrichment.

Plaintiffs allege members of The Masters Circle use techniques taught by the company to "to induce more patients to pay for chiropractic services," which enriches The Masters Circle through monthly membership fees and the sale of more products. Second Am. Pet. ¶ 45. The Masters Circle uses this success to attract new chiropractors. *Id.* As a result of The Masters Circle's policies and practices, Plaintiffs allege Kerkhoff experienced growth in his patient base and a resultant increase in his personal wealth. *Id.* ¶¶ 53, 87. And because of a general expansion in chiropractors' patient bases nationwide, Plaintiffs allege, The Masters Circle prospered as well. *Id.* ¶ 87.

This joint enrichment was purportedly at Plaintiffs' expense. Plaintiffs contend that after paying for a number of sessions, they learned the sessions were unnecessary but were based on their chiropractor's goal of selling long-term plans. *Id.* ¶ 4. Consequently, Brown and Christian allege, they paid for unnecessary treatments. *Id.* ¶¶ 59, 69.

## 3. Discussion.

Defendants first note Plaintiffs have not alleged The Masters Circle benefitted in any way if a chiropractor received more money resulting from a new patient or expanded patient base for its members. In fact, the Second Amended Petition shows members are charged a flat fee regardless of a chiropractor's practice size. *See* Second Am. Pet. ¶¶ 2, 38. In fact, the only variable income The Masters Circle received resulted from product sales. Because The Masters Circle receives all funds in this manner, its income is not based on the success of its members' businesses. Consequently, Defendants claim, The Masters Circle could not have been unjustly enriched at Plaintiffs' expense. Second, Defendants argue Plaintiffs have alleged no manner in which Hoffman, Markson, or Perman were unjustly enriched. Like The Masters Circle, these Defendants received no benefit when a chiropractor joined The Masters Circle or obtained or retained new patients.

Responding, Plaintiffs contend only that The Masters Circle's prosperity depends on the success of its members' businesses. Assuming this to be true, Plaintiffs have not pointed out how any benefit transferred to a chiropractor in the form of payments for services directly aided any other Defendant. For example, Plaintiffs have not alleged The Masters Circle received more money because they received treatment from Kerkhoff (i.e., a direct transferal of a benefit) or that Kerkhoff purchased more products from or was charged more for his membership as a result of Plaintiffs' receipt of treatment (*i.e.*, an indirect transferal of a benefit). Because demonstrating a defendant's "enrichment was at the expense of the plaintiff" is an essential element of an unjust

enrichment claim, *see Unisys Corp.,* 637 N.W.2d at 154–55, Plaintiffs' claim against all Defendants except Kerkhoff fails.

Turning to Kerkhoff, in addition to paying for services that were needed, the Second Amended Petition contains allegations that Plaintiffs remitted payment for and Kerkhoff received payment for services that were unnecessary. Assuming these allegations to be true, Plaintiffs have stated a claim against Kerkhoff for unjust enrichment.

#### 4. Conclusion.

Defendants' motion to dismiss Plaintiffs' unjust enrichment claim must be granted as to all Defendants except Kerkhoff.

### E. Conclusion.

Defendants' Motion to Dismiss for Failure to State a Claim is **granted in part and denied in part.** Defendants' motion to dismiss Plaintiffs' civil conspiracy claim is denied. Defendants' motion to dismiss Plaintiffs' ongoing criminal conduct claim is granted. Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is granted in part and denied in part as described above.

## IV. Plaintiffs' Motion to Amend the Second Amended Petition.

The final motion is Plaintiffs' Motion for Leave to File Third Amended Complaint and Dissolve or Modify the State Court's June 15, 2006, Order Pursuant to 28 U.S.C. § 1450. Through this pleading, Plaintiffs attempt to resuscitate certain claims dismissed by the state court prior to removal, clarify other claims, and add Defendants.

### A. Legal Standards.
#### 1. Federal Rule of Civil Procedure 15(a).

Federal Rule of Civil Procedure 15(a) provides that after a party has amended a pleading once as a matter of course, it may only amend again by obtaining "leave of court or . . . written consent of the adverse party." Fed.R.Civ.P. 15(a). The rule also directs that "leave shall be freely given when justice so requires." *Id.* Plaintiffs have already used their free pass at amendment, and Defendants have not consented to the proposed amendments, so Plaintiffs have now sought permission from the Court to file a Third Amended Complaint.

The Supreme Court has explained that "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see United States v. Hougham,* 364 U.S. 310, 316–17, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960) (suggesting amendments should always be permitted "except where prejudice to the opposing party would result"); *cf. Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330–31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (when considering whether to grant leave to amend an answer, the court must take into account prejudice suffered by the plaintiff). Because of the liberal rules governing amendments, the party resisting the amendment bears the burden of showing it is improper. *Roberson v. Hayti Police Dept.,* 241 F.3d 992, 995 (8th Cir.2001) (citing *Sanders v. Clemco Indus.,* 823 F.2d 214, 217 (8th Cir.1987)); *Beeck v. Aquaslide 'N' Dive Corp.,* 562 F.2d 537, 540 (8th Cir. 1997).

Defendants do not argue any prejudice would result if Plaintiffs were permitted to amend. Instead, Defendants argue Plain-

tiffs' amendments should be rejected because Plaintiffs have failed to cure by prior amendments the deficiencies the Third Amended Complaint attempts to remedy and, alternatively, the proposed amendments are futile.

### 2. 28 U.S.C. § 1450.

If granted, Plaintiffs' amendments would reinstate claims dismissed by the state court in its June 2006 Order. As a result, Plaintiffs seek to dissolve or modify that order under 28 U.S.C. § 1450 to the extent it is inconsistent with the proposed amendments. Defendants do not argue section 1450 imposes any restriction on the Court's ability to consider an amendment under Rule 15(a). As a result, to the extent the Court reaches a conclusion requiring modification of the state court's June 2006 Order, that order shall be so modified.

### B. Discussion.

#### 1. Failure to Cure Previous Amendments.

Defendants first argue Plaintiffs' amendments should be rejected because Plaintiffs have failed to cure deficiencies by prior amendments and have instead embarked on a series of shifting allegations, shifting claims, and shifting Defendants.[51] While the submission of multiple deficient pleadings can be a reason to deny a motion seeking leave to amend, *see Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1066 (8th Cir.2005); *Doe v. Cassel*, 403 F.3d 986, 991 (8th Cir. 2005), and Plaintiffs are certainly guilty of

submitting a variety of complaints—the Third Amended Complaint is the tenth in this litigation—the Court decides this reason is alone insufficient to deny Plaintiffs the opportunity to explain how new amendments would be useful to their position. The Court reaches this conclusion primarily because Defendants have demonstrated no prejudice arising from considering the amendments.

### 2. Futility.

Defendants' argument that any amendments would be futile requires substantial discussion.

#### a. Legal Standards.

Our circuit has recognized two species of futile amendments:

> When a district court concludes that an amendment would be futile because no actual amendments to the complaint are possible, we review the denial of leave to amend for abuse of discretion. On the other hand, when a district court concludes that an amendment would be futile because a specific allegation, even if amended, would fail to state a claim as a matter of law, we review the denial de novo.

*Stricker v. Union Planters Bank, N.A.*, 436 F.3d 875, 878 (8th Cir.2006) (citations and quotation marks omitted); *accord In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1086 (8th Cir.2005); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889–90 (8th Cir. 2002) (2–1 opinion). By arguing the Third Amended Complaint fails to include suffi-

---

**51.** The sole case cited by Defendants in support of their argument that the success (or lack thereof) of Plaintiffs' past amendments should tint the Court's analysis of the pending Motion to Amend is distinguishable. In *Gray v. McQuilliams,* the court upheld the denial of leave to amend to a *pro se* prisoner suing three prison employees because the prisoner had been given "multiple opportunities to amend, and one of the proposed amended

complaints would have been futile, while the other was non-specific and conclusory." *Gray v. McQuilliams,* 14 Fed.Appx. 726, 727 (8th Cir.2001) (per curiam). While the court did note that the plaintiff had been given other opportunities to amend, the court identified other independent reasons for upholding the district court's refusal to grant leave to amend. *See id.*

cient facts to state claims as a matter of law, Defendants' motion falls into the latter category. Therefore, the Court must decide whether the claims amended by the Third Amended Complaint state claims for relief under the applicable substantive law. *See In re Senior Cottages of Am., LLC,* 482 F.3d 997, 1001 (8th Cir.2007) ("[W]hen a court denies leave to amend on the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion."); *accord United States ex rel. Gaudineer & Comito, LLP v. Iowa,* 269 F.3d 932, 936 (8th Cir.2001) (2–1 decision) (citing *J.R. Stripling v. Jordan Prod. Co.,* 234 F.3d 863, 873 (5th Cir.2000); *Frey,* 44 F.3d at 671). If the amendments fail to state claims upon which relief could be granted, denial of leave to amend is proper. *See, e.g., Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 755–56 (8th Cir.2006) (proposed claim was unsupported by applicable law, making amendment adding that claim futile); *In re Charter Commc'ns, Inc., Sec. Litig.,* 443 F.3d 987, 993 (8th Cir.2006) (because proposed amendments would not have cured flaws leading to dismissal, rejection of leave to amend appropriate); *Joshi,* 441 F.3d at 558 (new allegations rejected because they failed to address the complaint's deficiencies); *Enervations, Inc. v. Minn. Mining & Mfg. Co.,* 380 F.3d 1066, 1068–69 (8th Cir.2004) (amendment futile because amended claim, like the original claim, was time-barred); *MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 364 F.3d 908, 911–12 (8th Cir.2004) (amendment seeking to add a private cause of action that does not exist is futile); *K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d at 899–900 (proper to block plaintiff's amendments where insufficient evidence suggested plaintiff class could cure defects in its complaint); *Wiles v. Capitol Indemnity Corp.,* 280 F.3d 868, 871 (8th Cir.2002) (amended pleading suffered the same defects as original pleading, rendering amendment futile); *Grandson v. Univ. of Minn.,* 272 F.3d 568, 575 (8th Cir.2001) (proposed amendment futile when added allegations failed to plead facts permitting recovery); *Gaudineer & Comito,* 269 F.3d at 936–37 (no error to refuse to add individual-capacity claims in a section 1983 claim where amended allegations failed to show how the defendant acted outside his official duties); *Ingrim v. State Farm Fire & Cas. Co.,* 249 F.3d 743, 745–46 (8th Cir.2001) (leave to amend properly denied because proposed amendments brought time-barred claims).

The Court turns to whether the claims added by the Third Amended Complaint state claims upon which relief could be granted.

### b. Discussion.

### i. Federal RICO Claims.

First, Plaintiffs wish to add claims alleging Defendants engaged in conduct amounting to violations of the federal RICO statute. More specifically, Plaintiffs contend Defendants violated 18 U.S.C. § 1962(c) and (d), which provide as follows:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection ... (c) of this section.

18 U.S.C. § 1962(c), (d). Parsed and labeled, subsection (c) requires a showing of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *accord Asa–Brandt, Inc. v. ADM Investor*

*Servs., Inc.,* 344 F.3d 738, 752 (8th Cir. 2003); *Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir.1997); *see also In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.,* 340 F.3d 749, 767 (8th Cir.2003); *United HealthCare Corp. v. Am. Trade Ins. Co.,* 88 F.3d 563, 570 (8th Cir.1996); *Blue Dane Simmental Corp. v. Am. Simmental Ass'n,* 178 F.3d 1035, 1041 (8th Cir.1999). Subsection (d) requires a showing of a conspiracy to violate, among other provisions, subsection (c).

 Defendants argue Plaintiffs' RICO claim fails in six ways. The Court focuses on Defendants' claim that Plaintiffs have failed to allege the existence of a racketeering activity. Failure to include sufficient allegations on one element of a RICO claim, of course, means the entire claim fails. *Sedima S.P.R.L.,* 473 U.S. at 496, 105 S.Ct. 3275.

### (a) Applicable Legal Standards.

To demonstrate a violation of either section 1962(c) or (d), Plaintiffs must demonstrate the existence of or a conspiracy to engage in a pattern of racketeering, which must include at least two acts of racketeering activity. *Id.* §§ 1961(4)-(5), 1963(c)-(d). The two acts of racketeering activity selected by Plaintiffs are wire and mail fraud. *See id.* §§ 1341 (mail fraud), 1343 (wire fraud). Because the two predicate acts require fraud, the heightened (but potentially "relaxed") pleading standards of Rule 9(b) apply. *See Joshi,* 441 F.3d at 560 n. 4; *Abels,* 259 F.3d at 920; *Murr Plumbing,* 48 F.3d at 1069; *Flowers,* 775 F.2d at 1054.

### (b) Analysis.

The Court focuses on the paragraphs in the Third Amended Complaint Plaintiffs claim render their amendments not futile. *See* Reply Br. in Supp. of Mot. to Amend 8 (citing Third Am. Compl. ¶¶ 11, 25, 39, 40–48). Plaintiffs first allege The Masters Circle, The Masters LLC, and Markson Management "engaged in the ongoing and continuous course of conduct as alleged herein." Third Am. Compl. ¶ 11. Plaintiffs then point to seventeen "questions of law and fact" common to the all members of the proposed Plaintiff class. *See id.* ¶ 25(a)-(q). Not one of these paragraphs alleges the use of the mails or wires.

 The second group of allegations are in a section labeled "The Conspiracy or Enterprise." Upon payment of membership dues, Plaintiffs allege each chiropractor received with an enrollment package a copy of The Masters Circle Manual, which contained techniques and teachings applied by chiropractors. *Id.* ¶ 39. Plaintiffs also allege chiropractors received from The Masters Circle one-on-one coaching (by use of a toll-free telephone number or through e-mail correspondence), computerized data relevant to their practices, and various newsletters and products. *Id.* ¶ 40; *see also id.* ¶ 42 (describing a conspiracy effected "through the use of [The Masters Circle] Manual, coaches, e-mails, newsletters, seminars and other training sessions"). Defendants are accused of "often utiliz[ing] interstate commerce to exchange information relating to this conspiracy through their seminars, telephone calls, PODs, e-mail, and the mail." *Id.* ¶ 44; *see also id.* ¶ 46(a) (identifying "meetings and conversations throughout the United States" as a place where the alleged conspiracy was furthered). Plaintiffs conclude with a pair of conclusory statements essentially quoting the mail and wire fraud statutes. *See id.* at ¶¶ 109–110. Comparing these paragraphs to a case with sufficient allegations reveals why Plaintiffs have failed to allege a pattern of racketeering.

In *Abels v. Farmers Commodities Corp.,* a group of farmers brought a class action against a futures commission merchant and the manager of its wholly-owned sub-

sidiary and introducing broker alleging, among other things, RICO violations in connection with the manager's solicitation of farmers to purchase "hedge-to-arrive" futures contracts from a grain elevator. *Abels*, 259 F.3d at 914–15. As here, the plaintiffs used mail and wire fraud as the crimes forming the pattern of racketeering. To support allegations of wire fraud, the plaintiffs alleged as follows:

As part of the fraudulent scheme, from no later than January, 1993 through April 1996, [the futures commission merchant] and [the broker] made and caused the use of interstate telephone lines to effectuate calls every day between [the futures commission merchant] and [the broker] and:

A. Various Plaintiffs herein to solicit [hedge-to-arrive] contracts and to confirm [farmers wished to exercise certain options available under the contracts].

B. With [the grain elevator] to place and execute orders for commodity futures contracts reflected in the monthly statements.

*Id.* at 918. The complaint referenced documents "appear[ing] to be copies of monthly statements of the [e]levator's account with [the futures commission merchant]." *Id.* To support allegations of wire fraud, the plaintiffs alleged,

As part of the scheme, from no later than January, 1993 through April 1996, [the futures commission merchant] and [the broker] caused the mailing of:

A. Commodity statements to [the elevator] each month from no later than January, 1993 through April, 1996;

B. A confirmation of each trade reflected on such monthly statements at the time the dates shown [sic] for such transactions;

C. Contracts and [confirmations regarding options available under the contracts] by [the elevator] to each of the Plaintiffs which in turn caused [the ele-

vator] to enter into corresponding futures positions in its . . . account [held by the futures commission merchant]; and

D. Exhibit "Z" hereto, to over 700 recipients.

*Id.* at 918–19 (quotation marks and citations omitted). Exhibit "Z" was a copy of a flyer relating to a meeting about the contracts equipped with a date and location for the meeting. *Id.* Elsewhere, the complaint set forth the

times and places of numerous meetings, marketing seminars, and private conversations in which misrepresentations are claimed to have been made. It names the parties to those communications and describes the content of the claimed false statements. It names the plaintiffs who allegedly relied on these statements in deciding to begin writing [hedge-to-arrive] contracts with [the elevator], and it states the monetary damage to each plaintiff that is claimed to have resulted from that venture.

*Id.* at 920.

The district court found the plaintiffs' allegations of mail and wire fraud insufficient. Reversing, the Eighth Circuit first noted the mail and telephone exchanges did not contain any alleged misrepresentations but were simply "ordinary business letters and phone calls." *Id.* As a result, the circumstances surrounding the mail and telephone exchanges were not "circumstances surrounding fraud" for purposes of Rule 9(b). *Id.* (quotation marks omitted). Because there was "no risk of damage to a defendant's reputation" from allegations of garden variety business communications, the court concluded the intent of Rule 9(b) would not be unserved by dismissal. *Id.* at 920–21.

The case at bar is different. Although they do not say why, Plaintiffs believe the communications between The Masters Cir-

cle and its members were not innocuous but formed the backbone of the enterprise through which the purported frauds occurred. *See* Third Am. Compl. ¶¶ 106–108. While there would be no danger of harm to a chiropractor's reputation by alleging the occurrence of telephone calls to a professional association to ask for a recommendation on a course of care, there is certainly a danger when the allegation is that the call was placed for the purpose of reciting a "script" or learning about a "heavy-handed" practice the chiropractor can use to defraud patients.

Second, the *Abels* court observed that many of the communications were between the futures commission merchant and the broker. *Abels*, 259 F.3d at 921. The court reasoned that it would be unreasonable to "expect highly specific allegations before allowing at least a brief discovery period" because the facts needed were "known to the defendants, but the plaintiffs have not yet had a chance to find them out." *Id.* While it could be fair to wedge this case into the murky ground between Rule 9(b) and Rule 8(a) these types of cases sometimes occupy because the communications at issue are not typically public, Plaintiffs have failed to include such basic allegations as who they believe caused to be mailed or transmitted the offending information, when and where Plaintiffs believe it was mailed or transmitted to, and which matter was transmitted through the mails and which was sent through the wires. They have not alleged how these communications were carried out through an association in fact or other conglomeration in which each Defendant played a managerial or operational role *separate from* the activities giving rise to the alleged frauds. If there were at least some description of the activity in which Plaintiffs believe Defendants engaged that amounts to mail or wire fraud, the Court would be more sympathetic to the lack of rich factual allegations typical of one standing outside a racket holding nothing more than disorganized and broken tesserae.[52]

Third, the *Abels* court found persuasive the fact that the plaintiffs had attached to their pleadings a summary of dates and contents of the defendants' mail communications, which gave "the defendants notice of specifically when and how they are claimed to have used the mails in furtherance of a scheme to defraud." *Abels*, 259 F.3d at 921. Here, Plaintiffs have done no such thing. In fact, Plaintiffs have not specifically accused Kerkhoff and any employee of The Masters Circle of communicating over the phone or through the mail, when these communications occurred, or what Plaintiffs believe the substance of these communications were (except for the

---

**52.** To provide one basic example of a deficiency in the Third Amended Complaint, Plaintiffs have not alleged which of the two types of mail or wire fraud they believe occurred in this case. *See Murr Plumbing*, 48 F.3d at 1069 n. 6. If Plaintiffs think these are frauds where misrepresentations occurred, they have not "charge[d] that [D]efendants made any representations to [P]laintiffs known at the time to be false." *See Flowers*, 775 F.2d at 1054. If this is a case where no misrepresentation occurred, Plaintiffs have not sufficiently alleged either a scheme to defraud or an intent to defraud on the part of Defendants. *See Murr Plumbing*, 48 F.3d at 1069 n. 6; *Atlas Pile Driving Co. v. DiCon Fin.*

*Co.*, 886 F.2d 986, 991 (8th Cir.1989). In all likelihood Plaintiffs intended to allege frauds in which no misrepresentations were made because under that version, a "scheme to defraud" includes "deceptive practices to induce the unwary to give up money or some other tangible property interest," which somewhat tracks the course of conduct in which Plaintiffs appear to have alleged Defendants engaged. *See Atlas Pile Driving*, 886 F.2d at 991. Of course, the fact that the Court is required to guess demonstrates the Third Amended Complaint's failure to notify one required to mount a defense exactly what to defend against.

conclusory allegation that the communications must have been designed to perpetrate a fraud).

Plaintiffs have failed to plead the commission of either mail or wire fraud with the required degree of specificity. Absent such allegations, Plaintiffs cannot sufficiently state a claim that Defendants engaged in or conspired to commit a pattern of racketeering. And without a pattern of racketeering, there can be no RICO violation.

### (c) Conclusion.

The Third Amended Complaint fails to allege a pattern of racketeering activity or a conspiracy to engage in a pattern of racketeering activity. As a result, Plaintiffs have not stated a claim under the federal RICO statute.

### ii. Tortious Interference Claims.

Next, Defendants argue the addition of Plaintiffs' "interference with existing relations" and "interference with prospective relations" claims should be disallowed because the allegations supporting those claims do not state claims upon which relief could be granted.

### (a) Elements of the Claims.

 To succeed on a claim of intentional interference with prospective business advantage under Iowa law, a plaintiff must allege and prove the following elements:

1. The plaintiff had a prospective contractual [or business] relationship with a third person.

2. The defendant knew of the prospective relationship.

3. The defendant intentionally and improperly interfered with the relationship in one or more particulars.

4. The interference caused either the third party not to enter into or to continue the relationship or the interference prevented the plaintiff from entering into or continuing the relationship.

5. The amount of damage.

*Tredrea v. Anesthesia & Analgesia, P.C.,* 584 N.W.2d 276, 283 (Iowa 1998); *accord Willey v. Riley,* 541 N.W.2d 521, 527 (Iowa 1995); *Econ. Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 651 (Iowa 1995); *Nesler v. Fisher & Co.,* 452 N.W.2d 191, 198–99 (Iowa 1990); *see also* Restatement (Second) of Torts § 766B (1979). The tort can be caused by "inducing a third person not to enter into a prospective relation or preventing the other from acquiring or continuing such a relation." *Tredrea,* 584 N.W.2d at 287 (citing *Nesler,* 452 N.W.2d at 195); *see also Econ. Roofing & Insulating,* 538 N.W.2d at 651 ("A defendant's interference with a . . . prospective business relationship is intentional if the defendant either interferes with the . . . prospective business relationship on purpose or knows the conduct is substantially certain to interfere with the . . . prospective business relationship." (quotation marks omitted)).

 When alleging interference with a business relationship that has not yet been consummated, a defendant must act with "the sole or predominant purpose . . . to financially injure or destroy the plaintiff" to be liable. *Tredrea,* 584 N.W.2d at 283; *accord Compiano v. Hawkeye Bank & Trust of Des Moines,* 588 N.W.2d 462, 464 (Iowa 1999); *Willey,* 541 N.W.2d at 526–27 (collecting cases); *Econ. Roofing & Insulating,* 538 N.W.2d at 651–52; *Burke v. Hawkeye Nat'l Life Ins. Co.,* 474 N.W.2d 110, 114 (Iowa 1991); *Harsha v. State Savings Bank,* 346 N.W.2d 791, 799 (Iowa 1984); *see also Nesler,* 452 N.W.2d at 199 ("In a claim of interference with a prospective business advantage, the 'purpose on the defendant's part to financially injure or destroy the plaintiff is essential.' ") (quoting *Page County Appliance Ctr. v. Honeywell,* 347 N.W.2d 171, 177 (Iowa 1984)); *Farmers Co-op. Elevator, Inc., Duncombe*

v. State Bank, 236 N.W.2d 674, 679 (Iowa 1975) ("In cases of interference with existing contracts, a purpose to injure or destroy is not essential. The situation is different in cases involving interference with prospective advantage." (citation omitted)). Where "a defendant acts for two or more purposes, [the] improper purpose must predominate in order to create liability." Tredrea, 584 N.W.2d at 283 (citing Willey, 541 N.W.2d at 526–27); accord Harsha, 346 N.W.2d at 799. A plaintiff making such allegations is "held to a strict standard" that the improper purpose predominated because such a rule "operates 'to avoid opening the door to virtually limitless suits of highly speculative and remote nature.'" Tredrea, 584 N.W.2d at 287 (quoting Page County Appliance Ctr., 347 N.W.2d at 178).

 The elements of the tort of intentional interference with an existing relationship are well established under Iowa law. To succeed, a plaintiff must plead and prove the following:

1. [P]laintiff had a [business relationship or] contract with a third party;

2. [D]efendant knew of the [business relationship or] contract;

3. [D]efendant intentionally and improperly interfered with the [business relationship or] contract;

4. [T]he interference caused the third party [or the plaintiff] not to perform, or made performance more burdensome or expensive; and

5. [D]amage to the plaintiff resulted.

Green v. Racing Ass'n of Cent. Iowa, 713 N.W.2d 234, 243 (Iowa 2006) (quotation marks omitted); accord Gibson v. ITT Hartford Ins. Co., 621 N.W.2d 388, 399 (Iowa 2001); Jones v. Lake Park Care Ctr., Inc., 569 N.W.2d 369, 377 (Iowa 1997); Water Dev. Co. v. Bd. of Water Works, 488 N.W.2d 158, 161 (Iowa 1992); Nesler, 452 N.W.2d at 198.

#### (b) Allegations of the Third Amended Complaint.

Plaintiffs allege "The Masters Circle, Markson, Hoffman, Perman, and others known and unknown knew that Kerkhoff, Kerkhoff Chiropractic, and other chiropractic members of [T]he Masters Circle had existing contractual and chiropractor-patient relationships." Third Am. Compl. ¶ 117. The same individuals are accused of having knowledge of "prospective contractual and chiropractor-patient relationships." Id. ¶ 122. Plaintiffs contend Defendants "intentionally and improperly interfered with [existing and prospective contractual and chiropractor-patient relationships] by causing, aiding, abetting, and/or inducing that sale and purchase of unnecessary and inappropriate chiropractic services to and by Plaintiffs ..." as detailed elsewhere in their pleadings. Id. ¶¶ 118, 123. This conduct was undertaken "for the sole or primary purpose of improperly maximizing profits and injuring Plaintiffs ..." Id. ¶ 119, 124. As a result, Plaintiffs contend, The Masters Circle, Hoffman, Markson, and Perman allegedly committed the torts of intentional interference with existing and prospective contractual and business relationships.

#### (c) Arguments of the Parties.

Defendants claim the Third Amended Complaint lacks allegations that Defendants were aware of contracts or relationships between Kerkhoff and any Plaintiff, knew about the existence of any particular Plaintiff, or intended to financially injure or destroy any particular Plaintiff. Responding, Plaintiffs contend the allegations in the Third Amended Complaint are sufficient to state claims upon which relief could be granted, thereby defeating Defendants' contention that the addition of Plaintiffs' tortious interference claims would be futile.

### (d) Analysis.

■ Beginning with Plaintiffs' intentional interference with existing relationships claim, while Plaintiffs allege The Masters Circle, Hoffman, Markson, and Perman intentionally and improperly interfered with "contractual and chiropractor-patient relationships" by "causing, aiding, abetting, and/or inducing the sale and purchase of unnecessary and inappropriate chiropractic services to and by Plaintiffs," they have not explained how the purchase of either "unnecessary [or] inappropriate chiropractic services" resulted in any type of interference with a relationship (contractual or otherwise) between the Plaintiffs and their chiropractors. In fact, the purported scheme to convince patients to purchase unnecessary chiropractic care *depended* on the existence and strength of the patient-chiropractor relationship. Any intentional interference with that relationship militates against a finding that Plaintiffs suffered any damages.

With respect to Plaintiffs' intentional interference with prospective relationships claim, Plaintiffs have not identified a single patient who *intended* to seek care by Kerkhoff (or any other chiropractor) but who, as a result of some conduct by The Masters Circle, Hoffman, Markson or Perman, was prevented or persuaded not to enter into a such a relationship. While Plaintiffs need not exhaustively identify each and every proposed class member to comply with Rule 8(a), they must at least identify the individual bringing the cause of action.

### (e) Conclusion.

Plaintiffs' allegations supporting their intentional interference with existing and prospective business and contractual relations claim fall well short of stating a legal claim. Consequently, it would be futile to add these allegations to any amended pleading.

### iii. Conclusion.

The portions of the Third Amended Complaint Plaintiffs assert state claims for relief for RICO violations and tortious interference are deficient. As a result, permitting Plaintiffs to add these claims would be futile.

### c. Conclusion.

Plaintiffs' Motion to Amend is **granted in part and denied in part.** The motion is granted insofar as Plaintiffs wish to add The Masters LLC and Markson Management as Defendants. The motion is denied in all other respects.

## V. Motion Seeking Leave to Amend to Cure Deficiencies.

At a variety of points in their papers, Plaintiffs contend their arguments sufficiently defeat Defendants' motions seeking dismissal but alternatively claim that, if the Court deems their arguments insufficient, they be granted leave to amend their pleadings to cure whatever deficiencies the Court finds. The Court exceeds its proper role by advising Plaintiffs how to properly plead their claims; its function is to evaluate the claims the Plaintiffs elect to assert. As a result, Plaintiffs' motion seeking leave to amend their pleadings to cure any deficiencies brought to light by Defendants' motion is denied. *See United States ex rel. Lee v. Fairview Health Sys.,* 413 F.3d 748, 749–50 (8th Cir.2005).

The docket in this case is cluttered with nearly a dozen versions of various Complaints. Wherever the proper line exists where Plaintiffs have had enough attempts to massage and refine their factual allegations to state the minimum allegations needed, that line has been crossed. It is now time for this case to proceed.

## CONCLUSION

Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Clerk's No 22) is **granted in part and denied in part.** The Court cannot exercise personal jurisdiction over Markson, Hoffman, and Perman but finds that The Masters Circle has sufficient contacts with Iowa to comport with due process. Defendants' Motion to Dismiss for Failure to State a Claim (Clerk's No. 21) is also **granted in part and denied in part.** The Court concludes Plaintiffs have failed to state a claim upon which relief could be granted with respect to purported violations of the Iowa ongoing criminal conduct statute, the federal RICO statute, and the tort of unjust enrichment with respect to The Masters Circle, Hoffman, Markson, and Perman. Plaintiffs have stated a claim for civil conspiracy against Kerkhoff and The Masters Circle, with an unjust enrichment claim against Kerkhoff as the underlying actionable wrong.

Plaintiffs' Motion to Amend (Clerk's No. 33) is also **granted in part and denied in part.** Plaintiffs are directed to file a document titled "Fourth Amended Complaint," wherein they may add The Masters LLC and Markson Management as Defendants, stating whatever appropriate claims against these new parties. If Plaintiffs wish a limited period of discovery before filing that document to explore the jurisdictional and factual bases for any potential claims, the Court will entertain that suggestion by separate motion.

**IT IS SO ORDERED.**